**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

TOMAS ZAVALIDROGA, individually and as Power
of Attorney of Margaret Zavalidroga,

                                 **Plaintiffs,**

v.

THERESA GIROUARD, et al.,

                                 **Defendants.**

6:17-cv-682 (BKS/ATB)

_____

**APPEARANCES:**

Tomas Zavalidroga
Old Forge, NY
Plaintiff, pro se

**Hon. Brenda K. Sannes, United States District Judge:**

### MEMORANDUM-DECISION AND ORDER

On June 20, 2017, pro se Plaintiff Tomas Zavalidroga ("TZ") commenced this civil rights action under 42 U.S.C. § 1983, "individually and as Power of Attorney [for] Margaret Zavadriloga" ("MZ"), against twenty-one Defendants, including New York Supreme Court Justice Samuel Hester, Town Justice Paul Tryon, MZ's court-appointed guardian Theresa Girouard, the "State-employed Guardianship evaluators" Charles Massoud-Tastor and Stuart Finer, local government units, local law enforcement officials, and private parties. (Dkt. No. 1). The Complaint seeks monetary, injunctive, and declaratory relief, and asserts four "causes of action": (1) under 42 U.S.C. §§ 1981, 1983, and 1985, for alleged deprivation of his "federal rights, property interests," and discrimination; (2) under the First, Fourth, Fifth, Sixth, and Fourteenth Amendments to the U.S. Constitution, for alleged deprivation of "due process and

significant liberty and property interests"; (3) under state law, for alleged "false arrest and false imprisonment, trespass and conversion of property"; and finally (4) under the International Covenant on Civil and Political Rights (the "ICCPR"), for alleged violations of the "international human rights of the Plaintiff and his privies." (Dkt. No. 1, at 8-10).

This matter was referred to United States Magistrate Judge Andrew T. Baxter, who issued an Order and Report-Recommendation on July 7, 2017. Having reviewed the Complaint pursuant to 28 U.S.C. § 1915(e)(2)—which provides for dismissal of proceedings in forma pauperis if the action is frivolous, fails to state a claim, or seeks monetary relief from an immune defendant—Magistrate Judge Baxter recommended dismissal without prejudice of all the claims brought on behalf of MZ, and dismissal with prejudice of all the claims brought directly by TZ as against all Defendants. (Dkt. No. 4, at 35-36). TZ filed objections to the Report-Recommendation on July 24, 2017.

This Court reviews de novo those portions of the Magistrate Judge's findings and recommendations that have been properly preserved with a specific objection. *Petersen v. Astrue*, 2 F. Supp. 3d 223, 228-29 (N.D.N.Y. 2012); 28 U.S.C. § 636(b)(1)(C). "A proper objection is one that identifies the specific portions of the [Report and Recommendation] that the objector asserts are erroneous and provides a basis for this assertion." *Kruger v. Virgin Atl. Airways, Ltd.*, 976 F. Supp. 2d 290, 296 (E.D.N.Y. 2013) (quoting *DuBois v. Macy's Retail Holdings, Inc.*, 11-cv-4904, 2012 WL 4060586, at *1, 2012 U.S. Dist. LEXIS 131678, at *3 (E.D.N.Y. Sept. 13, 2012)). Properly raised objections must be "specific and clearly aimed at particular findings" in the Report. *Molefe v. KLM Royal Dutch Airlines*, 602 F. Supp. 2d 485, 487 (S.D.N.Y. 2009). Findings and recommendations as to which there was no properly preserved objection are reviewed for clear error. *Id.* "To the extent . . . that the party makes only

conclusory or general arguments . . . the Court will review the Report strictly for clear error."

*DiPilato v. 7-Eleven, Inc.*, 662 F Supp. 2d 333, 339 (S.D.N.Y. 2009).

First, TZ objects to dismissal because the "factual background of the action" cannot be established before "the requisite pre-trial conference" or Defendants' answer, and because the Magistrate Judge cannot provide "for the amending of the pro se Complaint." (Dkt. No. 5, at 1). Magistrate Judge Baxter did not base his dismissal on factual grounds. Instead, he ruled that, as a matter of law, TZ could not represent MZ and that TZ's direct claims should be dismissed for various reasons—including lack of jurisdiction, failure to state a claim, and absolute immunity. (*See* Dkt. No. 4, at 9-35). The Magistrate Judge's Report-Recommendation contains a thorough and accurate recitation of the relevant facts alleged in the Complaint. (*See* Dkt. No. 4, at 1-8). TZ's first objection is therefore meritless.

Second, TZ appears to argue that he has alleged new facts and causes of action and is not precluded from relitigating issues decided in prior proceedings. (Dkt. No. 5, at 1). The Report-Recommendation, however, does not discuss preclusion but the distinct *Rooker-Feldman* doctrine. *See Dubin v. County of Nassau*, No. 16-cv-4209, 2017 WL 4286613, at *5, 2017 U.S. Dist. LEXIS 159117, at *11 (E.D.N.Y. Sept. 27, 2017) (noting that the *Rooker-Feldman* "doctrine was once improperly equated with that of *res judicata*"). TZ's second objection thus provides no basis for rejecting the Report-Recommendation.[1]

Having reviewed the rest of the Report-Recommendation for clear error, the Court adopts the Report-Recommendation in its entirety except for the recommendation that the claims against Defendant Oneida County Sheriff's Deputy Ryan Marshall arising out of the allegedly false

---

[1] TZ also argues that it is "impermissible for a corrupt State Court to create its own procedural justifications and causes of action by negating federally protected contracts." (Dkt. No. 5, at 1). This is not an objection to any specific finding or conclusion in the Report-Recommendation. Accordingly, this argument also fails.

arrest and malicious prosecution that occurred on or about February 9, 2016 be dismissed with prejudice. As Magistrate Judge Baxter recognized, the pendency of the state criminal proceeding against TZ warrants this Court's abstention under *Younger v. Harris*, 401 U.S. 37, 43-54 (1971), but a dismissal under the *Younger* abstention doctrine is ***without prejudice*** to a federal plaintiff's resumption of federal litigation after the state criminal proceeding has ended. *See, e.g.*, *Novie v. Village of Montebello*, No. 10-cv-9436, 2012 WL 3542222, at *14, 2012 U.S. Dist. LEXIS 115948, at *51 (S.D.N.Y. Aug. 16, 2012) (dismissing a plaintiff's claims without prejudice under the *Younger* abstention doctrine). Therefore, TZ's complaint is dismissed with prejudice, except for his false arrest and malicious prosecution claims against Defendant Ryan Marshall, which are dismissed without prejudice.

For these reasons, it is hereby

**ORDERED** that the Report-Recommendation (Dkt. No. 4) is **ACCEPTED** in its entirety, except for the recommendation that the false arrest and malicious prosecution claims against Defendant Ryan Marshall be dismissed with prejudice; and it is therefore

**ORDERED** that, to the extent the Complaint (Dkt. No. 1) relates to MZ, that no guardian be appointed, and the Complaint be **DISMISSED** in its entirety without prejudice; and it is further

**ORDERED** that, as it relates to TZ, the Complaint (Dkt. No. 1) is **DISMISSED WITH PREJUDICE** in its entirety as against all Defendants, except for TZ's claims against Defendant Ryan Marshall regarding the alleged February 9, 2016 false arrest and malicious prosecution, which are **DISMISSED WITHOUT PREJUDICE**; and it is further

**ORDERED** that the Clerk of Court shall serve a copy of this Memorandum-Decision and Order on Plaintiff in accordance with the Local Rules along with copies of the unpublished decisions cited in this decision.

**IT IS SO ORDERED.**

Dated: October 24, 2017
       Syracuse, New York

Brenda K. Sannes
U.S. District Judge

2017 WL 4286613
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Benjamin DUBIN and Byron Alston, on behalf of
themselves and all others so similarly situated,
Plaintiffs,
v.
The COUNTY OF NASSAU, the Nassau County
Legislature, and the Nassau County Traffic and
Parking Violations Agency, Defendants.

No 16–CV–4209 (JFB) (AKT)
|
Signed September 27, 2017

**Attorneys and Law Firms**

Plaintiffs are represented by Kevin Page, Kiel Martin
Doran, and Steven M. O'Connor of O'Connor Reed, LLP,
242 King Street Port Chester, New York 10573.

Defendants are represented by Andrew Reginald Scott of
the Nassau County Attorney's Office, 1 West Street,
Mineola, New York 11501.

### MEMORANDUM AND ORDER

Joseph F. Bianco, District Judge:

**\*1** Plaintiffs Benjamin Dubin ("Dubin") and Byron
Alston ("Alston," and with Dubin, "plaintiffs") bring this
putative class action against defendants the County of
Nassau (the "County"), the Nassau County Legislature
(the "Legislature"), and the Nassau County Traffic and
Parking Violations Agency (the "TPVA") (collectively,
"defendants") alleging (1) a cause of action for violations
of various federal constitutional rights[2] pursuant to 42
U.S.C. § 1983 ("Section 1983"); (2) a claim under the
Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202;
and (3) eighteen claims under New York State law for
myriad constitutional and statutory infractions.[3] The
gravamen of plaintiffs' Second Amended Complaint
("SAC") is that defendants have unlawfully enacted and
enforced a local ordinance known as the Drivers'
Responsibility Fee (the "DRF"), Nassau Cty. Ordinance
190–2012.[4] The DRF allegedly imposes a mandatory
payment of $45 on all motorists who have been issued

tickets or citations and received a final disposition other
than "not guilty."

[1]  At oral argument on the instant motion, plaintiffs
     conceded that the TPVA is a non-suable entity under
     New York State law. Accordingly, the Court dismisses
     the TPVA from this action.

[2]  Specifically, plaintiffs allege bill of attainder,
     procedural due process, substantive due process, unjust
     takings, equal protection, excessive fines, and double
     jeopardy violations by defendants.

[3]  Plaintiffs also consented to dismissal of Count 20 of the
     SAC brought pursuant to Article 78 of the New York
     Civil Practice Law and Rules, N.Y. C.P.L.R. § 7801 et
     seq. The Court, therefore, dismisses that claim.

[4]  Nassau County Ordinance 190–2012 amended Nassau
     County Ordinance 16–2011, which is the provision
     cited in the SAC, and it appears to be the operative
     ordinance governing the DRF. See Guthart v. Nassau
     Cty., 55 Misc.3d 827, 52 N.Y.S.3d 821, 824 (Sup. Ct.
     Nassau Cty. 2017).

Defendants now move to dismiss the SAC pursuant to
Federal Rule of Civil Procedure 12(b)(6)[5] on the
following grounds: (1) the Rooker–Feldman doctrine bars
plaintiffs' claims; (2) the Court should abstain from
adjudicating the Section 1983 claim due to ongoing New
York State court proceedings; (3) the Court should
decline jurisdiction over plaintiffs' second cause of action
for a declaratory judgment; (4) all of plaintiffs' federal
claims under Section 1983 fail to state a cause of action;
and (5) in the absence of a viable federal claim, the Court
should not exercise supplemental jurisdiction over
plaintiffs' New York State law claims.

[5]  As discussed infra, defendants argue that there is no
     subject matter jurisdiction over this action; accordingly,
     the Court will also treat this motion as one to dismiss
     pursuant to Rule 12(b)(1).

As an initial matter, the Court concludes that (1) the
Rooker–Feldman does not bar any claims in this case, and
(2) abstention is unwarranted on the federal claims. On
the merits, the Court finds that plaintiffs have not pled a

plausible cause of action based on their bill of attainder, procedural due process, substantive due process, unjust takings, equal protection, and double jeopardy allegations. However, the Court denies the motion to dismiss the excessive fines claim under Section 1983 on the ground raised by defendants—namely, that the DRF cannot be punitive because it is not imposed following a criminal or quasi-criminal proceeding and is assessed to defray administrative costs. Because it was not raised by defendants, the Court does not reach the second issue with respect to the excessive fines claim—that is, whether a $45 fine can be unconstitutionally excessive.

**\*2** Accordingly, because a federal claim has survived defendants' motion, the Court retains supplemental jurisdiction over plaintiffs' state law claims and will not dismiss them at this stage. Thus, for the reasons set forth below, the Court grants defendants' motion in part and denies it in part.

## I. BACKGROUND

### A. Factual Background
The Court takes the following facts from the SAC. (ECF No. 23.) The Court assumes these facts to be true for purposes of deciding this motion and construes them in the light most favorable to plaintiffs as the non-moving party.

#### 1. The Parties
Plaintiffs Dubin and Alston are both New York State residents and were respectively assessed a DRF on September 4, 2015 and July 7, 2016. (SAC at ¶¶ 7–8.) The County is a local New York government governed by the Legislature, which established the TPVA and enacted ordinances related to the DRF. (*Id.* at ¶¶ 9–10.)

#### 2. Nature of the Action
This case arises out of "defendants' unlawful assessment of [the DRF] against motorists who have had tickets and/or citations dismissed by the" TPVA court. (*Id.* at ¶ 1.) Plaintiffs allege that the DRF mandates a $45 payment by all motorists who receive citations or tickets and a "final disposition other than not guilty," and although "characterized as a 'fee,' this charge is in fact a non-discretionary penalty imposed merely for having been issued a ticket, and the TPVA Court must charge the

penalty even when the tickets against the individuals have been dismissed ...." (*Id.* at ¶ 2; *see also id.* at ¶ 28 ("This is a legislative penalty, and is not based on an actual adjudication by any Court after a hearing or other opportunity to be heard.").)

The SAC further states that the "TPVA has created a chilling-effect to [sic] individual citizens who come before that Court, as the[ ] only way that the[y] can dispute the penalty is to go to trial, which requires time, effort, and costs just to dispute the DRF." (*Id.* at ¶ 4.) As a result, "only approximately 1% of individuals who are issued tickets elect to proceed to trial," notwithstanding that "for those individuals whom [sic] make an appearance before the TPVA Court, over 40% of all tickets are dismissed." (*Id.* at ¶¶ 4, 30.) In sum, plaintiffs assert that the DRF "has nothing to do with 'administrative costs' relating to issuing tickets/citations" but is rather a punishment imposed "against individuals for simply being issued a ticket without any findings of fact, nor proof of any actual violations," and "irrespective of whether or not they are actually guilty of any offense or violation ...." (*Id.* at ¶¶ 32–34.) Moreover, the SAC alleges that the DRF's underlying aim is to generate revenue for the County to help defray budget deficits. (*Id.* at ¶¶ 34–40.)

#### 3. Plaintiffs' Alleged Injuries
On or about July 31, 2015, Dubin was issued a ticket with an appearance date of September 11, 2015 for a defective brake light on his vehicle. (*Id.* at ¶¶ 16–17, Exh. A.) After Dubin repaired the brake light and had his vehicle inspected by a County police officer, the TPVA dismissed the ticket but nevertheless assessed a DRF.[6] (*Id.* at ¶¶ 18–20, Exhs. B–C.)

[6]    At that time, the DRF required Dubin to pay $30. (*Id.* at ¶ 19; *see also id.* at ¶ 2 n.2.)

Alston appeared before the TPVA on or about July 7, 2016 regarding seven outstanding tickets or citations. (*Id.* at ¶ 23, Exh. F.) He pled guilty to four offenses, and the TPVA dismissed the remaining three tickets/citations. (*Id.*) The TPVA assessed Alston a DRF for each dismissed ticket, as well as a "deferred payment fee" of $15 per ticket, for an approximate total cost of $180. (*Id.* at ¶ 24.)

**\*3** Among other relief, plaintiffs seek, on behalf of themselves and a class of other similarly situated individuals, a declaration that the "DRF violates the

Constitutional protections of the Fifth, Eighth and Fourteenth Amendments, and as well as [sic] other [federal] Constitutional Protections"; an injunction enjoining defendants from imposing the DRF; and reimbursement of all DRF charges and associated expenses. (*Id.* at ¶ 6.)

### B. Procedural Background
Dubin commenced this action on July 29, 2016 (ECF No. 3), and plaintiffs filed an amended complaint on October 20, 2016 (ECF No. 12) and the SAC on November 30, 2016 (ECF No. 23). Defendants moved to dismiss the SAC on January 13, 2017 (ECF No. 25) and provided supplemental legal authority in support of their motion on February 3, 2017 (ECF No. 28). Plaintiffs filed their opposition to the motion and defendants' supplemental letter on February 27, 2017 and March 2, 2017, respectively (ECF Nos. 30–31); and defendants replied on March 20, 2017 (ECF No. 33).

The Court heard oral argument on March 23, 2017 (ECF No. 34), and plaintiffs subsequently filed their own letter providing supplemental legal authority in support of their opposition on May 27, 2017 (ECF No. 38). The Court has fully considered all of the parties' submissions and arguments.

## II. STANDARDS OF REVIEW

Relevant here are Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), which respectively govern motions to dismiss for lack of subject matter jurisdiction and motions to dismiss for failure to state a claim. The following standards of review are applicable to motions brought under those provisions.

### A. Subject Matter Jurisdiction
To defeat a motion to dismiss brought under Rule 12(b)(1), "[t]he plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence." *Aurecchione v. Schoolman Transp. Sys., Inc.*, 426 F.3d 635, 638 (2d Cir. 2005). In resolving this issue, the court "must accept as true all material factual allegations in the complaint, but [it is] not to draw inferences from the complaint favorable to plaintiffs." *J.S. ex rel. N.S. v. Attica Cent. Schs.*, 386 F.3d 107, 110 (2d Cir. 2004). Additionally, the court "may refer to evidence outside the pleadings" to resolve the jurisdictional issue.

*Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000) (citing *Kamen v. Am. Tel. & Tel. Co.*, 791 F.2d 1006, 1011 (2d Cir. 1986)).

### B. Failure to State a Claim
In reviewing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *See Cleveland v. Caplaw Enters.*, 448 F.3d 518, 521 (2d Cir. 2006); *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100 (2d Cir. 2005). "In order to survive a motion to dismiss under Rule 12(b)(6), a complaint must allege a plausible set of facts sufficient 'to raise a right to relief above the speculative level.' " *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 91 (2d Cir. 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). This standard does not require "heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570, 127 S.Ct. 1955.

The Supreme Court clarified the appropriate pleading standard in *Ashcroft v. Iqbal*, setting forth a two-pronged approach for courts deciding a motion to dismiss. 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009). The Supreme Court instructed district courts to first "identify[ ] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679, 129 S.Ct. 1937 (explaining that though "legal conclusions can provide the framework of a complaint, they must be supported by factual allegations"). Second, if a complaint contains "well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* A claim has "facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* at 678, 129 S.Ct. 1937 (quoting and citing *Twombly*, 550 U.S. at 556–57, 127 S.Ct. 1955 (internal citation omitted)).

**\*4** The Court notes that in adjudicating a Rule 12(b)(6) motion, it is entitled to consider:

> (1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents 'integral' to the

complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint, (4) public disclosure documents required by law to be, and that have been, filed with the Securities and Exchange Commission, and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence.

*In re Merrill Lynch & Co.*, 273 F.Supp.2d 351, 356–57 (S.D.N.Y. 2003) (internal citations omitted), *aff'd in part and reversed in part on other grounds sub nom. Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005), *cert. denied*, 546 U.S. 935, 126 S.Ct. 421, 163 L.Ed.2d 321 (2005); *see also Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("[T]he district court ... could have viewed [the documents] on the motion to dismiss because there was undisputed notice to plaintiffs of heir contents and they were integral to plaintiffs' claim.").

## III. DISCUSSION

Defendants argue that the Court should dismiss the SAC because (1) the Court lacks jurisdiction under *Rooker*–Feldman; (2) the Court should abstain from considering the Section 1983 claim because it implicates pending New York State court proceedings; (3) the Court should decline jurisdiction over plaintiffs' declaratory judgment cause of action because it is dependent on plaintiffs' state law claims; and (4) plaintiffs' Section 1983 claim fails to state a cause of action because the SAC does not plausibly plead a violation of any federal constitutional right. Further, in the absence of a viable federal cause of action, defendants contend that the Court should decline supplemental jurisdiction over plaintiffs' remaining state law claims.

For the reasons set forth below, the Court concludes that *Rooker*–Feldman does not bar adjudication of this matter and that abstention on the Section 1983 and declaratory judgment claims is unwarranted. The Court further finds that plaintiffs' allegations do not plausibly plead a bill of attainder, procedural due process, substantive due

process, unjust takings, equal protection, or double jeopardy violation under Section 1983. However, the Court denies the motion to dismiss the excessive fines claim under Section 1983 on the ground raised by defendants—namely, that the DRF cannot be punitive because it is not imposed following a criminal or quasi-criminal proceeding and is assessed to defray administrative costs. Because it was not raised by defendants, the Court does not reach the second issue with respect to the excessive fines claim—that is, whether a $45 fine can be unconstitutionally excessive. Thus, because a federal claim survives defendants' motion, the Court retains supplemental jurisdiction over the pendant state law claims and will not dismiss them at this stage. Accordingly, defendants' motion is granted in part and denied in part.

### A. *Rooker*–Feldman

#### 1. Applicable Law

*5 The *Rooker*–Feldman doctrine arises from two decisions issued by the United States Supreme Court: *Rooker v. Fidelity Trust Company*, 263 U.S. 413, 44 S.Ct. 149, 68 L.Ed. 362 (1923); and *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462, 103 S.Ct. 1303, 75 L.Ed.2d 206 (1983). It stands for the proposition that "lower federal courts possess no power whatever to sit in direct review of state court decisions." *Atl. Coast Line R.R. Co. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 296, 90 S.Ct. 1739, 26 L.Ed.2d 234 (1970); *accord Hoblock v. Albany Cnty. Bd. of Elecs.*, 422 F.3d 77, 84 (2d Cir. 2005) ("[F]ederal district courts lack jurisdiction over suits that are, in substance, appeals from state-court judgments."). Though this doctrine was once improperly equated with that of *res judicata*, *see Moccio v. N.Y. State Office of Ct. Admin.*, 95 F.3d 195, 199–200 (2d Cir. 1996), the Supreme Court has clarified that *Rooker*–Feldman is jurisdictional in nature, whereas *res judicata* deals with preclusion, *see Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 293, 125 S.Ct. 1517, 161 L.Ed.2d 454 (2005) ("Preclusion, of course, is not a jurisdictional matter.") (citing Fed. R. Civ. P. 8(c) (listing *res judicata* as an affirmative defense)).

In *Hoblock,* the Second Circuit carefully reviewed the *Rooker*–Feldman doctrine in light of the Supreme Court's *Exxon Mobil* decision. *See Hoblock*, 422 F.3d at 83–92. Noting that *Exxon Mobil* had narrowed the scope of the *Rooker*–Feldman doctrine, the Second Circuit ruled that its application " 'is confined to cases of the kind from which the doctrine acquired its name: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court

proceedings commenced and inviting district court review and rejection of those judgments.' " *Id.* at 85 (quoting *Exxon Mobil*, 544 U.S. at 284, 125 S.Ct. 1517). Thus, the Second Circuit set forth four requirements for *Rooker–Feldman* to apply: (1) "the federal-court plaintiff must have lost in state court"; (2) "the plaintiff must complain of injuries caused by a state court judgment"; (3) "the plaintiff must invite district court review and rejection of that judgment"; and (4) "the state-court judgment must have been rendered before the district court proceedings commenced." *Id.* (footnote omitted). The Second Circuit has classified the first and fourth requirements as "procedural" and the second and third requirements as "substantive." *See id.*

2. Analysis

Defendants argue that *Rooker–Feldman* applies here because (1) "[p]laintiffs are challenging the fees incurred by them in appearing before and having their potential liability adjudicated before TPVA, an arm of the Nassau County District Court"; (2) plaintiffs' court-imposed DRF liability arose prior to commencement of the instant action; and (3) plaintiffs ask this Court to review and reject the TPVA's findings. (Defs.' Mem. of Law in Supp. of Mot. to Dismiss Second Am. Compl. ("Defs.' Br."), ECF No. 25–4, at 5.) The Court disagrees.

First, plaintiffs are not the quintessential "state court losers" to whom *Rooker–Feldman* pertains. Rather than litigating a state court proceeding and receiving an unfavorable judgment, plaintiffs allege that the TPVA dismissed their tickets or citations without a determination that they were guilty of any infraction. (*See* SAC at ¶¶ 2, 19–20, 24, 28.) Termination of a state court action without an adverse disposition is not a loss for *Rooker–Feldman* purposes. *See Green v. Mattingly*, 585 F.3d 97, 102 (2d Cir. 2009) ("We cannot say that [dismissal of the plaintiff's state family court proceeding] amount[ed] to a state-court *loss* for purposes of the *Rooker–Feldman* doctrine. Although there was no final adjudication in plaintiff's favor, there was also no final 'order of disposition' removing her child, and plaintiff secured the reversal of the one form of interlocutory relief entered against her. The *Rooker–Feldman* doctrine, therefore, does not bar plaintiff's claims, as she did not 'lose' in state court." (citations omitted)); *see also V.S. v. Muhammad*, 595 F.3d 426, 430 (2d Cir. 2010) (same); *Bertuglia v. City of New York*, 839 F.Supp.2d 703, 718 (S.D.N.Y. 2012) (holding that *Rooker–Feldman* did not bar Section 1983 claims stemming from a criminal prosecution because "the plaintiffs succeeded in having the state court indictments against them dismissed, and thus there was no 'extant and controlling' judgment with

continuing 'legal effect' in their case" (citation omitted)).

*6 Moreover, plaintiffs claim that imposition of the DRF is a non-discretionary and non-appealable legislative mandate. (SAC at ¶ 58 ("The individual motorist cannot dispute the DRF before the TPVA Court whatsoever, the TPVA judges are not provided a trial on the DRF itself, and there is no appeals process for the DRF." (citing *People v. Stamos*, 51 Misc.3d 136(A), 38 N.Y.S.3d 832 (App. Term. 2016) (holding that the imposition of a $30 fee by the TPVA following dismissal of a charge of operating an unregistered motor vehicle was not reviewable on appeal because "the $30 fee here was not made in conjunction with a judgment of conviction or sentence and does not come before this appellate court upon an appeal from a judgment of conviction"))).) Under such circumstances, the "narrow rule" of *Rooker–Feldman* does not apply. *See Green*, 585 F.3d at 103 ("Here, however, plaintiff brings a § 1983 action only after the Family Court proceedings were dismissed without a final order of disposition. Her action, moreover, complains only of injuries caused by a state-court order that was interlocutory, unappealable, and effectively reversed by a superseding order.").

Finally, as the Supreme Court recognized in *Feldman*, its namesake doctrine does not bar federal adjudication of a general constitutional challenge to a state law or rule. *See* 460 U.S. at 482–85, 103 S.Ct. 1303 (distinguishing "between general challenges to state bar admission rules and claims that a state court has unlawfully denied a particular applicant admission" and holding that a federal district court has jurisdiction over the former claim); *see also Feng Li v. Rabner*, 643 Fed.Appx. 57, 59 (2d Cir. 2016) ("As to the court's *Rooker–Feldman* ruling, this doctrine does not apply to Li's challenge to the constitutionality of the state court rule."). In other words, as the Court emphasized in another case, "[i]f a federal plaintiff presents an independent claim, it is not an impediment to the exercise of federal jurisdiction that the same or a related question was earlier aired between the parties in state court." *Skinner v. Switzer*, 562 U.S. 521, 532, 131 S.Ct. 1289, 179 L.Ed.2d 233 (2011) (brackets and citations omitted). Thus, the Supreme Court found in *Skinner* that *Rooker–Feldman* did not preclude a constitutional challenge to a Texas statute governing post-conviction DNA testing, notwithstanding that a state court had previously found that the petitioner was not entitled to testing under that law. *Id.* (finding that "Skinner does not challenge the adverse [state court] decisions themselves; instead, he targets as unconstitutional the Texas statute they authoritatively construed," and holding that "a state-court decision is not

reviewable by lower federal courts, but a statute or rule governing the decision may be challenged in a federal action" (citing *Feldman*, 460 U.S. at 487, 103 S.Ct. 1303; *Exxon*, 544 U.S. at 286, 125 S.Ct. 1517)). Likewise, plaintiffs are not contesting a state court's interpretation or application of the DRF;[7] instead, they assert that the County ordinance authorizing the DRF is itself unlawful. (*See, e.g.*, SAC at ¶ 6.) Thus, this Court has subject matter jurisdiction over plaintiffs' claims because they are independent of any state court judgment against them. *See McCormick v. Braverman*, 451 F.3d 382, 392 (6th Cir. 2006) ("None of these claims assert an injury caused by the state court judgments; Plaintiff does not claim that the state court judgments themselves are unconstitutional or in violation of federal law. Instead, Plaintiff asserts *independent claims* that ... a state statute is vague and overbroad."); *Sykes v. Mel Harris & Assocs., LLC*, 757 F.Supp.2d 413, 429 (S.D.N.Y. 2010) (Chin, J.) (holding that *Rooker–Feldman* did not apply because the plaintiffs sought, "*inter alia*, declaratory relief that defendants violated the law and injunctive relief via notice to putative class members that is independent of the state-court judgments"); *McCloud v. Mairs*, No. 12 CV 2556 SLT LB, 2014 WL 9880043, at *4 (E.D.N.Y. Oct. 24, 2014) ("As plaintiff complains only of defendants' actions, not those of the state court, the second prong of the *Rooker–Feldman* doctrine is not met." (citing *Morrison v. City of New York*, 591 F.3d 109, 112 (2d Cir. 2010))), *report and recommendation adopted*, 2015 WL 3607565 (E.D.N.Y. June 2, 2015).

[7]   Further, as noted, plaintiffs contend that the DRF is compulsory in every case other than those that receive a "not guilty" disposition. The Court finds *Rooker–Feldman* particularly inapplicable based on those allegations because plaintiffs are not seeking review of an independent determination or judgment by a state court. *See Hoblock*, 422 F.3d at 84 (under *Rooker–Feldman*, "[f]ederal district courts lack jurisdiction over suits that are, in substance, appeals from state-court judgments").

**\*7** In sum, *Rooker–Feldman* does not require dismissal of this case for lack of subject matter jurisdiction because the SAC alleges (1) that plaintiffs did not lose in state court; (2) that the DRF is non-discretionary and non-appealable and, thus, that plaintiffs are not seeking federal review of a state court decision; and (3) independent constitutional claims against the law authorizing the DRF.

**B. Abstention**

Defendants advance two abstention arguments in support of their motion to dismiss. First, they contend that, under *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971), the Court should decline subject matter jurisdiction over plaintiffs' Section 1983 claim because there are ongoing state court proceedings. Second, defendants assert that the Court should abstain from adjudicating the second cause of action for a declaratory judgment pursuant to *Railroad Commission v. Pullman Company*, 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941), because interpretation of the DRF depends on unsettled New York State law. As discussed below, the Court disagrees with both contentions.

1. Applicable Law

As a threshold matter, "abstention is generally disfavored, and federal courts have a 'virtually unflagging obligation' to exercise their jurisdiction." *Niagara Mohawk Power Corp. v. Hudson River–Black River Regulating Dist.*, 673 F.3d 84, 100 (2d Cir. 2012) (quoting *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976)). "The abstention doctrine comprises a few extraordinary and narrow exceptions to a federal court's duty to exercise its jurisdiction," and "the balance is heavily weighted in favor of the exercise of jurisdiction." *Woodford v. Cmty. Action Agency of Greene Cnty., Inc.*, 239 F.3d 517, 522 (2d Cir. 2001) (alterations and citations omitted).

Under *Younger* abstention, "federal courts should generally refrain from enjoining or otherwise interfering in ongoing state proceedings." *Spargo v. New York State Comm'n on Judicial Conduct*, 351 F.3d 65, 74 (2d Cir. 2003). In *Sprint Communications, Inc. v. Jacobs*, ––– U.S. ––––, 134 S.Ct. 584, 187 L.Ed.2d 505 (2013), the Supreme Court "clarified that district courts should abstain from exercising jurisdiction only in three 'exceptional circumstances' involving (1) 'ongoing state criminal prosecutions,' (2) 'certain civil enforcement proceedings,' and (3) 'civil proceedings involving certain orders uniquely in furtherance of the state courts' ability to perform their judicial functions.' " *Falco v. Justices of the Matrimonial Parts of Supreme Court of Suffolk Cty.*, 805 F.3d 425, 427 (2d Cir. 2015) (quoting *Sprint*, 134 S.Ct. at 591), *cert. denied*, ––– U.S. ––––, 136 S.Ct. 2469, 195 L.Ed.2d 802 (2016). "[T]hese three 'exceptional' categories ... define *Younger*'s scope."[8] *Sprint*, 134 S.Ct. at 591.

[8]   Prior to *Sprint*, the Second Circuit held that abstention under *Younger* is mandatory when: "(1) a pending state proceeding, (2) that implicates an

important state interest, and (3) the state proceeding affords the federal plaintiff an adequate opportunity for judicial review of his or federal constitutional claims." *Spargo*, 351 F.3d at 75. However, the Supreme Court held in *Sprint* that these criteria are "not dispositive," but are rather "*additional* factors appropriately considered by the federal court before invoking *Younger*." 134 S.Ct. at 593.

The *Pullman* doctrine permits a federal court to abstain from deciding a state law issue "when it appears that abstention may eliminate or materially alter the constitutional issue presented." *Ohio Bureau of Emp't Servs. v. Hodory*, 431 U.S. 471, 481, 97 S.Ct. 1898, 52 L.Ed.2d 513 (1977); *see Pullman*, 312 U.S. 496, 61 S.Ct. 643. The policy served by such abstention is to "avoid the need to address difficult constitutional questions dependent on the interpretation of state law in a situation where a decision on the ambiguous state law could not 'escape being a forecast rather than a determination' and might be 'supplanted by a controlling decision of a state court.' " *Hartford Courant Co. v. Pellegrino*, 380 F.3d 83, 100 (2d Cir. 2004) (quoting *Pullman*, 312 U.S. at 499–500, 61 S.Ct. 643). The doctrine is an "extraordinary and narrow exception" to a district court's duty to adjudicate the case before it. *Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 188, 79 S.Ct. 1060, 3 L.Ed.2d 1163 (1959).

**\*8** In the Second Circuit, *Pullman* abstention may be appropriate where three conditions are met: (1) the state statute is "unclear or the issue of state law [is] uncertain"; (2) "resolution of the federal issue depend[s] upon the interpretation to be given to the state law"; and (3) "the state law [is] susceptible to an interpretation that would avoid or modify the federal constitutional issue." *McRedmond v. Wilson*, 533 F.2d 757, 761 (2d Cir. 1976); *see also Hartford Courant Co.*, 380 F.3d at 100; *United Fence & Guard Rail Corp. v. Cuomo*, 878 F.2d 588, 594 (2d Cir. 1989).

2. Analysis

For the following reasons, the Court finds, in its discretion, that abstention is not warranted at this stage of the litigation under either *Younger* or *Pullman*.

a. *Younger* Abstention

Defendants argue the court should dismiss plaintiffs'

Section 1983 claim pursuant to *Younger* because, although plaintiffs' TPVA adjudications have been resolved, the SAC "asserts causes of action on behalf of a putative class including all persons who have paid the fee from January 1, 2008 and the present. Thus, since these Plaintiffs' state proceedings are ongoing, this Court should decline" subject matter jurisdiction over the federal claims in the SAC. (Defs.' Br. at 7.)

This argument is without merit. As plaintiffs note in their opposition, other courts have correctly held that the existence of an uncertified, putative class does not implicate abstention concerns. *See, e.g., Winfield v. Citibank, N.A.*, 842 F.Supp.2d 560, 572–73 (S.D.N.Y. 2012) ("The defendant has not established a basis for *Colorado River* abstention at this stage of the litigation. The Court is not yet being asked to decide whether it is appropriate to certify the California subclass on whose behalf plaintiff Shen seeks to bring his claim, such that there would be a class action in New York" that is duplicative of a state court action.). Given the Supreme Court's admonition in *Sprint* that "[o]nly exceptional circumstances justify a federal court's refusal to decide a case in deference to the States," 134 S.Ct. at 591 (quoting *New Orleans Pub. Serv., Inc. v. Council of City of New Orleans*, 491 U.S. 350, 368, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989)), the Court agrees with plaintiffs that, because the Court has not yet determined the nature and constituent members of the proposed class, it would be premature to conclude that resolving this action would necessarily interfere with ongoing state proceedings involving unidentified individuals.[9]

[9]  Of course, the Court may reconsider this issue at a later stage in the litigation if it becomes appropriate to do so. *See* Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

Moreover, as the Supreme Court has consistently held, the "pertinent inquiry [under *Younger*] is whether the state proceedings afford an adequate opportunity to raise the constitutional claims ...." *Moore v. Sims*, 442 U.S. 415, 430, 99 S.Ct. 2371, 60 L.Ed.2d 994 (1979); *see also Sprint*, 134 S.Ct. at 591 (holding that whether a pending state court proceeding "provides an adequate opportunity to raise federal challenges" is a relevant "additional factor[ ] appropriately considered by the federal court before invoking *Younger*" (brackets and citations omitted)); *Zablocki v. Redhail*, 434 U.S. 374, 380 n.5, 98 S.Ct. 673, 54 L.Ed.2d 618 (1978) ("[T]he District Court was correct in finding *Huffman* and *Younger* inapplicable, since there was no pending state-court proceeding in

which appellee could have challenged the statute."). Thus, in *Gerstein v. Pugh*, 420 U.S. 103, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975), the Court found that *Younger* did not preclude injunctive relief in a Section 1983 case contesting a state statute governing preliminary hearings in criminal prosecutions because the "injunction was not directed at the state prosecutions as such, but only at the legality of pretrial detention without a judicial hearing, an issue that could not be raised in defense of the criminal prosecution," and thus, the district court's "order to hold preliminary hearings could not prejudice the conduct of the trial on the merits." *Id.* at 108 n.9, 95 S.Ct. 854; *see also Donohue v. Mangano*, 886 F.Supp.2d 126, 141 (E.D.N.Y. 2012) ("*Younger* abstention does not apply when a plaintiff's federal claims cannot be presented in pending state proceedings." (citation omitted)).

**\*9** Here, as already discussed, plaintiffs have alleged that the DRF is non-discretionary and non-appealable and, therefore, that there is no opportunity to challenge that statute on federal constitutional grounds before the TPVA or any state appellate tribunal. (*See, e.g.*, SAC at ¶ 58 (citing *Stamos*, 38 N.Y.S.3d 832).) In addition, plaintiffs do not seek to enjoin cases before the TPVA or any other New York State court; instead, they request an injunction barring defendants from imposing the *DRF* (*see* SAC at ¶ 6)—an act, plaintiffs further contend, that does not involve fact-finding or a merits determination by a state judge (*see id.* at ¶¶ 32–33). In other words, as in *Gerstein*, an order by this Court precluding enforcement of the DRF would not "prejudice the conduct of" TPVA proceedings concerning the underlying ticket or citation.[10]

[10]    For purposes of its analysis, the Court assumes, *arguendo*, that TPVA adjudications fall into one of three *Sprint* categories. However, as discussed, such classification permits—but does not require—abstention; instead, a federal district court may consider additional factors before invoking *Younger*, including whether the state proceeding at issue affords litigants an avenue for raising federal claims. *See Sprint*, 134 S.Ct. at 593.

Therefore, based on the allegations in the SAC, the Court concludes, in its discretion, that *Younger* abstention is not warranted with respect to plaintiffs' Section 1983 claim.

### b. *Pullman* Abstention

Defendants also assert that the Court should decline jurisdiction over plaintiffs' second cause of action under

the Declaratory Judgment Act because the SAC "request[s] the Court to determine New York Constitutional issues, as well as issues regarding whether the challenged ordinance is preempted, as a matter of state law, by NY Vehicle and Traffic Law, the NY Civil Rights Law, the NY Penal Law and the NY Criminal Procedures Law"; and "the Court is requested to decide whether the challenged ordinances are authorized under the NY Municipal Home Rule Law." (Defs.' Br. at 8.) In addition, defendants contend that resolution of plaintiffs' state law claims will dispose of the Section 1983 challenge because "[i]t is only after the [DRF is] declared invalid [under New York State law] that Plaintiffs' constitutional claims are made relevant." (Defs.' Reply Mem. of Law in Supp. of Mot. to Dismiss Second Am. Compl. ("Defs.' Reply Br."), ECF No. 33, at 5; *see also id.* at 3 ("[I]f there are no questions that the ordinances imposing the DRF are valid under state law, then it cannot be said that there was a constitutional violation.").) The Court disagrees.

As an initial matter, defendants mischaracterize the SAC. They argue that plaintiffs "make[ ] no allegation that the enactment of the [DRF] was in violation of federal law." (*Id.* at 3.) However, that contention is belied by nearly twenty pages of substantive claims asserting that the DRF infringes numerous federal constitutional rights (*see* SAC at ¶¶ 1–6, 28–92), as well as plaintiffs' specific request for "declaratory relief that the DRF violates the Constitutional protections of the Fifth, Eighth and Fourteenth Amendments, and as well as [sic] other Constitutional Protections" (*id.* at ¶ 6).

With respect to the *Pullman* factors, even assuming that this case satisfies the first criterion—that the DRF ordinance is "unclear or the issue of state law is uncertain"—it does not fulfill the second prong because resolution of plaintiffs' federal claims does not depend upon the Court's construction of New York State law. This Court addressed a similar issue in *Moore v. County of Suffolk*, 851 F.Supp.2d 447 (E.D.N.Y. 2012), in which the plaintiffs sought a declaration that certain county and town laws were unconstitutional under federal law and an injunction enjoining their enforcement. In addition, the plaintiffs argued that New York State law preempted those local statutes. The Court found that "[r]esolution of the constitutional issues [did] not *depend* upon the Court's interpretation of the state law issue" because "[t]his Court's holding as to whether [New York State law] preempts the town and county laws has no bearing on the resolution of the constitutional issues." *Id.* at 457. It further cited *Canaday v. Koch*, 608 F.Supp. 1460 (S.D.N.Y. 1985), for the proposition that *Pullman's* second factor "requires that the constitutional issue be logically dependent on resolution of the state law issue."

*Id.* at 1467.

**\*10** Likewise, in *Planned Parenthood of Dutchess–Ulster, Inc. v. Steinhaus*, 60 F.3d 122 (2d Cir. 1995), the Second Circuit found that the district court abused its discretion in abstaining from plaintiff's claims that the defendants' refusal to enter into a contract with the plaintiff constituted a bill of attainder and violated the First and Fourteenth Amendments, as well as various New York State laws. The Court held that *Pullman* abstention was not warranted because the

> defendants [did] not explain[ ] how the federal issue presented in this case ... could be mooted by any particular interpretation of the state regulations at issue. The defendants' alleged failure to comply with the procedural requirements set forth in N.Y. Gen. Mun. L. § 104–b and N.Y. Comp. R. and Regs. tit. 18, §§ 407.2, 407.10 has no bearing on the constitutional issue presented. Nor, finally, are we aware of a statutory construction which could cure the constitutional violations alleged by plaintiff.

*Id.* at 126–27 (citing *Williams v. Lambert*, 46 F.3d 1275, 1282 (2d Cir. 1995)) (no interpretation of statute could avoid fact that plaintiff fell within class of people at whom statute was aimed)).

Here, whether or not the DRF is a valid enactment under New York State law or is preempted by other statutes does not vitiate plaintiffs' claims that the DRF, *inter alia*, is a bill of attainder or violates federal procedural due process protections. *See Canaday*, 608 F.Supp. at 1467 ("Whether plaintiffs were denied equal protection of the laws is a question that may be decided independently of any decision as to plaintiffs' rights under state law. It is not logically necessary to decide the state law issues first, before reaching the constitutional claim; the constitutional claim is alternative to, rather than dependent upon, the state law claims."); *see also United Fence & Guard Rail Corp.*, 878 F.2d at 593, 596 (holding that abstention "policies are outweighed by countervailing concerns when a federal court is asked to consider claims involving important federal rights" and that the district court abused its discretion in abstaining under *Pullman* from considering a federal constitutional challenge to a state law because "the federal constitutional issues presented do not depend upon resolution of the state law issues");

*Donohue*, 886 F.Supp.2d at 140 ("*Pullman* is not applicable in the instant case because resolution of the federal issue—namely, the Contracts Clause in the United State[s] Constitution—does not depend on any construction of the state laws at issue."); *Sherman v. Town of Chester*, No. 01 CIV. 8884 (SAS), 2001 WL 1448613, at \*3 (S.D.N.Y. Nov. 15, 2001) ("The resolution of the federal question does not 'depend' on the resolution of ... whether the Town acted *ultra vires* under [New York State law] or [ ] whether the Town violated Sherman's property right under the State constitution. Instead, the federal claim turns on whether Sherman had a federally protectable property right in the permit." (internal citations omitted)). *Cf. Nov. Team, Inc. v. New York State Joint Comm'n on Pub. Ethics*, 233 F.Supp.3d 366, 371 (S.D.N.Y. 2017) ("Regarding the second factor relevant to *Pullman* abstention, resolution of Plaintiffs' federal constitutional claims depends on the interpretation of the Advisory Opinion."), *appeal withdrawn*, No. 17–334, 2017 WL 3399691 (2d Cir. May 17, 2017); *Zuffa, LLC v. Schneiderman*, No. 15-CV-7624 (KMW), 2016 WL 311298, at \*6 (S.D.N.Y. Jan. 26, 2016) (holding that *Pullman* abstention was warranted because the "[p]laintiff's federal constitutional vagueness challenge depend [ed] on the interpretation of [the] state law, and the [the state law was] susceptible to interpretations that would resolve the statutory uncertainty and eliminate the federal constitutional issue"), *appeal withdrawn*, No. 16–535 (2d Cir. June 14, 2016).

**\*11** Thus, defendants' reliance on *Guthart v. Nassau County*, 55 Misc.3d 827, 52 N.Y.S.3d 821 (Sup. Ct. Nassau Cty. 2017), is misplaced. (*See* Defs.' Feb. 3, 2017 Letter, ECF No. 28.) There, a New York State trial court found that imposing the DRF was a proper exercise of the County's power pursuant to New York Municipal Home Rule Law § 10 and New York Vehicle and Traffic Law § 1111–b(e). *Id.* at 824–25 ("[T]here is nothing in the language of [New York Vehicle and Traffic Law § 1111–b(e) ] itself that abrogates the existing and long-standing authority holding that a municipality may impose fees reasonably related to the cost of administering and/or enforcing its own regulations and programs."); *see also id.* at 826 ("Nor can it be said that the cited charges cannot be imposed under the doctrine of preemption. Local governments have broad authority to enact legislation that promotes the welfare of their citizens, but cannot adopt local laws or ordinances that are inconsistent with the New York State constitution or with any general State law."). Accordingly, the court dismissed the plaintiff's claims seeking a declaration that the DRF was invalid under New York State law and for unjust enrichment, fraud, and negligent misrepresentation. *Id.* at

827–28. That determination, however, does not vitiate plaintiffs' Section 1983 claim in this action because, as already discussed, the validity of the DRF under New York State law does not abrogate any potential federal constitutional violations.[11] Simply put, a local ordinance may comport with the substantive and procedural requirements of a state constitution and state statutes but nevertheless infringe federally-protected rights.[12] See, e.g., Nelson v. Colorado, ––– U.S. ––––, 137 S.Ct. 1249, 1256, 197 L.Ed.2d 611 (2017) (holding that a Colorado statute violated the Due Process Clause). Further, the plaintiff in Guthart—unlike plaintiffs in this case—did not assert a Section 1983 cause of action, and in any event, "to permit state courts to rule first on what are substantially federal constitutional claims is inconsistent with Congress' grant of federal jurisdiction." United Fence & Guard Rail Corp., 878 F.2d at 596 (citing, inter alia, Hawaii Hous. Auth. v. Midkiff, 467 U.S. 229, 236–37 & n.4, 104 S.Ct. 2321, 81 L.Ed.2d 186 (1984)).

[11]  Further, as plaintiffs note, to the extent that Guthart clarified the application of state law to this case, then the first Pullman prong has not been satisfied.

[12]  Thus, defendants err in citing to the Second Circuit's decisions in Allstate Insurance Company v. Serio, 261 F.3d 143 (2d Cir.), certified question accepted, 96 N.Y.2d 931, 733 N.Y.S.2d 366, 759 N.E.2d 364 (2001), and certified question answered, 98 N.Y.2d 198, 746 N.Y.S.2d 416, 774 N.E.2d 180 (2002); and Expressions Hair Design v. Schneiderman, 808 F.3d 118 (2d Cir. 2015), vacated and remanded, ––– U.S. ––––, 137 S.Ct. 1144, 197 L.Ed.2d 442 (2017). Both of those cases involved First Amendment challenges to vague New York statutes, and the Second Circuit found that certifying certain state law questions to the New York Court of Appeals was proper because those issues were antecedent to the federal claims. Here, in contrast, resolving plaintiffs' state law claims—which allege that the DRF is invalid under the New York Constitution and various state statutes—would not obviate the Section 1983 cause of action.

Finally, to the extent that defendants argue that the language of plaintiffs' second cause of action—which "request[s] that this Court issue a declaration that the DRF is not a 'fee', but instead a 'penalty' or 'fine[']'; or in the alternative that the DRF is a 'mandatory surcharge'; or in the alternative that the DRF is a 'tax' " (SAC ¶ 118) and cites several New York statutes and cases—obligates application of unclear state law, the Court does not conclude that such an interpretation is warranted at this juncture. For instance, as discussed further infra,

determining whether a statute imposes an unconstitutional punishment for bill of attainder purposes is a question of federal law. Thus, in deciding whether the DRF is a "penalty" as opposed to a "fee," the Court may not need to apply ambiguous New York legal authority. If, however, such a concern becomes relevant at a later stage of this case, the Court may re-visit the Pullman inquiry. See Fed. R. Civ. P. 12(h)(3).

Accordingly, as set forth above, the Court finds, in its discretion, that Pullman abstention—which is a limited exception to the rule that federal courts must exercise their mandatory subject matter jurisdiction, see United Fence & Guard Rail Corp., 878 F.2d at 593—is inapplicable here because resolving plaintiffs' New York State claims is not a condition precedent to adjudicating their federal constitutional challenges.[13]

[13]  Although defendants have not raised this argument in their motion, the Court also finds that Wilton abstention—which applies to Declaratory Judgment Act cases—does not pertain to this action because plaintiffs do not "seek purely declaratory relief," but also, inter alia, damages. See Niagara Mohawk Power Corp. v. Hudson River–Black River Regulating Dist., 673 F.3d 84, 105–06 (2d Cir. 2012).

## C. Section 1983

**\*12** Having determined that there is subject matter jurisdiction over this action, the Court proceeds to the merits of plaintiffs' Section 1983 claim and discusses each constitutional challenge seriatim.[14]

[14]  At oral argument, plaintiffs averred that defendants had waived their merits challenges to the Section 1983 claim because they failed to reiterate those arguments in their reply brief. Although the Court may accordingly deem those claims as abandoned, see, e.g., In re Dana Corp., 412 B.R. 53, 64 (S.D.N.Y. 2008), in its discretion, it will not do so.

Section 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured ...." 42 U.S.C. § 1983. In order to state a claim under Section 1983, a plaintiff must allege (1) the deprivation of any rights, privileges, or immunities secured by the Constitution and its laws, and (2) that the deprivation was

"committed by a person acting under the color of state law." *Cornejo v. Bell*, 592 F.3d 121, 127 (2d Cir. 2010); *see also Ahlers v. Rabinowitz*, 684 F.3d 53, 60–61 (2d Cir. 2012); *see also Rehberg v. Paulk*, 566 U.S. 356, 132 S.Ct. 1497, 1501–02, 182 L.Ed.2d 593 (2012). Here, defendants only contest the first factor.

For the reasons set forth below, the Court holds that plaintiffs have failed to state a cause of action based on alleged bill of attainder, procedural due process, substantive due process, equal protection, unjust takings, and double jeopardy violations. However, the Court denies the motion to dismiss the excessive fines claim under Section 1983 on the ground that the DRF cannot be punitive. Because it was not raised by defendants, the Court does not address whether a $45 fine can be unconstitutionally excessive.

1. Bill of Attainder

Article I, Section 10, Clause 1 of the United States Constitution states, in relevant part, "No State shall ... pass any Bill of Attainder ...." U.S. Const. art. I, § 10, cl. 1. "A bill of attainder is a legislative act which inflicts punishment without a judicial trial." *United States v. Lovett*, 328 U.S. 303, 315, 66 S.Ct. 1073, 90 L.Ed. 1252 (1946) (quoting *Cummings v. Missouri*, 71 U.S. (4 Wall.) 277, 18 L.Ed. 356 (1866)). The Supreme Court has articulated three elements of a bill of attainder: (1) "specification of the affected persons," (2) "punishment," and (3) "lack of a judicial trial." *Selective Serv. Sys. v. Minn. Pub. Interest Research Grp.*, 468 U.S. 841, 846–47, 104 S.Ct. 3348, 82 L.Ed.2d 632 (1984).

"With respect to the existence *vel non* of punishment," the Second Circuit has identified the following three factors to consider:

(1) whether the challenged statute falls within the historical meaning of legislative punishment (historical test of punishment); (2) whether the statute, "viewed in terms of the type of severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes" (functional test of punishment); and (3) whether the legislative record "evinces a [legislative] intent to punish" (motivational test of punishment).

*ACORN v. United States*, 618 F.3d 125, 136 (2d Cir. 2010) (quoting *Selective Serv. Sys.*, 468 U.S. at 853, 104 S.Ct. 3348). These three factors "are the evidence that is weighed together in resolving the bill of attainder claim." *Id.* (quoting *Con. Edison Co. of N.Y., Inc. v. Pataki*, 292 F.3d 338, 350 (2d Cir. 2002)). Nevertheless, the Supreme

Court has warned that, "[h]owever expansive the prohibition against bills of attainder, it surely was not intended to serve as a variant of the equal protection doctrine, invalidating every Act of Congress or the States that legislatively burdens some persons or groups but not all other plausible individuals." *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 471, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977) (footnotes omitted). "Forbidden legislative punishment is not involved merely because the Act imposes burdensome consequences." *Id.* at 472, 97 S.Ct. 2777.

**\*13** The SAC alleges that the "DRF is a legislatively mandated fine and/or penalty, being imposed by a governmental entity under the color of law, without a trial, and without discretion by a court of law." (SAC at ¶ 45.) Additionally, it states that the "DRF penalty is imposed only against any individuals who have been issued a ticket by the Nassau County police or the TPVA under the authority of defendants, irrespective of guilt under the eyes of the law and/or a trial being conducted." (*Id.* at ¶ 47.) Defendants argue that the SAC fails to state a claim because (1) "the ordinance does not impose punishment upon an identifiable individual"; (2) "the assessment of a relatively modest fee for the processing of the infraction does not" constitute punishment as a matter of law; and (3) "[p]laintiffs had the ability to have a trial and obtain a disposition of not guilty." (Defs.' Br. at 9.)

The Court agrees with defendants that the SAC does not adequately allege the specificity element.[15] Plaintiffs are correct that for a legislative act to be a bill of attainder, it must "apply either to named individuals or to easily ascertainable members of a group ...." *Lovett*, 328 U.S. at 315, 66 S.Ct. 1073. However, the Supreme Court cautioned in *Nixon* that "the Constitution is [not] offended whenever a law imposes undesired consequences on an indvidual [sic] or on a class that is not defined at a proper level of generality." 433 U.S. at 469–70, 97 S.Ct. 2777. This is because finding that "an individual or defined group is attainted whenever he or it is compelled to bear burdens which the individual or group dislikes" would "remove [ ] the anchor that ties the bill of attainder guarantee to realistic conceptions of classification and punishment" and "cripple the very process of legislating, for any individual or group that is made the subject of adverse legislation can complain that the lawmakers could and should have defined the relevant affected class at a greater level of generality." *Id.* at 470, 97 S.Ct. 2777 (footnote omitted). Thus, although the SAC asserts that the DRF singles out ticketed motorists who do not receive a disposition of innocence, that is not the end of the specificity inquiry.

15  Accordingly, the Court need not, and does not, address defendants' aadditional arguments regarding lack of punishment and the availability of judicial process.

Instead, the Supreme Court has held that a law distinguishes a class of people for bill of attainder purposes when it speaks "in terms of conduct which, because it is past conduct, operates only as a designation of particular persons." *Communist Party of the U.S. v. Subversive Activities Control Bd.*, 367 U.S. 1, 86, 81 S.Ct. 1357, 6 L.Ed.2d 625 (1961); *see also Cummings*, 71 U.S. at 317–18 (holding that law was a bill of attainder because, *inter alia*, it singled out individuals for past involvement in the Confederacy); *Ex parte Garland*, 71 U.S. (4 Wall.) 333, 377–78, 18 L.Ed. 366 (1866) (same). In contrast, the Court has upheld laws with a prospective enforcement application even if they designate a particular group of individuals for possible sanction.

For instance, *Communist Party* held that the Subversive Activities Act was not a bill of a attainder because it "require[d] the registration only of organizations which, after the date of the Act, [were] found to be under the direction, domination, or control of certain foreign powers and to operate primarily to advance certain objectives," and thus, "[p]resent activity constitute[d] an operative element to which the statute attache[d] legal consequences, not merely a point of reference for the ascertainment of particular persons ineluctably designated by the legislature." 367 U.S. at 86–87, 81 S.Ct. 1357; *see also id.* at 87, 81 S.Ct. 1357 (holding that "[f]ar from attaching to the past and ineradicable actions of an organization," the Act's application was "made to turn upon continuing contemporaneous fact"). Likewise, in *Selective Service System*, the Supreme Court found that a federal statute was not sufficiently specific and, therefore, not a bill of attainder because it did not target a group based on their prior behavior, but instead penalized present and future violations of that law. 468 U.S. at 847–51, 104 S.Ct. 3348; *see also id.* at 850–51 & n.7, 104 S.Ct. 3348 ("Because it allows late registration, § 12(f) is clearly distinguishable from the provisions struck down in *Cummings* and *Garland*. *Cummings* and *Garland* dealt with absolute barriers to entry into certain professions for those who could not file the required loyalty oaths; no one who had served the Confederacy could possibly comply, for his status was irreversible.").

*14  Conversely, the Second Circuit found in *Consolidated Edison* that a New York State law imposing a utility sanction for prior wrongdoing was an unconstitutional bill of attainder because of its "retrospective focus." 292 F.3d at 349. It emphasized that

"defin[ing] past conduct as wrongdoing and then impos[ing] punishment on that past conduct" is an "indispensible [sic] element of a bill of attainder" because "[s]uch a bill attributes guilt to the party or parties singled out in the legislation." *Id.* (citing, *inter alia*, *Nixon*, 433 U.S. at 472–73, 97 S.Ct. 2777; *Cummings*, 71 U.S. at 325). Accordingly, the Second Circuit held that "[t]he retrospective focus of Chapter 190 [was] essential to [its] determination that the statute is a bill of attainder. The power of legislatures to enact purely prospective changes to utility rates, even to the rates of a single utility, is considerably broader than their authority to act retrospectively." *Id.*

Here, there are no allegations in the SAC that defendants enacted or enforced the DRF to punish past conduct. Instead, plaintiffs assert that they have sufficiently alleged the specificity element because "individuals whose tickets/citations have '*a final disposition other than not-guilty*', which includes those motorists whose tickets have been dismissed ... are 'easily ascertainable via the group defined by the [L]egislature." (Pls.' Mem. of Law in Opp'n to Defs.' Mot. to Dismiss ("Pls.' Opp'n Br."), ECF No. 30, at 11.) However, that is plainly not the applicable standard. As *Nixon* instructed, determining that a statute is a potential bill of attainder merely because it specifies an individual or a collective of individuals for sanction would "invalidat[e] every Act of Congress or the States that legislatively burdens some persons or groups but not all other plausible individuals." 433 U.S. at 471, 97 S.Ct. 2777; *see also Elgin v. U.S. Dep't of Treasury*, 641 F.3d 6, 21 (1st Cir. 2011) (Stahl, J., concurring in judgment) ("A statute meets the specification element if it identifies individuals by name or by description of prior conduct so that it operates only as a designation of particular persons. A statute of general applicability that affects individuals only upon enforcement is not a bill of attainder; it is simply an example of the quintessential legislation that the Constitution tasks Congress with creating." (citations omitted)), *aff'd sub nom. Elgin v. Dep't of Treasury*, 567 U.S. 1, 132 S.Ct. 2126, 183 L.Ed.2d 1 (2012).

Even construing the SAC in a light most favorable to plaintiffs and drawing all inferences in their favor, there are no claims that the DRF identifies individuals or a class of people for sanction based on their past acts; instead, the only plausible reading of the SAC is that the DRF is a "general enforcement statute" that "turn[s] upon continuing contemporaneous fact" because individuals are not assessed a fee until the TPVA dismisses their ticket or citation. As a result, plaintiffs have not adequately pled specificity, *see, e.g.*, *Communist Party*, 367 U.S. at 87, 81 S.Ct. 1357, and accordingly, the Court dismisses the bill

of attainder aspect of their Section 1983 claim.

### 2. Procedural Due Process

The crux of plaintiffs' Section 1983 claim is that the DRF violates their procedural due process rights. The SAC alleges that the "system the defendants have created through the TPVA Court for imposing the DRF is an unfair adjudication process against individuals who are simply issued a ticket by Nassau County law enforcement officer[s]" because "[t]here is no justification for taking away plaintiffs' and Class members' property (money) without any charges/accusatory instruments pending, nor any findings of fact against such individuals" or proof "that any violations occurred (i.e.—innocent until proven guilty)." (SAC at ¶¶ 51–53.) Moreover, plaintiffs aver that "by charging a DRF, the defendants have found a way to legally extort individuals whom appear before the TPVA" because if plaintiffs and others "refuse to pay such a fee they are scheduled for a trial, which is done as a penalty for refusing to pay and questioning the imposition of the DRF. Such trial may require additional days in court, and possibly even the retention of an attorney." (*Id.* at ¶ 57.) Similarly, the SAC alleges that

> **\*15** there is a $125 non-refundable application fee to the TPVA to simply apply to vacate the DRF, as well as a $250 non-refundable fee to appeal the application of the DRF. The faux procedures in place to simply question the DRF are more costly and expensive (and non-refundable) than the DRF itself, and therefore are substantially insufficient to protect an individual's due process rights (i.e.—even if they win the dispute before the TPVA, they will not get their $150 fee returned).

(*Id.* at ¶ 66.)

To assert a violation of procedural due process rights, a plaintiff must "first identify a property right, second show that the [State] has deprived him of that right, and third show that the deprivation was effected without due process." *Local 342, Long Island Pub. Serv. Emps., UMD, ILA, AFL–CIO v. Town Bd. of Huntington*, 31 F.3d 1191, 1194 (2d Cir. 1994) (citation omitted). Further, a plaintiff must prove that he or she was deprived of " 'an opportunity ... granted at a meaningful time and in a meaningful manner' for [a] hearing appropriate to the

nature of the case." *Boddie v. Connecticut*, 401 U.S. 371, 378, 91 S.Ct. 780, 28 L.Ed.2d 113 (1971). The Supreme Court, however, distinguishes between (1) claims based on established state procedures, and (2) claims based on random, unauthorized acts by state employees. *See Rivera–Powell v. N.Y.C. Bd. of Elections*, 470 F.3d 458, 465 (2d Cir. 2006) (citing *Hudson v. Palmer*, 468 U.S. 517, 532, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984); and *Parratt v. Taylor*, 451 U.S. 527, 537, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *overruled on other grounds by Daniels v. Williams*, 474 U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986)). On the one hand, where a plaintiff alleges a deprivation pursuant to an established state procedure, "the state can predict when it will occur and is in the position to provide a predeprivation hearing." *Id.* (citing *Hellenic Am. Neighborhood Action Comm. v. City of New York*, 101 F.3d 877, 880 (2d Cir. 1996)). "Under those circumstances, 'the availability of post-deprivation procedures will not, *ipso facto*, satisfy due process.' " *Id.* (quoting *Hellenic*, 101 F.3d at 880). In contrast, when a plaintiff brings a procedural due process claim "[b]ased on random unauthorized acts by state employees," the state satisfies procedural due process requirements so long as it provides a meaningful post-deprivation remedy.[16] *Id.* (citing *Hellenic*, 101 F.3d at 880; and *Hudson*, 468 U.S. at 532, 104 S.Ct. 3194).

---

[16]  This differing treatment for "random, unauthorized acts" rests on "pragmatic considerations." *Hellenic*, 101 F.3d at 880 (citing *Hudson*, 468 U.S. at 532–33, 104 S.Ct. 3194). When an arbitrary act by a low-level state employee causes a deprivation, "it is difficult to conceive of how the State could provide a meaningful hearing before the deprivation takes place." *Velez v. Levy*, 401 F.3d 75, 92 (2d Cir. 2005). Thus, "[w]here a pre-deprivation hearing is impractical and a post-deprivation hearing is meaningful, the State satisfies its constitutional obligations by providing the latter." *Giglio v. Dunn*, 732 F.2d 1133, 1135 (2d Cir. 1984).

---

Here, defendants concede that "the *de minimus* [DRF] is [ ] a protected property interest for the procedural due process discussion."[17] (Defs.' Br. at 13.) Nevertheless, they contend that an adequate remedial process exists. At the second step of the above test, the Court must balance the following factors in evaluating the adequacy of a challenged procedure:

> (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used, and the probable

value, if any, of additional or substitute procedural safeguards; and (3) the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

**\*16** *Nat'l Org. for Women v. Pataki*, 261 F.3d 156, 167–68 (2d Cir. 2001) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976)).

17    As discussed *infra*, however, the Court concludes that the DRF does not implicate a property interest subject to substantive due process protections.

Defendants argue that plaintiffs' procedural due process claim fails because "neither of the named plaintiffs claims to have pursued their remedies under the law," since they elected not to proceed to trial on their underlying tickets or citations. (Defs.' Br. at 13–14.) Further, defendants argue that, "[a]s a general rule, there can be no procedural due process violation when the state provides apparently adequate procedural remedies and the plaintiff has not availed himself of those remedies." (*Id.* at 14 (citation omitted).) The Court agrees that, based on the allegations in the SAC, adequate procedures exists to safeguard plaintiffs' property rights.

*First*, the Court finds that the "private interest" at stake is minimal. A \$45 fee does not involve substantial property rights. *See, e.g., Krieger v. City of Rochester*, 42 Misc.3d 753, 978 N.Y.S.2d 588, 601 (Sup. Ct. Monroe Cty. 2013) (holding on a procedural due process challenge to red-light traffic ticket laws that "the modest \$50 penalty was not so substantial as to infringe upon a person's private property rights"); *cf. Pringle v. Wolfe*, 88 N.Y.2d 426, 431, 646 N.Y.S.2d 82, 668 N.E.2d 1376 (1996) ("It is well established that a driver's license is a substantial property interest that may not be deprived without due process of law.").

*Second*, insofar as plaintiffs allege that the DRF ensnares "innocent" motorists whose tickets or citations have been dismissed without a disposition of "not guilty" (*see* SAC at ¶¶ 36, 39, 53, 55, 61), the Court finds that there are adequate pre-deprivation and post-deprivation procedures to prevent erroneous determinations by the TPVA.[18] The Supreme Court has said that "due process ordinarily requires an opportunity for 'some kind of hearing' prior to the deprivation of a significant property interest." *Hodel v. Virginia Surface Min. & Reclamation Ass'n, Inc.*, 452 U.S. 264, 299, 101 S.Ct. 2389, 69 L.Ed.2d 1 (1981) (citation omitted). "It is sufficient, where only property rights are concerned, that there is at some stage an opportunity for a hearing and a judicial determination." *Id.* at 303, 101 S.Ct. 2389 (quoting *Ewing v. Mytinger & Casselberry*, 339 U.S. 594, 599, 70 S.Ct. 870, 94 L.Ed. 1088 (1950)).

18    Because the SAC alleges a procedural due process violation based on "systemic" enforcement of the DRF, the Court concludes that available post-deprivation procedures will not, standing alone, necessarily satisfy due process. *See Hellenic*, 101 F.3d at 880; *Pierre v. N.Y.C. Taxi & Limousine Comm'n*, No. 17-CV-973 (MKB), 2017 WL 1417257, at \*3 (E.D.N.Y. Apr. 19, 2017) (collecting cases).

Here, plaintiffs concede that motorists accused of traffic violations are entitled to a trial on the merits, and that the relevant County ordinance does not impose a DRF on those who receive a "not guilty" finding. (*See* Pls.' Opp'n Br. at 17 & n.23.) Nevertheless, they assert that "[s]uch a situation flips the burden of proof, and is violative of numerous procedural due protections" because "the government cannot flip the burden to the individual to prove his innocence,"[19] and "motorists before the TPVA have no ability to dispute the DRF penalty, nor have a trial on the DRF itself." (*Id.* at 18.) However, that position is against the weight of federal and New York authority holding that due process is satisfied by notice and an opportunity to be heard before a motorist is punished for a traffic infraction. *See, e.g., Boguslavsky v. City of New York*, 173 F.3d 843, 1999 WL 197202, at \*2 (2d Cir. 1999) (unpublished opinion) ("As for Boguslavsky's Fourteenth Amendment procedural due process claim, Boguslavsky was provided a hearing on the parking ticket underlying the booting incident and an opportunity to present evidence that the parking signs on the street were inadequate. Thus, the district court properly found that Boguslavsky had presented no factual basis for asserting a due process claim."); *Rackley v. City of New York*, 186 F.Supp.2d 466, 482 (S.D.N.Y. 2002) ("There is no material factual dispute that the City's administrative parking violations system, together with the judicial system of the State of New York, provided plaintiff with adequate pre-deprivation remedies, adequate post-deprivation remedies, and sufficient notice that such remedies were available." (footnote omitted)); *Calabi v. Malloy*, 438 F.Supp. 1165, 1171–72 (D. Vt. 1977), *amended sub nom. Calabi v. Conway*, 468 F.Supp. 76 (D. Vt. 1978) (holding that there was no due process violation based on "the legislature's decision not to provide a separate presuspension hearing procedure" prior to suspending a motorist's license because "the opportunity

to contest the actual traffic offense in court provide[d] the motorist with a hearing which [was] sufficient to meet due process standards"); *Pringle v. Wolfe*, 88 N.Y.2d 426, 434, 646 N.Y.S.2d 82, 668 N.E.2d 1376 (1996) (holding that "the minimal risk of an erroneous suspension [of a driver's license] is further diminished by the driver's right to a meaningful presuspension opportunity to rebut the" charges against him); *Krieger*, 978 N.Y.S.2d at 602 (due process satisfied by notice and an opportunity to be heard at an evidentiary hearing before assessment of red-light traffic penalty).

[19]  Plaintiffs' contention that motorists are required to "prove their innocence" before the TPVA to avoid imposition of the DRF appears to be a rhetorical statement rather than a factual description of the evidentiary burdens borne at a TPVA proceeding. Indeed, *Section 227 of the New York Vehicle and Traffic Law* provides that "[e]very hearing for the adjudication of a traffic infraction, as provided by this article, shall be held before a hearing officer ... [and] [t]he burden of proof shall be upon the people, and no charge may be established except by clear and convincing evidence." N.Y. Veh. & Traf. Law § 227[1].

**\*17** Further, although plaintiffs contend that availing themselves of a trial would be costly and time-consuming (*see* SAC at ¶¶ 4–5, 57–58), "[t]he fact that [the available pre-deprivation] procedures place the onus for resolving outstanding tickets on the driver, rather than on the [County], does not violate the Due Process Clause of the United States Constitution." *Schaer v. City of New York*, No. 09 CIV. 7441 CM MHD, 2011 WL 1239836, at \*9 (S.D.N.Y. Mar. 25, 2011). For example, in *Davis v. Nassau County*, No. 06-CV-4762 ADS WDW, 2011 WL 5401663 (E.D.N.Y. Nov. 5, 2011), the plaintiff sued, *inter alia*, the County and the TPVA for suspending his driver's license without a finding of guilt. The plaintiff acknowledged that he willfully chose not to attend a hearing on the alleged violation, and the court held that there was no procedural due process violation because

> as a matter of law, the Plaintiff was afforded with [sic] a sufficient pre-deprivation remedy that he chose not to pursue. The Plaintiff was given the opportunity of a trial on the merits and did not attend, even though he knew the consequences of not doing so. Therefore, the Court finds that the Plaintiff received all the process he was due under the law.

2011 WL 5401663, at \*6. Similarly, plaintiffs here failed to pursue an available and adequate pre-deprivation procedure that may have avoided the DRF injury that led to this lawsuit. As a result, plaintiffs have not pled a procedural due process violation. *See, e.g., Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988) (to state a due process claim, "a plaintiff must [allege] that he or she was deprived of 'an *opportunity* ... granted at a meaningful time and in a meaningful manner' for [a] hearing appropriate to the nature of the case" (citation omitted)).

Moreover, even where a post-deprivation procedure is not, by itself, sufficient relief for claims based on established state procedures, *see Hellenic*, 101 F.3d at 880, the *combination* of pre- and post-injury proceedings can provide constitutionally-sufficient redress. *See Levy v. Cohen*, 439 Fed.Appx. 30, 31–32 (2d Cir. 2011) (holding that the "pre-deprivation proceedings available to [the plaintiff] ... combined with the availability of an adequate post-deprivation remedy through New York's Article 78 proceeding, constituted sufficient process to satisfy the Due Process Clause of the Fourteenth Amendment" (citing *Harris v. Mills*, 572 F.3d 66, 76 (2d Cir. 2009) (denial by state agency of physician's petition to reinstate his revoked medical license did not deprive physician of due process, where physician was given adequate notice and opportunity to be heard before his petition for reinstatement was denied, and an adequate post-deprivation remedy was available through Article 78 proceedings); and *Rivera–Powell*, 470 F.3d at 466 (holding that pre-deprivation process was constitutionally adequate where the plaintiff received notice and was represented at a pre-deprivation hearing by an attorney)); *Morales v. New York*, 22 F.Supp.3d 256, 277 (S.D.N.Y. 2014) ("Plaintiff's own allegations show that he was afforded disciplinary hearings and that he willingly abandoned at least some of these hearings. Moreover, Plaintiff could have brought an Article 78 proceeding under New York Civil Practice Law and Rules.").

To the extent that plaintiffs claim that any individual DRF assessment was in error—or that the DRF ordinance is in conflict with a state law requirement that, where traffic ticket "cases are dismissed upon appeal (from the TPVA court to the Appellate Term), all fines and fees [must be] returned to the individual" (Pls.' Opp'n Br. at 19)—New York provides an avenue for post-deprivation relief via an Article 78 proceeding, N.Y. C.P.L.R. § 7801 *et seq. See, e.g., De Asis v. New York City Police Dep't*, 352 Fed.Appx. 517, 518 (2d Cir. 2009) ("Finally, insofar as Appellant can be construed as raising a due process claim based on the defendants' failure to refund a prepaid fine after Appellant successfully challenged his traffic

citations, the claim is unavailing because a post-deprivation remedy was available, in the form of an Article 78 mandamus proceeding." (citing *New York State Nat'l Org. for Women*, 261 F.3d at 168)); *Nestle Waters N. Am., Inc. v. City of New York*, No. 15-CV-05189 (ALC), 2016 WL 3080722, at *11 (S.D.N.Y. May 25, 2016) (noting that "Article 78 proceedings allow for unfettered review of alleged errors in statutory interpretation"), *aff'd*, 689 Fed.Appx. 87 (2d Cir. 2017). For instance, the Second Circuit held in *Nestle Waters* that there was no procedural due process violation based on the plaintiff's allegation that the defendants had a policy of issuing and enforcing defective parking summonses because the "review afforded through the Parking Violations Bureau ('PVB') administrative processes and Article 78 proceedings in New York State [was] adequate for due process purposes." 689 Fed.Appx. at 88.

*\*18* Based on the facts of this case—which, as noted, involves a property interest far less substantial than the suspension of a driver's license, *see Davis*, 2011 WL 5401663; the revocation of a professional license, *see Levy*, 439 Fed.Appx. 30; or the removal of a candidate from an election ballot, *see Rivera–Powell*, 470 F.3d 458—the Court finds, as other courts in this Circuit have correctly determined, *see, e.g.*, *Rackley*, 186 F.Supp.2d at 482, that the availability of both pre- and post-deprivation procedures to plaintiffs was constitutionally adequate under the second prong of the *Mathews* inquiry.

The Supreme Court's recent decision in *Nelson v. Colorado* does not, as plaintiffs contend, affect this determination. (*See* Pls.' May 27, 2017 Letter, ECF No. 38.) There, the Court invalidated a Colorado statute on due process grounds because it permitted the state to "retain[ ] conviction-related assessments unless and until the prevailing defendant institute[d] a discrete civil proceeding and prove[d] her innocence by clear and convincing evidence" following vacatur of her criminal conviction. 137 S.Ct. at 1252. The Court held that "Colorado may not retain funds taken from [the petitioners] solely because of their now-invalidated convictions, for Colorado may not presume a person, adjudged guilty of no crime, nonetheless guilty *enough* for monetary exactions." *Id.* at 1256 (citations omitted). However, *Nelson* is distinguishable from this case on three significant grounds.

First, and as discussed further *infra* with respect to plaintiffs' double jeopardy claim, plaintiffs have not alleged facts sufficient to show that TPVA proceedings are akin to criminal prosecutions, which implicate far more important rights than the property interest at issue

here. Second, the Supreme Court emphasized in *Nelson* that the "risk [t]here involved [was] not the risk of wrongful or invalid conviction *any* criminal defendant may face," but rather "the risk faced by a defendant whose conviction has already been overturned that she will not recover funds taken from her solely on the basis of a conviction no longer valid." *Id.* at 1257. Thus, in *Nelson*, the petitioners were deprived of property based on convictions that were no longer extant. Here, plaintiffs allege that the DRF is imposed after a ticket or citation is dismissed with a disposition of other than "not guilty." In other words, the deprivation at issue does not stem from a subsequently invalidated conviction. Finally, the Colorado statute that the Supreme Court struck down in *Nelson* placed the evidentiary burden on the defendant to demonstrate innocence, whereas here, the County must prove a traffic violation by "clear and convincing evidence" at any trial on the merits. *See supra* note 19. Accordingly, to the extent that plaintiffs would argue that *Nelson* changes the clear and consistent precedent summarized above, the Court disagrees and finds that it has no bearing on the *Mathews* test as applied to the facts of this case.

*Third*, in light of the Court's determination *supra* that the existing procedures are adequate, and given that neither party has suggested alternative or additional procedural protections, the Court need not address the final step of the *Mathews* analysis.

In sum, the Court concludes that plaintiffs have not plausibly stated a procedural due process claim because (1) the property interest at issue is minimal; and (2) there are adequate pre- and post-deprivation safeguards to prevent a wrongful injury. Therefore, the Court dismisses this aspect of plaintiffs' Section 1983 claim.

### 3. Substantive Due Process

*\*19* The SAC also asserts that "the DRF violates plaintiffs' and Class members' substantive due process rights under the Fifth and Fourteenth Amendments" because

> [i]rrespective of any procedural safeguards the defendants have utilized in assessing the DRF penalty against individuals whom have simply been issued a ticket ... defendants' imposition of the DRF penalty against plaintiffs and the Class when the ticket has been dismissed violates their fundamental right to property

without sufficient substantive justification or rational basis in law.

(SAC at ¶ 63.)

The Due Process Clause of the Fourteenth Amendment protects persons against deprivations of "life, liberty, or property." U.S. Const. amend. XIV, § 1. The Fourteenth Amendment "does not provide a comprehensive scheme for determining the propriety of official conduct or render all official misconduct actionable." Pena v. DePrisco, 432 F.3d 98, 112 (2d Cir. 2005). Instead, the scope of substantive due process is very limited. See Washington v. Glucksberg, 521 U.S. 702, 720, 117 S.Ct. 2258, 138 L.Ed.2d 772 (1997). The Supreme Court has said that it is "reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." Collins v. Harker Heights, 503 U.S. 115, 125, 112 S.Ct. 1061, 117 L.Ed.2d 261 (1992). Substantive due process is a means of "protection of the individual against arbitrary action of government." Wolff v. McDonnell, 418 U.S. 539, 558, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974).

"In order to establish a violation of a right to substantive due process, [after plaintiff demonstrates that it was denied a valid property interest,] a plaintiff must demonstrate not only government action but also that the government action was 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.' " Pena, 432 F.3d at 112 (quoting Cty. of Sacramento v. Lewis, 523 U.S. 833, 847 n.8, 118 S.Ct. 1708, 140 L.Ed.2d 1043 (1998)). To satisfy this standard, a plaintiff must show that the government decision it challenges "was arbitrary or irrational or motivated by bad faith." Rosa R. v. Connelly, 889 F.2d 435, 439 (2d Cir. 1989).

Here, plaintiffs have not adequately alleged deprivation of a protected property right. As courts in this Circuit have correctly held, "the substantive Due Process clause does not protect plaintiffs from modest fines ...." Leder v. Am. Traffic Sols., Inc., 81 F.Supp.3d 211, 224 (E.D.N.Y. 2015) (holding that $65 fine imposed by the TPVA was not a substantive due process violation) (citing Idris v. City of Chicago, Ill., 552 F.3d 564, 566 (7th Cir. 2009) ("The interest at stake is a $90 fine for a traffic infraction, and the Supreme Court has never held that a property interest so modest is a fundamental right."); Kelly v. Rice, 375 F.Supp.2d 203, 209 (S.D.N.Y. 2005) ("Nothing about the issuance of a parking ticket implicates the rarely-used doctrine of 'substantive due process.' If a claim that a police officer's deliberate indifference caused the death of

a motorist during a high-speed chase does not violate substantive due process, ... then surely the issuance of a parking ticket on a single occasion does not do so." (citations omitted)); and Krieger, 978 N.Y.S.2d 588), aff'd, 630 Fed.Appx. 61 (2d Cir. 2015); see also Buttaro v. Affiliated Computer Servs., Inc., No. CV14353LDWSIL, 2016 WL 8711058, at *2 (E.D.N.Y. Dec. 2, 2016) (holding that plaintiffs failed to plead substantive due process violation based on an $80 fine). Likewise, the $45 sanction imposed by the DRF does not impinge an "interest[ ] that [is] 'implicit in the concept of ordered liberty' " and, therefore, does not implicate substantive due process protections.[20] Local 342, 31 F.3d at 1196 (quoting Palko v. Connecticut, 302 U.S. 319, 325, 58 S.Ct. 149, 82 L.Ed. 288 (1937)).

[20]  Plaintiffs' attempt to distinguish Leder is unpersuasive. They argue that the instant case is different because "the plaintiffs here are not disputing individual's [sic] actions being arbitrary, but instead the DRF ordinance itself being arbitrary ...." (Pls.' Opp'n Br. at 20 n.25.) However, as set forth above, a substantive due process violation must allege arbitrary state action that results in deprivation of a property right. Capricious conduct, standing alone, does not state a claim for relief. See W. Farms Assocs. v. State Traffic Comm'n of State of Conn., 951 F.2d 469, 472 (2d Cir. 1991) ("[A] plaintiff may not successfully claim a deprivation of property without due process absent the identification of a protected property interest.").

*20 As a result, the Court dismisses the substantive due process component of plaintiffs' Section 1983 claim.


4. Unjust Takings

In addition, the SAC states that defendants have violated "the Takings Clause of the Fifth Amendment" because "defendants have been systematically taking property from individuals (here, monetary amounts), without any compensation whatsoever, and without any just cause." (SAC at ¶ 77.) Plaintiffs further assert that, although the stated "purpose behind the DRF is the reimbursement the costs for issuing tickets/citations to drivers ... such overhead fees for regulating the public should only be borne upon those who plead guilty and/or are found guilty of such infractions, and/or taxpayers as a whole ...." (Id. at ¶ 80 (citing Armstrong v. United States, 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960).)

The Fifth Amendment guarantees that no one will "be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use,

without just compensation," U.S. Const. amend. V, and it has been made applicable to the states through the Fourteenth Amendment, *see, e.g.,* Weaver v. Brenner, 40 F.3d 527, 534 (2d Cir. 1994). To plead a taking under the Fifth (or Fourteenth) Amendment, a plaintiff must allege that (1) plaintiff possessed a valid property interest; (2) there was a taking of that property interest under color of state law; and (3) the taking was without just compensation. *See, e.g.,* Cranley v. Nat'l Life Ins. Co. of Vt., 318 F.3d 105, 111 (2d Cir. 2003); Story v. Green, 978 F.2d 60, 62 (2d Cir. 1992).

However, even where a plaintiff has sustained an unjust taking, he "has not suffered a violation of the Just Compensation Clause until [he] has unsuccessfully attempted to obtain just compensation through the procedures provided by the State." Villager Pond, Inc. v. Town of Darien, 56 F.3d 375, 379 (2d Cir. 1995) (quoting Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City, 473 U.S. 172, 195, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985)). "The Fifth Amendment does not proscribe the taking of property; it proscribes taking without just compensation." Williamson Cty., 473 U.S. at 194, 105 S.Ct. 3108. "Thus, before a plaintiff may assert a federal takings claim, he must first seek compensation from the state if the state has a 'reasonable, certain and adequate provision for obtaining compensation.' " Villager Pond, 56 F.3d at 379–80; *see also* Sherman v. Town of Chester, 752 F.3d 554, 561 (2d Cir. 2014) (holding that to establish ripeness, a plaintiff "must 'show that (1) the state regulatory entity has rendered a final decision on the matter, and (2) the plaintiff has sought just compensation by means of an available state procedure' " (quoting Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 88 (2d Cir. 2002))). The Second Circuit has further held that "a state compensation procedure will be deemed available and adequate within the meaning of Williamson even when that procedure remains unsure and undeveloped." Southview Assocs., Ltd. v. Bongartz, 980 F.2d 84, 99 (2d Cir. 1992) (citations omitted).

Here, plaintiffs have not pled that they pursued any state court remedies for the purported takings, and "[c]ourts within the Second Circuit have uniformly dismissed Fifth Amendment takings claims at the pleadings stage when plaintiffs fail to sufficiently allege that they have availed themselves of such state procedures." Viteritti v. Inc. Vill. of Bayville, 831 F.Supp.2d 583, 591 (E.D.N.Y. 2011) (citing, *inter alia,* Vandor, Inc. v. Militello, 301 F.3d 37, 38–39 (2d Cir. 2002)). Moreover, courts in this Circuit have correctly and consistently held that Article I, Section 7 of the New York State Constitution—which provides that "private property shall not be taken for public use

without just compensation," N.Y. Const. art. I, § 7—"satisfies the availability element of the second prong of Williamson County." Melrose Credit Union v. City of New York, 247 F.Supp.3d 356, ——, 2017 WL 1200902, at *11 (S.D.N.Y. 2017) (collecting cases) (citing, *inter alia,* McCormack Sand Co. v. Town of N. Hempstead Solid Waste Mgmt. Auth., 960 F.Supp. 589, 595 (E.D.N.Y. 1997) ("New York law provides procedures for obtaining compensation for the alleged taking [of personal property], including a cause of action for inverse condemnation under Article I, Section 7 of the New York Constitution.")). "Indeed, Plaintiffs ... assert a claim for compensatory damages under Article I, Section VII *in this very lawsuit*" as Count 8 of the SAC (*see* SAC at ¶¶ 203–12). Melrose Credit Union, 247 F.Supp.3d at ——, 2017 WL 1200902, at *11.

**\*21** Plaintiffs attempt to circumvent this pleading requirement by invoking the well-established rule that there is no need to *exhaust* available state remedies prior to instituting a Section 1983 action. (*See* Pls.' Opp'n Br. at 14–15 & n.19.) However, the Supreme Court squarely rejected that argument in Williamson County and, in so doing, explained the difference between the exhaustion and ripeness doctrines:

> Respondent asserts that it should not be required to seek variances from the regulations because its suit is predicated upon 42 U.S.C. § 1983, and there is no requirement that a plaintiff exhaust administrative remedies before bringing a § 1983 action. Patsy v. Florida Board of Regents, 457 U.S. 496, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982). The question whether administrative remedies must be exhausted is conceptually distinct, however, from the question whether an administrative action must be final before it is judicially reviewable.

> ...

> While the policies underlying the two concepts often overlap, the finality requirement is concerned with whether the initial decisionmaker has arrived at a definitive position on the issue that inflicts an actual, concrete injury; the exhaustion requirement generally refers to administrative and judicial procedures by which an injured party may seek review of an adverse decision and obtain a remedy if the decision is found to be unlawful or otherwise inappropriate. Patsy concerned the latter, not the former.

> ...

> The Fifth Amendment does not proscribe the taking of property; it proscribes taking without just

compensation. ... If the government has provided an adequate process for obtaining compensation, and if resort to that process yields just compensation, then the property owner has no claim against the Government for a taking.

473 U.S. at 192–95, 105 S.Ct. 3108 (citations and alterations omitted).

Thus, plaintiffs err in relying on the rule that failure to exhaust state avenues for relief does not bar Section 1983 actions. Ripeness, not exhaustion, is the relevant inquiry, and plaintiffs have not suffered a takings violation under the Due Process Clause if they have not attempted to secure compensation via state procedures. Thus, the Court grants defendants' motion to dismiss plaintiffs' unjust takings claim because the SAC does not allege a ripe injury.

5. Equal Protection
As for the equal protection prong of plaintiffs' Section 1983 claim, the SAC alleges that

defendants have deprived the plaintiffs of equal protections under law by imposing the DRF (which is unquestionably a penalty/fine for simply being issued a ticket/citation), which groups innocent individuals along with guilty individuals, whom are all imposed with the same monetary penalty/fine.

...

Very simply, to charge the DRF penalty against innocent individuals, when the court (here, the TPVA) does not have sufficient evidence to make a guilty finding is an explicit violation of the Equal Protections Clause.

(SAC at ¶¶ 82, 84.)

The Fourteenth Amendment to the United States Constitution provides that no state may "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This language has been interpreted to mean that, in legislation, "all persons similarly situated should be treated alike." City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). Where, as here,[21] a challenged law does not discriminate against a suspect class or implicate a fundamental right, rational basis scrutiny applies. See Hayden v. Paterson, 594 F.3d 150, 170 (2d Cir. 2010).

[21] Plaintiffs concede that their equal protection claim does not implicate a suspect class or a fundamental right. (Pls.' Opp'n Br. at 15.)

*22 This standard of review is "a paradigm of judicial restraint." FCC v. Beach Commc'ns, Inc., 508 U.S. 307, 314, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993); see also id. at 313, 113 S.Ct. 2096 ("Whether embodied in the Fourteenth Amendment or inferred from the Fifth, equal protection is not a license for courts to judge the wisdom, fairness, or logic of legislative choices."). "In areas of social and economic policy," a statutory classification must be upheld "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification," id. at 313, 113 S.Ct. 2096, and such a statute is valid unless the "varying treatment of different groups or persons is so unrelated to the achievement of any combination of legitimate purposes that [a court] can only conclude that the legislature's actions were irrational," Hayden, 594 F.3d at 170 (quoting Vance v. Bradley, 440 U.S. 93, 97, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979)); see also Beach Commc'ns, 508 U.S. at 316, 113 S.Ct. 2096 ("Defining the class of persons subject to a regulatory requirement—much like classifying governmental beneficiaries—inevitably requires that some persons who have an almost equally strong claim to favored treatment be placed on different sides of the line, and the fact that the line might have been drawn differently at some points is a matter for legislative, rather than judicial, consideration." (alterations and citation omitted)); Greene v. Town of Blooming Grove, 879 F.2d 1061, 1063 (2d Cir. 1989) (holding that a statute exercising general police power "will not be held unconstitutional if its wisdom is at least fairly debatable and it bears a rational relationship to a permissible state objective"). "The party challenging such an ordinance bears the heavy burden of negating every conceivable rational and legitimate basis for the ordinance." Casciani v. Nesbitt, 392 Fed.Appx. 887, 889 (2d Cir. 2010) (citing Tuan Anh Nguyen v. I.N.S., 533 U.S. 53, 75, 121 S.Ct. 2053, 150 L.Ed.2d 115 (2001)).

Plaintiffs have not carried their pleading onus in this case. Although the SAC summarily alleges that the DRF's classification scheme is not "rational" (see, e.g., SAC at ¶¶ 63, 65), those threadbare, conclusory assertions are insufficient under the legal standard set forth supra. See, e.g., Seabrook v. City of New York, 509 F.Supp.2d 393, 402 (S.D.N.Y. 2007); Rheaume v. Pallito, No. 5:11-CV-72 (JC), 2012 WL 3394343, at *5 (D. Vt. July 13, 2012) ("Indeed, [the plaintiff's] entire equal protection claim, asserted amidst a string of other alleged constitutional violations, is precisely the sort of

'threadbare recital' that the Supreme Court has deemed insufficient." (citing *Iqbal*, 556 U.S. at 678, 129 S.Ct. 1937)), *report and recommendation adopted*, 2012 WL 3518535 (D. Vt. Aug. 14, 2012). Plaintiffs have not alleged any facts from which a plausible claim could be made that the DRF lacks "any reasonable conceivable" purpose.[22] Indeed, its acknowledged, ostensible objective—to recoup administrative costs associated with processing and adjudicating traffic violations (*see* SAC at ¶ 34)—would certainly be a prudent goal. *See Guthart*, 52 N.Y.S.3d at 824 (noting that the "legislative finding supporting the [DRF] is stated in the amending ordinance to be that 'the current fee charged to motorists appearing before TPVA whose cases have been adjudicated to a final disposition other than not guilty is currently below the actual cost of adjudicating those cases' ").

> [22]  Plaintiffs cite *Sacher v. Village of Old Brookville*, 967 F.Supp.2d 663 (E.D.N.Y. 2013), in their opposition, but that case is inapposite because it concerned a "class-of-one" equal protection claim, and the relevant touchstone was whether plaintiffs had sufficiently pled disparate treatment. *Id.* at 670–72. Here, plaintiffs have not met their burden of pleading facts that would "negat[e] every conceivable rational and legitimate basis for the [DRF]." *Casciani*, 392 Fed.Appx. at 889.

Insofar as plaintiffs allege that the DRF has an improper ulterior motive—namely, to finance the County's budget deficits (*see* SAC at ¶¶ 34–38)—"defendants' *subjective* motivation in enacting the ordinance is irrelevant to the question of whether the ordinance itself is constitutionally valid." *Casciani v. Nesbitt*, 659 F.Supp.2d 427, 437 (W.D.N.Y. 2009), *aff'd*, 392 Fed.Appx. 887 (2d Cir. 2010); *see also Beach Commc'ns*, 508 U.S. at 315, 113 S.Ct. 2096 ("Moreover, because we never require a legislature to articulate its reasons for enacting a statute, it is entirely irrelevant for constitutional purposes whether the conceived reason for the challenged distinction actually motivated the legislature.").

**\*23** Finally, although plaintiffs argue that they are entitled to discovery to demonstrate that the DRF lacks rationality (*see* Pls.' Opp'n at 17), "it is well settled that 'the Government has no obligation to produce evidence, or empirical data to sustain the rationality of a statutory classification.' " *Jones v. Schneiderman*, 888 F.Supp.2d 421, 428 (S.D.N.Y. 2012) (quoting *Lewis v. Thompson*, 252 F.3d 567, 582 (2d Cir. 2001). "In other words, a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." *Beach Commc'ns*, 508 U.S. at 315, 113 S.Ct. 2096. "To hold otherwise would be to interpret the Fourteenth Amendment in a way that is

destructive to federalism and to the power of the sovereign states to regulate their internal economic affairs." *Sensational Smiles, LLC v. Mullen*, 793 F.3d 281, 287 (2d Cir. 2015), *cert. denied*, ––– U.S. ––––, 136 S.Ct. 1160, 194 L.Ed.2d 174 (2016); *see also id.* ("Much of what states do is to favor certain groups over others on economic grounds. We call this politics."). Thus, even were plaintiffs to proceed to summary judgment on their equal protection claim, they could not undermine the DRF's rationality through extrinsic evidence or testimony.[23] Put differently, if a reasonable purpose appears on the face of the challenged law, then the Court's inquiry is at an end.

> [23]  As a result, the legislative histories that plaintiffs attached to and cited in their opposition (*see* ECF No. 29) are irrelevant. In any event, they are outside the pleadings and are not materials that a Court may consider on a motion to dismiss. *See supra* Part II.B.

In sum, because plaintiffs have not adequately alleged that the DRF ordinance is irrational, the Court dismisses the equal protection portion of their Section 1983 claim.[24] *See Casciani*, 659 F.Supp.2d at 434; *Immaculate Heart Cent. Sch. v. N.Y. State Pub. High Sch. Athletic Ass'n*, 797 F.Supp.2d 204, 211 (N.D.N.Y. 2011) ("When neither the complaint nor the non-moving party's opposition negate 'any reasonably conceivable state of facts that could provide a rational basis' for the challenged classification, a defendant's motion to dismiss an equal protection claim will be granted." (citation omitted)).

> [24]  In the event of dismissal, plaintiffs have requested leave to amend their pleading to assert a "class-of-one" equal protection claim. (*See* Pls.' Opp'n at 16 n.21.) Given that this a putative class action, it is unclear that plaintiffs could successfully allege such a cause of action. *See Fortress Bible Church v. Feiner*, 694 F.3d 208, 221 (2d Cir. 2012) (observing that "the Supreme Court affirmed [has] the existence of a class-of-one theory for equal protection claims, under which *a single individual* can claim a violation of her Equal Protection rights based on arbitrary disparate treatment" (emphasis added) (citing *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000))). However, in an abundance of caution, the Court will grant plaintiffs leave to amend to attempt to assert that claim.

### 6. Double Jeopardy

Plaintiffs also assert a double jeopardy violation on the

ground that "[b]y imposing the DRF upon individuals after the charges/accusatory instrument against them have been dismissed, the TPVA court is subjecting/jeopardizing individuals twice to the same charges/assessment of penalties." (SAC at ¶ 86.)

The Double Jeopardy Clause protects an individual's right not to be "subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V, cl. 2. It prohibits both the second prosecution of a defendant for the same offense after an acquittal or a conviction and the imposition of multiple punishments for the same offense. See North Carolina v. Pearce, 395 U.S. 711, 717, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), *overruled on other grounds*, Alabama v. Smith, 490 U.S. 794, 109 S.Ct. 2201, 104 L.Ed.2d 865 (1989). In Hudson v. United States, 522 U.S. 93, 118 S.Ct. 488, 139 L.Ed.2d 450 (1997), the Supreme Court clarified that the "Clause protects only against the imposition of multiple *criminal* punishments for the same offense," and it thus does not extend to civil penalties. Id. at 99, 118 S.Ct. 488.

In United States v. Ursery, 518 U.S. 267, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996), the Supreme Court articulated a two-part test to determine whether a sanction is criminal or civil. First, a court must consider whether the legislative "intent underlying the enactment of, or the end served by" the law. Doe, 120 F.3d at 1273. "[I]f a disability is imposed 'not to punish, but to accomplish some other legitimate governmental purpose,' then it has been considered 'nonpenal.' " Id. (quoting Trop v. Dulles, 356 U.S. 86, 96, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958)). Second, if the law was not designed to be punitive in nature, courts must then determine whether, despite this, it is "so punitive either in purpose or effect" that it is "transform[ed] into a criminal penalty ...." United States v. Ward, 448 U.S. 242, 249, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980). "The Supreme Court has not spelled out the precise nature of the second-stage inquiry," Doe v. Pataki, 120 F.3d 1263, 1275 (2d Cir. 1997), and indeed has determined it to be "a highly context specific matter," Flemming v. Nestor, 363 U.S. 603, 616, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960). However, the Court has set forth a list of considerations to guide the inquiry, including

> **\*24** [w]hether the sanction involves an affirmative disability or restraint, whether it has historically been regarded as a punishment, whether it comes into play only on a finding of scienter, whether its operation will promote the traditional aims of punishment—retribution and

deterrence, whether the behavior to which it applies is already a crime, whether an alternative purpose to which it may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned....

Kennedy v. Mendoza–Martinez, 372 U.S. 144, 168–69, 83 S.Ct. 554, 9 L.Ed.2d 644 (1963) (footnotes omitted). The list is not exhaustive nor is any particular inquiry dispositive. See United States v. Ward, 448 U.S. 242, 249, 100 S.Ct. 2636, 65 L.Ed.2d 742 (1980); Doe, 120 F.3d at 1275 ("Sometimes one factor will be considered nearly dispositive of punitiveness 'in fact,' while sometimes another factor will be crucial to a finding of nonpunitiveness." (citation omitted)). Moreover, the Supreme Court has cautioned that "all civil penalties have some deterrent effect," and if a civil sanction was required to be " 'solely' remedial (i.e., entirely nondeterrent) ... then no civil penalties are beyond the scope of the [Double Jeopardy] Clause." Hudson, 522 U.S. at 102, 118 S.Ct. 488.

The burden thus rests on the party challenging the law to "show by 'the clearest proof' that the sanctions imposed 'are so punitive in form and effect as to render them criminal despite [the legislature's] intent to the contrary.' " Doe, 120 F.3d at 1274 (quoting Ursery, 518 U.S. at 290, 116 S.Ct. 2135). The Supreme Court has described this burden as "heavy" and found punishments such as involuntary civil confinement to be civil in nature. See Kansas v. Hendricks, 521 U.S. 346, 361, 117 S.Ct. 2072, 138 L.Ed.2d 501 (1997). At the same time, the Court has recognized that sanctions imposed in civil proceedings may constitute punishment. See Dep't of Revenue of Montana v. Kurth Ranch, 511 U.S. 767, 114 S.Ct. 1937, 128 L.Ed.2d 767 (1994); Hudson, 522 U.S. at 95, 118 S.Ct. 488.

Here, plaintiffs argue that they have carried their pleading burden because the SAC alleges that the DRF is punitive. (Pls.' Opp'n Br. at 21–22; *see, e.g.*, SAC at ¶ 45.) However, as the court in Guthart noted, "[t]he legislative finding supporting the [DRF] is stated in [Nassau County Ordinance 190–2012] to be that 'the current fee charged to motorists appearing before TPVA whose cases have been adjudicated to a final disposition other than not guilty is currently below the actual cost of adjudicating those cases.' " Guthart, 52 N.Y.S.3d at 824 (quoting Nassau Cty. Ordinance § 190–2012). Thus, because the Legislature evidently intended the DRF to be, at least in part, remedial, plaintiffs have not met the first part of the

*Ursery* test.[25] *See Hudson*, 522 U.S. at 102, 118 S.Ct. 488.

[25]     As discussed further *infra*, for purposes of the Excessive Fines Clause, a civil sanction may be both remedial and punitive and still be subject to the Eighth Amendment's ambit. Thus, even if a law does not implicate double jeopardy protections, it may still be considered a "fine." *See Hudson*, 522 U.S. at 103, 118 S.Ct. 488.

Further, plaintiffs have not alleged facts sufficient to state a plausible claim that the DRF " '[is] so punitive in form and effect as to render [it] criminal ....' " *Doe*, 120 F.3d at 1274 (quoting *Ursery*, 518 U.S. at 290, 116 S.Ct. 2135). Indeed, such a claim would not be plausible given the weight of New York legal authority holding that penalties for traffic infractions are civil and not criminal. *See Dolce v. Nassau Cty. Traffic & Parking Violations Agency*, 7 N.Y.3d 492, 493–94, 497, 825 N.Y.S.2d 663, 859 N.E.2d 469 (2006) ("reviewing the language of the statute authorizing the creation of the TPVA and its legislative history" and noting that the TPVA's purpose was to enable "divestiture in City and District Courts statewide of jurisdiction over non-criminal traffic violations and parking violations" (citation omitted)); *Krieger*, 978 N.Y.S.2d at 598–99 (holding double jeopardy does not apply to red-light ticket penalties because "the statutory scheme demonstrates an unequivocal intent to create a civil enforcement mechanism, not a criminal one," and "the limited $50 fine is not so severe as to transform the intended civil penalty into a quasi-criminal one"); *Cty. of Nassau v. Levine*, 29 Misc.3d 474, 907 N.Y.S.2d 563, 568 (Dist. Ct. Nassau Cty. 2010) ("As for movant's claim that his due process rights are violated because he will not be able to cross-examine a live witness [at a hearing on a red-light ticket], and assuming that claim be correct, inasmuch as he faces neither criminal conviction nor conviction for any provision of the Vehicle and Traffic Law, his assertion is without merit."); *People v. Haishun*, 238 A.D.2d 521, 656 N.Y.S.2d 660, 661 (App. Div. 2d Dep't 1997) ("Applying the *Ursery* two-prong test to the instant case, we conclude, as have the Third and Fourth Departments, that sentencing a defendant for driving while intoxicated after the suspension of his or her driver's license pursuant to Vehicle and Traffic Law § 1193(2)(e)(7), does not violate double jeopardy principles." (citations omitted)).

**\*25** Accordingly, the Court dismisses plaintiffs' double jeopardy claim because they have not alleged facts sufficient to plausibly state either that (1) the Legislature intended the DRF to be a criminal sanction, or (2) the DRF and the circumstances surrounding its imposition are

so punitive that it is effectively penal in nature.[26]

[26]     Therefore, the Court need not, and does not address, defendants' additional argument that the Double Jeopardy Clause does not apply to this case because the DRF is not imposed following a judgment of acquittal or conviction. (*See* Defs.' Br. at 17.)

7. Excessive Fines

Finally, the SAC alleges that the "DRF imposed by the defendants is an excessive fine issued against those whose only improper action is simply being issued a ticket," and that "[b]y charging a penalty after the charges/accusatory instrument have been dismissed, defendants have violated the Eighth Amendment's prohibition upon excessive fines in comparison to the accused actions." (SAC at ¶¶ 90–91.)

The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const., Amend. 8. The Supreme Court has explained that "the word 'fine' ... mean[s] a payment to a sovereign as punishment for some offense." *Browning–Ferris Industries of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 265, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989) (footnoted omitted). "The Excessive Fines Clause thus 'limits the government's power to extract payments, whether in cash or in kind, as punishment for some offense.' " *United States v. Bajakajian*, 524 U.S. 321, 328, 118 S.Ct. 2028, 141 L.Ed.2d 314 (1998) (quoting *Austin v. United States*, 509 U.S. 602, 609–10, 113 S.Ct. 2801, 125 L.Ed.2d 488 (1993)).

The Second Circuit has established a "two-step inquiry for determining whether a financial penalty is excessive under the Eighth Amendment." *United States v. Viloski*, 814 F.3d 104, 108 (2d Cir. 2016) (footnote omitted), *cert. denied*, ––– U.S. ––––, 137 S.Ct. 1223, 197 L.Ed.2d 462 (2017). First, a court must "determine whether the Excessive Fines Clause applies at all." *Id.* at 109 (citing *Bajakajian*, 524 U.S. at 334, 118 S.Ct. 2028). That requirement is met if a forfeiture "may be characterized, at least in part, as 'punitive'—*i.e.*, forfeitures for which a defendant is personally liable." *Id.* (citing *Bajakajian*, 524 U.S. at 327–28, 118 S.Ct. 2028). "In contrast, purely 'remedial' forfeitures—*i.e.*, those *in rem* forfeitures intended not to punish the defendant but to compensate the Government for a loss or to restore property to its rightful owner—fall outside the scope of the Excessive Fines Clause." *Id.* (citing *Bajakajian*, 524 U.S. at 329, 118 S.Ct. 2028; and *Paroline v. United States*, ––– U.S.

——, 134 S.Ct. 1710, 1726, 188 L.Ed.2d 714 (2014) ("The primary goal of restitution is remedial or compensatory, but it also serves punitive purposes. That may be sufficient to bring it within the purview of the Excessive Fines Clause.")).

Second, a court must "determine whether the challenged forfeiture is unconstitutionally excessive." *Id.* at 109 (citing *Bajakajian,* 524 U.S. at 334, 118 S.Ct. 2028.) "A forfeiture is unconstitutionally excessive 'if it is grossly disproportional to the gravity of a defendant's offense.' " *Id.* (quoting *Bajakajian*, 524 U.S. at 334, 118 S.Ct. 2028). The Second Circuit has articulated a four-factor test governing this inquiry:

> (1) the essence of the crime of the defendant and its relation to other criminal activity, (2) whether the defendant fits into the class of persons for whom the statute was principally designed, (3) the maximum sentence and fine that could have been imposed, and (4) the nature of the harm caused by the defendant's conduct.

**\*26** *Id.* (quoting *United States v. George*, 779 F.3d 113, 122 (2d Cir. 2015)). Moreover, the Second Circuit has said that "courts may consider—in addition to the four factors ... previously derived from *Bajakajian*—whether the forfeiture would deprive the defendant of his livelihood, *i.e.*, his 'future ability to earn a living.' " *Id.* at 111 (citation omitted).

Here, defendants argue that the Court need not consider whether the DRF is "unconstitutionally excessive" because it is "not punitive in nature." (Defs.' Br. at 20.) They assert that because the DRF is not imposed following a "criminal or quasi-criminal proceeding from which there was a finding of guilt or innocence" and is assessed "to defer the administrative costs associated with a ticket's processing," the Excessive Fines Clause does not apply. (*Id.* at 19.)

However, in *Austin*, the Supreme Court held that because the "purpose of the Eighth Amendment ... was to limit the government's power to punish," the Excessive Fine Clause may apply to civil forfeiture if that sanction "can only be explained as serving *in part* to punish." 509 U.S. at 609–10, 113 S.Ct. 2801 (emphasis added) (citing *United States v. Halper*, 490 U.S. 435, 447, 109 S.Ct. 1892, 104 L.Ed.2d 487 (1989) ("It is commonly understood that civil proceedings may advance punitive as well as remedial goals, and, conversely, that both

punitive and remedial goals may be served by criminal penalties."), *abrogated on other grounds by Hudson*, 522 U.S. 93, 118 S.Ct. 488). "Thus, the question is not ... whether [the] forfeiture ... is civil or criminal, but rather whether it is punishment." *Id.* at 610, 113 S.Ct. 2801 (footnote omitted); *see also Halper*, 490 U.S. at 448, 109 S.Ct. 1892 ("[A] civil sanction that cannot fairly be said solely to serve a remedial purpose, but rather can only be explained as also serving either retributive or deterrent purposes, is punishment, as we have come to understand the term.").

Accordingly, defendants are mistaken to contend that for a sanction to be a "fine," it must be the result of a "criminal or quasi-criminal proceeding from which there was a finding of guilt or innocence."[27] Following *Austin* and *Bajakajian*, both federal and New York State courts have found that administrative and other civil penalties satisfy the first part of the test delineated above, even if they bear no direct relationship to a criminal prosecution.[28] *See, e.g.*, *Korangy v. U.S. F.D.A.*, 498 F.3d 272, 277 (4th Cir. 2007) (assuming that Food and Drug Administration "penalties [were] at least partially punitive and thus subject to the Eighth Amendment," but "conclud[ing] that [the] penalties imposed [were not] grossly disproportionate to the gravity of the offense"), *cert denied sub nom. Korangy Radiology Assocs., P.A. v. Food & Drug Admin.*, 552 U.S. 1143, 128 S.Ct. 1110, 169 L.Ed.2d 811 (2008); *Towers v. City of Chicago*, 173 F.3d 619, 624 (7th Cir. 1999) (holding that "fines imposed by the City under the ordinances at issue here [were] not solely remedial" and therefore were subject to Eighth Amendment), *cert. denied*, 528 U.S. 874, 120 S.Ct. 178, 145 L.Ed.2d 150 (1999); *Sanders v. Szubin*, 828 F.Supp.2d 542, 553 n.8 (E.D.N.Y. 2011) (observing that defendants conceded that administrative sanctions imposed by Office of Foreign Assets Control were "at least in part, punitive and thus [ ] properly considered within the ambit of the Eighth Amendment's prohibition of 'excessive' fines"); *Prince v. City of New York*, 108 A.D.3d 114, 966 N.Y.S.2d 16, 20 (App. Div. 1st Dep't 2013) (in a case challenging a mandatory sanitation fine, "reject[ing] the City's contention that the Excessive Fines Clause does not apply to the civil penalty at issue here" because "[a]lthough Eighth Amendment claims often arise in the criminal context, civil fines may also fall within reach of the amendment," and "[t]he relevant inquiry is not whether the fine arises in the civil or criminal context, but whether the fine constitutes punishment" (collecting cases)). *But see New York State Fed'n of Taxi Drivers, Inc. v. City of New York*, 270 N.Y.S.2d 340, 343 (E.D.N.Y. 2003) ("Plaintiff cites no authority for the proposition that administrative penalties of the sort challenged here could be subject to the Eighth

Amendment.").

27    Prior to *Austin*, the Supreme Court held in *Ingraham v. Wright*, 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977), a case concerning corporal punishment in schools, that

> Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional guarantees traditionally associated with criminal prosecutions.... [T]he State does not acquire the power to punish with which the Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law. Where the State seeks to impose punishment without such an adjudication, the pertinent constitutional guarantee is the Due Process Clause of the Fourteenth Amendment.

*Id.* at 671 n.40; *see also City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983) (holding that individual could not sue hospital for failing to provide medical care after he was shot because where there has "been no formal adjudication of guilt ... the Eighth Amendment has no application").

However, the Supreme Court subsequently distinguished that decision and its progeny on the ground that it involved alleged cruel and unusual punishment. *See Browning–Ferris Indus.*, 492 U.S. at 263 n.3, 109 S.Ct. 2909 ("*Ingraham*, like most of our Eighth Amendment cases, involved the Cruel and Unusual Punishments Clause, and it therefore is not directly controlling in this Excessive Fines Clause case.") Further, as set forth *supra*, *Austin* and related case law make clear that a civil proceeding that does not involve a formal adjudication of guilt may nevertheless result in an excessive fine.

28    As noted *supra* note 25, in this way, the Excessive Fines Clause has a more expansive reach than the Double Jeopardy Clause, which is limited to criminal sanctions and civil penalties that are so punitive as to effectively be criminal in nature. *See Ursery*, 518 U.S. at 286, 116 S.Ct. 2135 ("But *Austin* ... it must be remembered, did not involve the Double Jeopardy Clause at all. *Austin* was decided solely under the Excessive Fines Clause of the Eighth Amendment, a constitutional provision which we never have understood as parallel to, or even related to, the Double Jeopardy Clause of the Fifth Amendment.").

**\*27** Thus, to determine whether the DRF constitutes an excessive fine, the appropriate standard is not whether it stems from a criminal or pseudo-criminal proceeding, but whether it is punishment. Although defendants argue that the DRF has the legitimate remedial purpose of "defer[ring] the administrative costs associated with a ticket's processing," on a motion to dismiss, the Court must assume the allegations in the SAC to be true, and plaintiffs have adequately asserted that the DRF is, at least in part, punishment imposed "against individuals for simply being issued a ticket without any findings of fact, nor proof of any actual violations," and "irrespective of whether or not they are actually guilty of any offense or violation ...."[29] (*Id.* at ¶¶ 32–34.)

29    Accordingly, defendants err in relying on *Ford Motor Credit Company v. New York City Police Department*, 394 F.Supp.2d 600 (S.D.N.Y. 2005), because that decision involved a motion for summary judgment, and the court concluded based on the facts in the record that a municipal fine was "plainly not punitive and therefore not subject to Eighth Amendment analysis," but instead "remedial, as it is imposed to compensate the City for administrative expenses incurred in the disposition of [ ] vehicles." *Id.* at 618, *aff'd*, 503 F.3d 186 (2d Cir. 2007). In contrast, this action is at the pleadings stage, and defendants have adduced no facts demonstrating that the DRF has a wholly non-punitive objective.

Accordingly, because plaintiffs have asserted that the DRF has a punitive purpose, the Court finds that they have stated a cause of action pursuant to the Excessive Fines Clause. As noted, defendants do not argue that the SAC fails to plausibly assert that the DRF is "unconstitutionally excessive," and plaintiffs do allege that the DRF is disproportionate "in comparison to the accused actions (i.e.—no charges pending, yet a penalty still imposed)." (SAC at ¶ 91.) Thus, the Court does not reach this second requirement.

\*\*\*

In sum, with respect to defendants' subject matter jurisdiction arguments, the Court concludes that *Rooker*–*Feldman* does not bar adjudication of this case because plaintiffs are not state court losers and are not seeking review of an adverse state judgment, but rather assert a general constitutional challenge to the DRF. In addition, the Court, in its discretion, declines to abstain under either *Younger* or *Pullman* because there are no pending state court proceedings involving plaintiffs in which they could assert their Section 1983 claim, and resolution of plaintiffs' constitutional claims does not depend on interpreting or applying unclear state law.

On the merits, the Court grants defendants' 12(b)(6) motion to dismiss (1) the bill of attainder claim because

plaintiffs have not sufficiently alleged specificity; (2) the procedural due process claim because plaintiffs have not sufficiently alleged inadequate procedures connected to deprivation of a substantial property interest; (3) the substantive due process claim because plaintiffs have not sufficiently alleged deprivation of a protected property right; (4) the unjust takings claim because plaintiffs have not sufficiently alleged a ripe injury; (5) the equal protection claim because plaintiffs have not sufficiently alleged that the DRF lacks a rational basis; and (6) the double jeopardy claim because plaintiffs have not sufficiently alleged that the DRF is a criminal sanction by design or is so punitive as to effectively be a criminal sanction.

However, the Court denies the motion to dismiss the excessive fines claim under Section 1983 on the ground raised by defendants—namely, that the DRF cannot be punitive because it is not imposed following a criminal or quasi-criminal proceeding and is assessed to defray administrative costs. Because it was not raised by defendants, the Court does not reach the second issue with respect to the excessive fines claim—that is, whether a $45 fine can be unconstitutionally excessive.

**\*28** Therefore, the Court grants defendants' motion in part and denies it in part, and, because one of plaintiffs' federal claims survives, the Court will not dismiss the pendant state law claims at this stage.[30]

---

[30]    The Court notes that plaintiffs' brief focuses on the unconstitutional application of the DRF as to tickets or citations that the TPVA has dismissed with a disposition of other than "not guilty." However, the SAC alleges claims on behalf of, *inter alia*, a proposed "*ultra vires* class" that includes "[a]ll persons who paid a [DRF] to the [TPVA] between January 1, 2008 and the present." (SAC at ¶ 93.) In other words, plaintiffs also apparently challenge the constitutionality of the DRF as to tickets or citations imposed against motorists who received a "guilty" disposition and paid that fee.
The Court's analysis in this Memorandum and Order applies equally to all DRF assessments irrespective of a ticket or citation's final disposition. In fact, many of plaintiffs' Section 1983 claims, including the procedural due process claim, do not apply to "guilty" dispositions. In any event, the Court dismisses the Section 1983 claims—except for the excessive fines claim—as to all applications of the DRF.

**D. Leave to Amend**
In the event of dismissal, plaintiffs have only requested leave to amend their equal protection claim. *See supra*

note 24. Nevertheless, the Court has considered whether plaintiffs should be granted leave to amend their other Section 1983 claims. Rule 15(a)(2) of the Federal Rules of Civil Procedure provides that a party shall be given leave to amend "when justice so requires." Fed. R. Civ. P. 15(a)(2). "Leave to amend should be freely granted, but the district court has the discretion to deny leave if there is a good reason for it, such as futility, bad faith, undue delay, or undue prejudice to the opposing party." *Jin v. Metro. Life Ins. Co.*, 310 F.3d 84, 101 (2d Cir. 2002); *see Local 802, Assoc. Musicians of Greater N.Y. v. Parker Meridien Hotel*, 145 F.3d 85, 89 (2d Cir. 1998) (finding that leave to amend may be denied based upon the "futility of amendment"). As to futility, "leave to amend will be denied as futile only if the proposed new claim cannot withstand a 12(b)(6) motion to dismiss for failure to state a claim, *i.e.*, if it appears beyond doubt that the plaintiff can plead no set of facts that would entitle him to relief." *Milanese v. Rust–Oleum Corp.*, 244 F.3d 104, 110 (2d Cir. 2001) (citing *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991)).

In light of the pleading deficiencies discussed above, it is not clear to the Court that plaintiffs can plausibly state any of the federal constitutional claims that the Court has dismissed. However, in an abundance of caution, the Court will grant plaintiffs leave to amend.

IV. CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part defendants' motion to dismiss. With plaintiffs' consent, the Court dismisses defendant TPVA and plaintiffs' Article 78 claim (Count 20 of the SAC). In addition, the Court dismisses plaintiffs' bill of attainder, procedural due process, substantive due process, unjust takings, equal protection, and double jeopardy claims under Section 1983 for failure to state a claim with leave to amend. The Court denies defendants' motion with respect to the excessive fines claim. Any amended complaint must be filed within thirty (30) days of this Memorandum and Order.

**\*29** SO ORDERED.

**All Citations**

--- F.Supp.3d ----, 2017 WL 4286613

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 4060586
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Serge DuBOIS, Plaintiff,
v.
MACY'S RETAIL HOLDINGS, INC., Defendant.

No. 11–CV–4904 (NGG)(LB).
|
Sept. 13, 2012.

**Attorneys and Law Firms**

Serge Dubois, Brooklyn, NY, pro se.

Diane Krebs, Gordon & Rees LLP, New York, NY, for
Defendant.

**MEMORANDUM & ORDER**

NICHOLAS G. GARAUFIS, District Judge.

**\*1** Before the court is a motion filed by Defendant
Macy's Retail Holdings, Inc. to dismiss Plaintiff Serge
DuBois's complaint, and confirm an arbitral award
against DuBois. (See Docket Entry # 25.) The court
referred these motions to Magistrate Judge Lois Bloom
(see Docket Entry # 16), and Judge Bloom has
recommended that they be granted (see Report and
Recommendation ("R & R") (Docket Entry # 35)) Judge
Bloom also construed a document attached to DuBois's
complaint as a cross-motion to vacate the arbitral award,
and recommend that the cross-motion be denied. (See id.
at 6 & n. 6.) For the following reasons, R & R is
ADOPTED as modified below. The motion to dismiss is
GRANTED. The motion to confirm the arbitral award is
GRANTED. The cross-motion to vacate the arbitral
award is DENIED.

DuBois objects to the R & R.[1] (See Objections ("Obj.")
(Docket Entry # 36).)

[1] DuBois's objections are untimely, but the court will
nevertheless consider them. Rule 72(b)(2) of the
Federal Rules of Civil Procedure limits a party's time
to object to a report and recommendation to fourteen
days from the day that the report and recommendation

is served. The R & R reiterates this requirement. (See R
& R at 20.) Judge Bloom filed the R & R on August 17,
2012, and the Clerk of Court mailed a copy to DuBois
later that day. (See Docket Entry # 35.) Under Rule
5(b)(2)(C) of the Federal Rules, service of a paper such
as a report and recommendation is complete when the
paper is mailed. Accordingly, DuBois had until end of
Friday, August 31, 2012, to file objections. The Clerk
of Court, however, noted on the public docket that
objections to the R & R would be due by Tuesday,
September 4, 2012. (See Docket Entry # 35.) DuBois
filed his objections on Wednesday, September 5, 2012,
and thereby missed both the true and the posted
deadline for filing objections. Because the objections
are untimely, it would be within the court's discretion
to ignore them and to review the entire R & R for clear
error. See La Torres v. Walker, 216 F.Supp.2d 157, 159
(S.D.N.Y.2000); Gesualdi v. Mack Excavation &
Trailer Serv., Inc., No. 09–CV–2502 (KAM)(JO), 2010
WL 985294, at *1 (E.D.N.Y. Mar. 15, 2010). But
DuBois is pro se and he has filed his objections within
one day of the posted deadline. Under these relatively
unusual circumstances, the court will, sua sponte, grant
DuBois a one-day extension of time to object to the R
& R nunc pro tunc.

The court reviews de novo those portions of the R & R to
which DuBois properly objects. See 28 U.S.C. §
636(b)(1). A proper objection is one that identifies the
specific portions of the report and recommendation that
the objector asserts are erroneous and provides a basis for
this assertion. See U.S. Flour Corp. v. Certified Bakery,
Inc., No. 10–CV–2522 (JS)(WDW), 2012 WL 728227, at
*2 (E.D.N.Y. Mar. 6, 2012). Conclusory or general
objections are insufficient to trigger de novo review. See
Pall Corp. v. Entergris, Inc., 249 F.R.D. 48, 51
(E.D.N.Y.2008); see also Mario v. P & C Food Markets,
Inc., 313 F.3d 758, 766 (2d Cir.2002) (holding that
plaintiff's objection to a report and recommendation was
"not specific enough" to "constitute an adequate
objection"). Those portions of the R & R to which there is
no specific reasoned objection are reviewed for clear
error. See Pall Corp., 249 F.R.D. at 51. As with all pro se
submissions, the court construes DuBois's objections
liberally. See Triestmann v. Fed. Bureau of Prisons, 470
F.3d 471, 474 (2d Cir.2006).

DuBois first objects to "Judge Bloom's statement [ ] that
the plaintiff did not raise a claim for 'color' in the
arbitration proceeding or in the instant complaint." (Obj.¶
1.) The issue of whether DuBois's discrimination claims
were based in part on "color," as opposed to being solely
based on race, sex, and national origin, is not related to
Judge Bloom's recommendations and in no way affects

the outcome of this case. The court therefore accepts, *arguendo*, DuBois's contention, and sustains this objection. The R & R is MODIFIED to assume *arguendo* that DuBois's discrimination claims, here and at arbitration, were based in part on "color."

Next, DuBois objects to Judge Bloom's construction of his complaint and attached affidavit as solely a motion to vacate the arbitral award pursuant to 9 U.S.C. § 10. (*See* Obj. ¶ 2.) According to DuBois, the affidavit accompanying his complaint should *also* be construed as motion under 9 U.S.C. § 11 to modify the award. (*See id.*) DuBois's affidavit is not styled as motion of any sort. Judge Bloom treated it as a motion to vacate only because pro se submissions are afforded a special liberal construction by the court. (*See* R & R at 6.) The court has reviewed the affidavit and it does not set forth any grounds to modify the arbitral award. (*See* Aff. of Serge DuBois (Docket Entry # 1).) Its thrust is that the arbitrator was unfair and biased, arguments that go to vacatur not modification. *Compare* 9 U.S.C. § 10 *with id.* § 11. The objection is overruled.

**\*2** DuBois's third objection is to Judge Bloom's characterization of his arguments for vacating the arbitral award. (*See* Obj. ¶ 3) Judge Bloom construed DuBois's allegations as focused on 9 U.S.C. § 10(a)(1), (2) and (3). (*See* R & R at 8.) DuBois now claims that he also raised arguments related to the other ground for vacatur under § 10(a)—that "the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted to them was not made." *See* 9 U.S.C. § 10(a)(4). An "inquiry under § 10(a)(4) ... focuses on whether the arbitrators had the power, based on the parties' submissions or the arbitration agreement, to reach a certain issue, not whether the arbitrators correctly decided that issue." *DiRussa v. Dean Witter Reynolds, Inc.,* 121 F.3d 818, 824 (2d Cir.1997). The court has reviewed DuBois's submissions in this case and cannot discern any argument challenging the arbitrator's authority to issue an award on DuBois's discrimination claims.[2] The objection is overruled.

---

[2]  With respect to this objection, DuBois refers also to the transcript of the arbitration itself. (*See* Obj. ¶ 3.) The court has reviewed this portion of the transcript, and there is nothing there to indicate that DuBois questioned the arbitrator's authority or jurisdiction. (*See* Arb. Tr. (Docket Entry # 30–5) at 52–60.)

Fourth, DuBois objects to "Judge Bloom's statement that the plaintiff was given every opportunity to present his

testimony, documentary evidence and witnesses, both during and after the arbitration." (Obj.¶ 4.) In support of this objection he cites his affidavit (which was construed as a motion to vacate, *see supra* ), two letters he wrote after the arbitration to the American Arbitration Association, and an affidavit from his wife. (*See* Obj. ¶ 4 (citing Aff. of Serge DuBois; Aff. of Linda DuBois (Docket Entry # 30–1); Ltr. of July 28, 2011 (Docket Entry # 30–2); Ltr. of Sept. 26 (Docket Entry # 30–2)).) Even if these self-serving documents are read liberally to allege that DuBois was not allowed to present evidence, such an argument is utterly belied by the record. The arbitrator included the following passage in his written award:

> The right to call witnesses and issue subpoenas was fully explained to Claimant [DuBois]. He repeatedly stated that he chose not to call any witnesses. Claimant was also given the opportunity to give direct testimony at the hearing, but he declined to do so. Instead, he insisted that the Amended Claim and other documents he had previously submitted told his entire story. It was explained to him that live supplemental testimony would aid his case, but he declined. As a result, I accepted Claimant's written submissions as his direct testimony. Claimant's case consisted of his arguments at the hearing, his testimony on cross-examination, his documentary exhibits and his cross-examination of Respondent's witnesses. He did not call any witnesses to corroborate his claims, despite having identified potential witnesses during the pre-hearing conferences and at the hearing itself.

(Arb. Award (Docket Entry # 1) ¶¶ 7–9 (citing Arb. Tr. (Docket Entry30–4) at 6–9, 15–18, and 33–37).) The court has reviewed the arbitration's transcript, and it more than confirms the arbitrator's description of the proceedings. The arbitrator veritably implored DuBois to present evidence and testify during, and even after, the arbitration, but DuBois always refused. (*See, e.g.,* Arb. Tr. (Docket Entry30–4, 30–5, 30–6) at 6–9, 13–18, 31–37, 119–21.) DuBois indeed had "every opportunity" to fully present his case. The objection is overruled.

**\*3** Fifth, DuBois objects to the section of the R & R that addresses 9 U.S.C. § 10(a)(3) (*see* Obj. ¶ 5.), but he does so solely in a conclusory fashion.[3] The objection is overruled.

[3] Judge Bloom determined that DuBois had failed to show that the arbitration was fundamentally unfair, as is required to obtain vacatur under § 10(a)(3). (*See* R & R at 12–14.) In his Objections, DuBois maintains that: "there is plenty of evidences [sic] demonstrating that the plaintiff was unfairly prejudiced during and after the arbitration process and that fundamental fairness was strongly violated"; "there is no ground for the arbitrator's decision to be inferred from the facts of the case"; and "the entire arbitration hearing is fraudulent." (*Id.*) DuBois makes no factual allegations to support these assertions.

DuBois's sixth objection is to Judge Bloom's refusal to consider certain materials that DuBois attached to his affidavit in opposition to the motion to dismiss. (Obj.¶ 6.) It appears that DuBois is referring to an affidavit by his wife, Linda DuBois, an affidavit by one Beneze Duvenhere (Docket Entry # 30–2), and a list of "additional claims for expenses and damages" (Docket Entry # 30–3). (*See* R & R at 16 n. 15.) As these documents were submitted after DuBois filed his complaint, Judge Bloom correctly ruled that they cannot be considered in connection with his opposition to the motion to dismiss. *See* Fed.R.Civ.P. 12(d). Giving these documents an extremely liberal reading, however, the court concludes that Linda DuBois's affidavit relates to DuBois's court-construed motion to vacate. Accordingly, the court considers this affidavit as a supplement to the motion to vacate, and it determines that the affidavit does not affect Judge Bloom's analysis of vacatur motion in any way. The objection is sustained as to the affidavit of Linda DuBois and overruled as to the other documents described in this objection. The R & R is MODIFIED to reflect the fact that the court has considered Linda DuBois's affidavit in connection with its review of Judge Bloom's recommendation that the motion to vacate be denied.

Seventh, DuBois objects to Judge Bloom's conclusion that his city-law discrimination claims must be dismissed pursuant to the election of remedies provision contained in the New York City Human Rights Law ("NYCHRL"). (*See* Obj. ¶ 7.) His principal argument is that his claims should survive because the clerk's office told him that his complaint was properly filed.[4] (*Id.*)

[4] DuBois also appears to argue that his city-law discrimination claims are cognizable because they may have been included in a prior complaint that was dismissed without prejudice. (*See* Obj. ¶ 7 .) But the court did not address any of DuBois's claims in his prior case; it merely granted a motion to compel arbitration and dismissed the complaint accordingly. *See* *DuBois v. Macy's East Inc.,* No. 06–CV–6522 (NGG)(LB), 2007 U.S. Dist. LEXIS 87039, at \*1, \*4, 2007 WL 4224781 (E.D.N.Y. Nov. 26, 2007).

While it is not clear that an objection solely supported by frivolous arguments such as these is sufficient to avoid clear error review, *cf. Pall Corp.,* 249 .F.R.D. at 51 (conclusory objections do not trigger de novo review), the court—out of an abundance of caution—will nevertheless review this portion of the R & R de novo.

To begin with, all of DuBois's claims are barred by the doctrine of res judicata, *see infra,* and so his argument regarding Judge Bloom's alternative ruling is beside the point. That said, his city-law claims must also be dismissed because DuBois pursued them administratively before he filed suit against Macy's. Subject to several exceptions not implicated in this case, the NYCHRL requires claimants to choose between pursuing judicial or administrative remedies for their city-law-based discrimination claims. *See* N.Y .C. Admin. Code § 8–502(a). Where a claimant files charges with a city or state agency, he generally cannot reassert those claims in a court of law. *Id.* DuBois brought his city-law claims before New York City Commission of Human Rights in 2005. (*See* CCHR Det. & Order of Dec. 7, 2005 (Docket Entry # 26–2).) He may not pursue them again here. The objection is overruled.

**\*4** DuBois's eighth objection concerns Judge Bloom's statement that "a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." (Obj.¶ 8.) Liberally construed, it appears that DuBois objects to Judge Bloom's conclusion that all of DuBois claims's are barred by the doctrine of res judicata.

Here, again, DuBois's arguments are so weak as to raise a real question about whether de novo review is merited, but, again, the court will give DuBois the benefit of the doubt and review this portion of the R & R de novo.[5]

[5] DuBois argues that res judicata should not apply because a previous action between these parties was dismissed without prejudice, and because his claims are meritorious. (*See* Obj. ¶ 8) The latter argument does not go to the issue of res judicata, and the former argument

evinces a misunderstanding of the R & R. As Judge Bloom made clear, it is the arbitral award, not the dismissal of DuBois's prior complaint, that operates as res judicata in this case. (*See* R & R at 18.)

An arbitral award can have just as much of a preclusive effect in federal court as can a judgment in a lawsuit. *See Pike v. Freeman*, 266 F.3d 78, 90–91 (2d Cir.2001). The law is unclear as to whether a federal court should rely on state or federal law when it determines an arbitral award's preclusive effect, *see id.* at 90 n. 14, but, for the purposes of this case, this does not matter because federal and New York are sufficiently similar, *see id.* Thus, the arbitral award is entitled to preclusive effect here if it: (1) involved an adjudication on the merits; (2) involved the same parties or their privies; (3) decided or could have decided the same claims at issue here. *See id.* at 91 (citing federal law). These elements are all easily met in this case (*compare* Arb. Award *with* Compl. (Docket Entry # 1)), and so all of DuBois claims must be dismissed.[6] The objection is overruled.

[6]   The court may dismiss a complaint under Rule 12(b)(6) based on an affirmative defense that appears on the face of the complaint. *Jones v. Block*, 549 U.S. 199, 215, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007). Here, DuBois attached a copy of the arbitral award to his complaint, and thereby incorporated it into his pleadings.

Ninth, DuBois purports to object to the entire R & R because Judge Bloom "should at least consider the inappropriate [sic] prejudiced bias and unfairness [sic] manner that [the arbitrator] behaved, conducted and decided the award, which included fraud, violation of fundamental fairness, partiality, and corruption." (Obj. at 9.) Even liberally construed as an attack limited to the part of R & R that addresses DuBois's motion to vacate, this objection is extremely general. It is also almost entirely conclusory.[7] (*Id.*) The court therefore concludes that this objection is insufficient to merit de novo review of any portion of the R & R. The objection is overruled.

[7]   Read liberally, Dubois makes one allegation related to his otherwise conclusory assertion of partiality: that the arbitrator failed to sanction Macy's when it "exhibited additional fraudulent documents during the [arbitral] hearing, [and] failed to exhibit several other documents to the hearing." (Obj.¶ 9.) The remainder of his arguments in connection with this objection, however, do not relate to fraud or arbitral misconduct. He attacks Judge Bloom for failing to consider his wife's affidavit; reminds the court that he alleged fraud in his

court-construed motion to vacate; and complains that he never received a certain check, the relevance of which the court is unable to discern from the objections or the R & R. (*See id.*)

The arbitrator's failure to sanction Macy's does not constitute partiality or corruption for the purposes of § 10(a)(2). "In this Circuit, evident partiality within the meaning of 9 U.S.C. § 10 will be found where a reasonable person would have to conclude that an arbitrator was partial to the arbitration." *Scandinavian Reinsurance Co. v. St. Paul Fire & Marine Ins. Co.*, 668 F.3d 60, 73 (2d Cir.2012). Here, no reasonable person could conclude that the arbitrator's failure to sanction Macy's exhibited bias. The arbitrator found that the documents in question were authentic (*see* Arb. Award ¶ 10), and there was no evidence besides DuBois's self-serving testimony on which he could have found otherwise.

Tenth, DuBois again purports to object to the entire R & R, this time on the grounds that Judge Bloom did not overturn the arbitral award on its merits. (Obj.¶ 10.) The court does not have the authority to review the merits an otherwise properly entered arbitral award. *Cf.* 9 U.S.C. §§ 10 and 11 (providing grounds for vacatur and modification of arbitral awards). The objection is overruled.

DuBois's eleventh objection is to Judge Bloom's determination that DuBois had failed to show that the arbitrator was biased against him. (Obj.¶ 11.) According to DuBois, "the nature of the entire arbitration hearing and the unfair outcome of the award establish strong evidence of bias, fraud, corruption, undue means, misconduct, misbehavior and excessive power, and the plaintiff has established everything that the court requires to vacate an arbitration award." (*Id.*) This objection is utterly conclusory. The objection is overruled.

**\*5** Finally, for his twelfth objection, DuBois delivers a purely merits-based defense of his claims. (Obj.¶ 12.) The court has already determined that DuBois's claims must be dismissed because they are barred by the doctrine of res judicata. Their underlying merit is therefore irrelevant. The objection is overruled.

The court has reviewed the remainder of the R & R for clear error and finds none.

The court accordingly ADOPTS the R & R as modified above. The motion to dismiss is GRANTED. The motion to confirm the arbitral award is GRANTED. The cross-motion to vacate the arbitral award is DENIED. The Clerk of Court is respectfully directed to close the case.

SO ORDERED.

Not Reported in F.Supp.2d, 2012 WL 4060586

**All Citations**

**End of Document**

© 2017 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 3542222
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Brian NOVIE and Marina Novie, Plaintiffs,
v.
VILLAGE OF MONTEBELLO, its Board of
Trustees, its Planning Board, and its Engineer,
Attorney(s), and Building Inspector, Defendants.

No. 10–CV–9436 (CS).
|
Aug. 16, 2012.

**Attorneys and Law Firms**

Michael D. Diederich, Jr., Brigitte M. Gulliver, Law
Office of Michael Diederich, Jr., Stony Point, NY, for
Plaintiffs.

Mary E. Brady Marzolla, Feerick Lynch MacCartney,
PLLC, South Nyack, NY, for Defendants.

**OPINION AND ORDER**

SEIBEL, District Judge.

**\*1** Before this Court are Plaintiffs' Motion for Leave to
file a Second Amended Complaint pursuant to Federal
Rule of Civil Procedure 15(a)(2), (Docs.39, 48–50), and
Defendants' Motion to Dismiss the Amended Complaint
pursuant to Rules 12(b)(1) and 12(b)(6), (Doc. 16). For
the following reasons, Plaintiffs' Motion is GRANTED
IN PART and DENIED IN PART, and Defendants'
Motion is GRANTED.

**I. Background**

 A. *Factual Background*
For the purposes of the present Motions, the Court accepts
as true the facts (but not the conclusions) as stated in
Plaintiffs' Amended Complaint ("AC"), (Doc. 11), and
Plaintiffs' proposed Second Amended Complaint
("SAC"), (Doc. 49).[1]

[1] Except where noted, the factual allegations set forth in
the AC and the SAC are the same; I cite to the SAC
only for the sake of simplicity.

 1. *Plaintiffs' Property*
Plaintiffs, a married couple, and their twins, born in 2008,
are residents of the Village of Montebello (the "Village"),
Town of Ramapo. (SAC ¶¶ 1, 11, 13.) In 2004,[2] Plaintiffs
purchased a piece of property (the "Property") in the
Village that is approximately 40,000 square feet in size
and has a single-family house on it. (*Id.* ¶¶ 11, 14, 16, 19.)
The house was built in 1972, and Plaintiffs believe that at
that time, the rear portion of the Property consisted of a
backyard lawn without trees. (*Id.* ¶ 22.) Over the course
of the next several decades, ash and elm trees grew in the
backyard, "eventually becoming mature trees which, as a
result of Dutch Elm Disease and other diseases and
blights, became sick and dying in recent years." (*Id.* ¶ 23.)
By 2009, "virtually all the trees in Plaintiffs' back yard
were crowded together, spindly, and dead, dying,
vine-covered or otherwise in poor health." (*Id.* ¶ 24.)
Plaintiffs believe that this " 'untamed' rear yard" has
created problems such as "unmanageable undergrowth
and brush, and with this the obvious likelihood of animal
intruders including snakes[,] ... black widow spiders,
skunks, raccoons, rodents, bats and deer, and with the
mammals, the possibility of rabies and the increasing
threat of deer ticks carrying Lyme Disease." (*Id.* ¶ 26.)

[2] Plaintiffs' SAC is inconsistent as to whether they
purchased the property in 2003, (*see* SAC 1), or 2004,
(*see* SAC ¶ 11).

 2. *The Village Tree Preservation Law*
This case concerns provisions of the Village's Tree
Preservation and Landscape Maintenance Law (Chapter
176 of the Village Code) (the "Tree Law").[3] The relevant
portions of the law are reproduced below:

[3] General Code of the Village of Montebello, New York,
Ch. 176, *available at*
http://www.ecode360.com/8769464.

 *§ 176–6. Tree removal; permit; Planning Board
review; licensing of contractors; fees.*

A. Prohibited activities. Except as permitted herein, no person shall do or cause to be done by others, either purposely, carelessly, or negligently, any of the following acts upon privately owned property within the Village of Montebello:

(1) Cut, destroy, remove, or substantially injure any tree except as may be permitted in Subsection B, permitted activities, below,

(2) Place or maintain upon the ground any substance or impervious surface which would impede the free access of air and water to the roots of any tree.

*2 (3) Apply any substance to any part of a tree, including the roots, with the intent to injure or destroy the tree.

B. Permitted activities. Notwithstanding the restrictions above, the following activities shall be permitted:

(1) The cutting, pruning, or trimming of trees in a manner that is not harmful to the health of the tree.

(2) The cutting, destruction or removal of trees which are dead or imminently dead or which endanger public safety and pose imminent peril, such condition confirmed by the Village Engineer, or his or her designee as chosen by the Village Board of Trustees, with the assistance of an arborist if the Village Engineer or designee believes same necessary to facilitate making an informed decision in the circumstances, in the form of a permit issued after application and after payment of a permit fee set by said Board by resolution, and prior to cutting or removal. Application for this permit shall include a map of the property identifying the location of said tree or trees and supporting evidence (e.g., photographs, report of an arborist) indicating the reason for removal. Any person who cuts, destroys or removes trees for said purpose without first obtaining a permit because he or she believed that public safety was endangered or an imminent peril posed shall submit a written application to the Planning Board made within five days after the cutting, destruction or removal of trees has occurred, except that the period is extended to 20 days if the removal occurs due to an extreme weather condition, such as a hurricane, which is known to have damaged a significant number of trees in the Village. In the case of removal without a permit, independent proof (such as a photograph, police report or arborist's certification) is required in accordance with § 176–6D, Exceptions, in order to obtain

approval from the Planning Board excepting said person from the regulations contained herein. The Planning Board may also request the Village Engineer, Village Planner or other Village consultant to assist in evaluating such applications. The fees charged to the Village by all such consultants shall be paid by the applicant. Removal of trees for nonimminent perils shall be governed by § 176–6B(4).

(3) Upon receipt of a permit after application to the Village Engineer or other designee of the Village Board and payment of a permit fee set by said Board by resolution, the cutting or removal of not more than one tree per 10,000 square feet of lot area during any two-year period but, irrespective of lot area, in no event removal of more than eight trees per lot in any two-year period, or 12 trees in any six-year period, unless said removal is in accordance with a site or subdivision plan duly approved by the Planning Board. [See Subsection B(6), below.] In the latter case, trees shall have been identified on said plans, and no additional trees shall be cut without approval of the Planning Board. For the purpose of this provision, "year" shall be construed to be the calendar year.

*3 ...

C. Excluded activities. The provisions of this chapter shall not apply to activities involving trees within the public rights-of-way or publicly owned properties.

D. Exceptions. Upon written application to the Planning Board, and after payment of a permit fee set by the Board of Trustees by resolution, the Planning Board may, by resolution, grant an exception from any of the requirements of this chapter. The decision by the Planning Board shall be made within 30 days of receipt of the request or at the next regularly scheduled Planning Board meeting if not within 30 days. The Planning Board may grant such exceptions from the requirements of this chapter as may be reasonable and within the purposes and intent of this chapter if the enforcement of one or more of the provisions is impractical or will exact undue hardship because of peculiar conditions pertaining to the property in question but, in so granting, may require that a compensatory planting or compensatory payment be made. The Planning Board may also request the Village Engineer, Village Planner or other Village consultant to assist in evaluating such applications. The fees charged to the Village by all

such consultants shall be paid by the applicant.

E. Planning Board review standards and fees. Where an application is submitted to the Planning Board to remove tree(s), said permit may be granted only for the following reasons and under the following conditions:

(1) Where the location of an existing tree or trees provides no alternative but to place a proposed structure outside the permitted building setbacks, and only if a said tree or trees to be removed are replaced on the property as a compensatory planting, or a compensatory payment is made to the Tree Fund, as directed by the Planning Board, to the extent removal exceeds the number of trees which may be removed as of right for the subject lot per Subsection B(3).

...

(4) Nonimminent peril.

(a) At the discretion of the Planning Board, and upon the express written finding of an arborist having ISA certification or having other comparable credentials acceptable to the Planning Board or other expert opinion acceptable to the Planning Board, that the proposed removal will alleviate a nonimminent peril to public safety or will likely not result in or cause, increase or aggravate any of the following conditions:

[1] Impaired growth or development of the remaining trees or shrubs on the property of the applicant or upon adjacent property;

[2] Soil erosion sediment or dust, drainage or sewerage problems or any other reasonably foreseeable dangerous or hazardous condition;

[3] Have a significant adverse impact upon existing biological and ecological systems;

[4] Significantly affect noise pollution by increasing noise levels to such a degree that a public nuisance may be anticipated or by significantly reducing the noise-dampening effect of vegetation near sensitive noise receptors;

*4 [5] Significantly affect wildlife habitat available for wildlife existence and reproduction by causing emigration of wildlife to adjacent or associated ecosystems; or

[6] Significantly denude a visible buffer between adjacent properties.

(b) Such certification does not represent relief from the independent requirement that a compensatory planting be made elsewhere on the property or a compensatory payment be made to the Tree Fund, as directed by the Planning Board, to the extent removal exceeds the number of trees which may be removed as of right for the subject lot per Subsection B(3). The Planning Board may also request the Village Engineer, Village Planner or other Village consultant to assist in evaluating such applications. The fees charged to the Village by all such consultants shall be paid by the applicant.

(5) The fees for an application to the Planning Board for tree removal shall be $250 or other such fee as set from time to time by resolution of the Village Board. The Planning Board may also request the Village Engineer, Village Planner or other Village consultant to assist in evaluating such applications. The fees charged to the Village by all such consultants shall be paid by the applicant.

....

### § 176–7. Penalties for offenses.

A. The Village Engineer or other designee of the Village Board shall determine compliance with this chapter, and any person violating any of the terms or provisions of this chapter or refusing to comply with the rules and regulations of this chapter shall, upon conviction, be subject to a fine not exceeding $250 for each offense. Each tree that is cut or damaged without appropriate approval from a Village agency shall constitute a single offense, up to a maximum penalty of $10,000 per lot.

...

C. In addition to being subject to prosecution and fining, any person having violated this chapter shall also be referred to the Planning Board for the purpose of developing a tree remediation plan, showing the existing and proposed landscaping conditions on the premises in question, and which shall be designed to mitigate the effects of the offense, which shall be known as the "compensatory planting plan" or, if the Planning Board approves in lieu thereof, the making of a compensatory payment to the Tree Fund (See Subsection D below.) The Planning Board may

also require such remedial or protective measures to be undertaken as may be necessary to protect the balance of the original landscaping, such as, but not limited to, the use of snow fencing, chain link fencing, or other protective measures. The Planning Board may also request the Village Engineer, Village Planner or other Village consultant to assist in evaluating the violation and recommending a remediation. The fees charged to the Village by such consultants shall be paid by the violator.

D. In addition to any penalty, the violator will be required to effectuate a compensatory planting by replacing in kind each and every tree removed, cut down or destroyed in violation of this chapter. If a tree was so large and mature that it cannot be replaced, the Planning Board may require the planting of multiple trees instead, based oh the sole determination of the Planning Board of the number, species and size of trees necessary to meet the objectives of this chapter. In the alternative, in appropriate circumstances where the planting of additional trees is impractical in the judgment of the Planning Board, it may accept compensatory payment to the Tree Fund in lieu of planting as it may direct or as it may approve upon the request of the violator. No certificate of occupancy shall be issued for new construction on the property on which occurred any violation of this chapter unless and until the provisions of this subsection have been complied with.

**\*5** E. Where a tree of any size that is removed, cut down or destroyed is in a conservation easement or conservation area designated on a plan approved by the Planning Board, fines may be doubled.

F. Whenever the Village Engineer or designee as determined by the Village Board shall determine that any activity is being conducted in violation of this chapter, then the Village Engineer shall request that the Building Inspector notify the owner of the property, the owner's agent, or the person performing the work to suspend and halt work. Such direction by the Building Inspector (a stop-work order) shall be in writing and delivered to the owner, the owner's agent, or the person performing the work or affixed to the site. Such stop-work order shall state the reasons therefor and the conditions under which the work may be resumed.

...

### 3. *The 2009 Cutting*

In the spring of 2009, Plaintiffs, "without realizing that there existed a Village regulation pertaining to the cutting of trees," cut down three dead trees and three dying trees on their Property (the "2009 Cutting"). (SAC ¶ 28.) The Village brought charges against Mr. Novie for violation of the Tree Law in connection with the 2009 Cutting. (*See* Marzolla Aff. Ex. D.)[4] On or around February 26, 2010, Mr. Novie and the Village entered into a Civil Compromise Agreement, whereby Mr. Novie agreed to pay the Village $250 and "follow proper procedures with regard to any improvements/tree removal ... concerning [his] property," and the Village agreed to dismiss the charges against Mr. Novie. (*Id.; see* SAC ¶ 31.)

[4]     "Marzolla Aff." refers to Attorney Affidavit [of Mary E. Brady Marzolla]. (Doc. 17.)

### 4. *The 2010 Cutting*

In 2010, Plaintiffs applied for a permit to cut fifteen dead or dying ash and elm trees and three healthy trees. (SAC ¶¶ 32, 50; Marzolla Aff. Ex. E, at 1 (Plaintiffs' Tree Removal Permit Application, received by Village July 17, 2010, seeking permission for removal of fifteen dead ash and elm trees and three healthy trees, two of which were oak trees).) Plaintiffs state that they "received the permit back 'approved,' yet with ambiguous handwriting," (SAC ¶ 33), and maintain that "the Village Engineer did not expressly 'deny' any portion of Plaintiffs' application to remove fifteen dead trees," (*id.* ¶ 53). In August 2010, Plaintiffs had a contractor cut dead or dying trees (the "2010 Cutting"). (*Id.* ¶¶ 34, 54.) Plaintiffs allege that after the contractor began work, "a 'consulting engineer' of the Village suddenly appeared, intruded onto Plaintiffs' property without permission, ... and instructed Plaintiff[s'] contractor to cease work." (*Id.* ¶ 36.) Shortly thereafter, the Village filed a summons and complaint in the Ramapo Justice Court accusing Mr. Novie[6] of violating the Tree Law[7] by cutting three more trees than had been permitted. (*Id.* ¶¶ 37, 57.) Defendants also allegedly "coerced Plaintiffs into paying $250 to the Village Planning Board," "[n]otwithstanding that the only trees cut on Plaintiffs' property in 2010 were either dead or dying," and "invoiced Plaintiffs for approximately $2,000 in alleged contractor services."[8] (*Id.* ¶¶ 55–56.) Plaintiffs further allege that if they are found to have violated the Tree Law, the Village will be "allow[ed] ... to place demands upon [them] which could exceed tens of thousands of dollars." (*Id.* ¶ 42.)

[5]    It is not clear what Plaintiffs find "ambiguous" about the handwriting on the approved permit application. The handwriting states:

-Lot size: 37,461 S.F.

-(3) trees may be removed as of right, 176–6B(3)

-Total of (14) trees may be removed

-(1) tree is located in 20′ san. sewer easement (not allowed).

-(\*)-Inspection revealed: (8) trees may be removed per 176–6B(2), dead or imminently dead. Also, (3) trees may be removed as of right for a total of (11) trees allowed for removal.

(Marzolla Aff. Ex. E, at 3.) In fact, Plaintiffs' assertion that the handwriting was "ambiguous" appears to be disingenuous, given that Plaintiffs' Brief on Appeal in a separate state action before the Supreme Court of the State of New York Appellate Term, Second Department, ("Plaintiffs' Appellate Brief"), attached as Exhibit C to Defendants' Supplemental Briefing ("Ds' Supp."), (Doc. 46), states in plain terms that the "hand-written language ... authorized the removal of 3 trees less than [Plaintiff] Novie had requested. No reason was given by the Village for the reduced number." (Ds' Supp. Ex. C, at 2.) It is also not clear why Plaintiffs now argue that the Village did not expressly deny any portion of their application, given their understanding that the Village "authorized the removal of 3 trees less than [Plaintiff] Novie had requested." (*Id.*)

[6]    Only Mr. Novie was named as a Defendant in the Justice Court action, but for the sake of simplicity, I will use the term "Plaintiffs" to refer to the sued party in that action.

[7]    Plaintiffs' SAC adds that the "Justice Court code enforcement proceeding was dismissed on January 31, 2012. The Justice Court found the Tree Law to be unconstitutional." (SAC ¶ 38.)

[8]    The SAC adds that the Village has since "sought additional consultants' fees from the Plaintiffs, for their alleged yet unadjudicated violation of the Village's Tree Law." (*Id.* ¶ 41a.)

B. *Procedural History*

**\*6** Plaintiffs filed their Complaint in this action on December 20, 2010. (Doc. 1.) At a conference before this Court on March 24, 2011, the parties discussed Plaintiffs' request to amend the Complaint to include facts regarding a new invoice issued to Plaintiffs by the Village, (*see* Docs. 2, 3, 6), and address numerous potential deficiencies in Plaintiffs' Complaint, many of which were raised by Defendants in their pre-motion letter, (Doc. 8). The Court permitted Plaintiffs to amend their Complaint, (*see* Minute Entry Mar. 24, 2011), and Plaintiffs filed their AC on June 6, 2011, (Doc. 11), asserting a number of facial and as-applied constitutional claims, as well as other federal and state law claims. On October 12, 2011, Defendants filed the instant Motion to Dismiss. (Doc. 16.)

On January 31, 2012, Plaintiffs wrote to inform me that the Ramapo Justice Court dismissed the code enforcement matter against Plaintiffs and found the Tree Law to be unconstitutional. (Docs.29, 30.) Oh February 7, 2012, Plaintiffs wrote this Court again, mentioning that the Village planned to appeal the Justice Court's decision, taking issue with the Village's assertion of a Hen for consultant fees on the Property, and asking the Court to "accept this letter application as an informal motion ... to supplement the complaint with newly arising facts." (Doc. 32.)

At a conference on March 26, 2012, I allowed Plaintiffs to make a formal motion for leave to amend the AC and indicated that I would consider that Motion at the same time as Defendants' pending Motion to Dismiss. (*See* Minute Entry Mar. 26, 2012.) I also told Plaintiffs, however, that they should not attempt to refine the material already in the AC or add new claims arising from old facts; rather, they could only pursue leave to amend to add new claims arising from new facts and to drop claims that they believed to be meritless.

On May 17, 2012, Plaintiffs filed their Motion for Leave to Amend, (Doc. 35), but it consisted solely of the SAC and was unaccompanied by a memorandum of law or any other discussion of the legal standards pertaining to a motion for leave to amend. Accordingly, I gave them an opportunity to renew their Motion with the required documents and analysis. (*See* Doc. 36.) In that endorsement, I reminded counsel that any proposed second amended complaint could only add new claims arising from new facts, not refine old claims or add new claims arising from old facts. (*Id.*) Plaintiffs filed their renewed Motion for Leave to Amend the AC on June 1, 2012. (Doc. 39.)

II. *Motion for Leave to Amend*

Plaintiffs' SAC seeks to incorporate additional facts and claims and to withdraw certain claims.[9] I will address

each proposed change in turn.

[9]    In comparing the AC with the SAC, I rely on the "Tracked Changes" version of the SAC submitted by Plaintiffs with their Motion for Leave to Amend. (Doc. 49.)

### A. *Legal Standard*

Leave to amend a complaint should be "freely give[n] ... when justice so requires." Fed.R.Civ.P. 15(a)(2). "[I]t is within the sound discretion of the district court to grant or deny leave to amend." *McCarthy v. Dun & Bradstreet Corp.,* 482 F.3d 184, 200 (2d Cir.2007). "Leave to amend, though liberally granted, may properly be denied for; 'undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, futility of amendment, etc.' " *Ruotolo v. City of N.Y.,* 514 F.3d 184, 191 (2d Cir.2008) (quoting *Foman v. Davis,* 371 U.S. 178, 182, 83 S.Ct. 227, 9 L.Ed.2d 222 (1962)).

### B. *Changes in the Second Amended Complaint*

#### 1. *Additional Facts*

**\*7** Plaintiffs have added facts in the SAC concerning the outcome of the Justice Court code enforcement proceeding and the Village's subsequent appeal of the Justice Court's decision. (*See* SAC ¶ 38.) Because this decision was rendered in January 2012, well after the AC was filed, and is relevant to the current proceedings, and because adding these facts would not prejudice Defendants, the addition of these facts is appropriate. Plaintiffs also seek to incorporate facts concerning additional consultants' fees imposed on them by the Village subsequent to the Justice Court's decision. (*See id.* ¶¶ 41a-c, 42.) For the same reasons, these facts may be incorporated into the SAC.

Plaintiffs next attempt to incorporate new facts and assertions supporting their claim of unequal treatment based on Marina Novie's orthodox Jewish religion. (*See id.* ¶¶ 106a-d.) None of these facts are alleged to have occurred after the filing of the AC, and it does not appear to the Court that they postdate the AC. Accordingly, these statements may not be incorporated into the SAC. Similarly, Plaintiffs also attempt to incorporate new facts and assertions in support of their challenge to the provisions of the Tree Law that allow the Village to pass on the costs of consultants to residents (the "Consultant

Fee Regulations"). (*See id.* ¶¶ 108a-j.) Again, there is no indication as to why these allegations could not have been included in the AC. None of them appears to concern conduct that postdated the AC, except paragraph 108i which asserts that the Village "may be considering" action with regard to a wholly unrelated matter-permission to remove small rocks and debris from Plaintiffs' Property. (*Id.* ¶ 108i.) Rather, the proposed language consists of general, undated assertions concerning Defendants' practices pursuant to the Consultant Fee Regulations. Accordingly, these assertions may not be included in the SAC, because, to the extent they are even relevant to this action, they do not constitute new facts or new claims.[10]

[10]    In any event, for reasons discussed below—namely, the propriety of abstention in this matter—amendment to add the new facts discussed above would be futile.

#### 2. *Additional Claims*

Plaintiffs seek to incorporate two new claims into the SAC. First, they assert a claim pursuant to the Americans with Disabilities Act ("ADA") in connection with the Village's refusal to let Plaintiffs remove oak trees from their Property and the Village's demand that Plaintiffs plant several new oak trees as replacement trees. (*See id.* ¶¶ 121–28.) Plaintiffs' request to add an ADA claim is denied, because the facts on which they base this claim appear to predate the AC or at the very least are not alleged to have occurred after the AC. For example, the statements that "Plaintiffs requested removal of one of their oak trees" but the Village denied that request appears to refer to the application relating to the 2010 Cutting, (*see* Marzolla Aff. Ex. E (request to remove "2 oak" "due to allergy of home owner")),[11] and the claim that the Village required them to plant new oak trees is undated. In any event, even if the activity did postdate the AC, because this claim appears to be entirely without merit,[12] amendment to add it would be futile. Accordingly, this claim may not be included in the SAC.

[11]    If Plaintiffs are indeed referring to their July 2010 Tree Removal Permit Application when they say the Village denied them permission to remove oak trees, it is not clear why the permission they received to remove three trees as of right could not include the oak trees. If Plaintiffs are referring to some other request to remove oak trees from their Property, they have failed to give any specifics concerning such request.

[12] For one thing, Plaintiffs' claim appears to be meritless because their SAC provides no facts indicating why Mr. Novie is a "qualified individual with a disability," *see* 42 U.S.C. § 12102 (defining "disability"); *id.* § 12131(2) (defining "qualified individual with a disability"), apart from stating that he is allergic to oak pollen, *see Martinez v. RZB Fin. LLC,* No. 10–CV–4214, 2010 WL 4449031, at *4 (S.D.N.Y. Nov. 5, 2010) (dismissing ADA claim due to failure to allege a disability because "[t]he most specific allegation is that [plaintiff's] disability includes a severe allergy to mold") (internal quotation marks omitted). Nor does it appear that Plaintiffs ever sought an accommodation based on Mr. Novie's condition. *See Baker v. N.Y. State Dep't of Envtl. Conservation,* No. 10–CV1016, 2012 WL 2374699, at *3 (N.D.N.Y. June 22, 2012) (dismissing reasonable accommodation claim because plaintiffs never sought accommodation and noting that plaintiffs' papers were "devoid of any controlling legal authority which even suggests that an accommodation request ... is unnecessary").

**\*8** Similarly, Plaintiffs seek to add a new claim under the New York Constitution based on the same facts supporting their existing First Amendment claim. (*See* SAC 21.) Again, because this attempt explicitly contravenes my order not to refine or supplement the existing claims based on old facts, Plaintiffs are not permitted to add this claim.[13]

[13] In any event, as stated above, amendment to add this claim would be futile, because if added, I would dismiss it on jurisdictional grounds, as discussed below.

#### 3. *Withdrawn Claims*

The AC contains a Fair Housing Act claim. (*See* AC ¶¶ 109–19.) In their Memorandum of Law in opposition to Defendants' Motion to Dismiss, Plaintiffs expressly withdrew this claim. (Ps' Mem. 15.)[14] It is not clear whether the inclusion of this claim in the SAC was an oversight. (*See* SAC ¶¶ 109–20, 127.) To the extent Plaintiffs seek to amend the AC to add the claim back in after thinking better of withdrawing it, they are not permitted to do so. As stated above, I permitted Plaintiffs to seek leave to amend to add new facts and claims, not to refine and rethink their old claims.

[14] "Ps' Mem." refers to Plaintiff's [*sic* ] Memorandum of Law in Opposition to Defendants' Motion to Dismiss. (Doc. 24.)

Finally, Plaintiffs wish to withdraw their Commerce Clause claim-which claim was already withdrawn in their Memorandum of Law in opposition to Defendants' Motion to Dismiss, (Ps' Mem. 15)—and their Fourth Amendment search and seizure claim, and are permitted to do so.

### III. *Motion to Dismiss*

#### 1. *Documents the Court may Consider*

When deciding a motion to dismiss, the Court's "review is limited to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy,* 482 F.3d at 191; *see Faulkner v. Beer,* 463 F.3d 130, 134 (2d Cir.2006). "When matters outside the pleadings are presented in response to a 12(b)(6) motion, a district court must either exclude the additional material and decide the motion on the complaint alone or convert the motion to one for summary judgment ... and afford all parties the opportunity to present supporting material." *Friedl v. City of N.Y.,* 210 F.3d 79, 83 (2d Cir.2000) (alteration and internal quotation marks omitted).

There are circumstances, however, under which it is appropriate for a court to consider documents outside of the complaint on a motion to dismiss. For example, when deciding a motion to dismiss, the Court is entitled to consider:

> (1) facts alleged in the complaint and documents attached to it or incorporated in it by reference, (2) documents "integral" to the complaint and relied upon in it, even if not attached or incorporated by reference, (3) documents or information contained in [a] defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint, (4) public disclosure documents required by law to be, and that have been, filed with the Securities and Exchange Commission, and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence.

**\*9** *Weiss v. Inc. Vill. of Sag Harbor,* 762 F.Supp.2d 560, 567 (E.D.N.Y.2011) (internal quotation marks omitted). If a document outside of the complaint is to form the basis for dismissal, however, "it must be clear on the record that no dispute exists regarding the authenticity or accuracy of the document," and "[i]t must also be clear that there exist no material disputed issues of fact regarding the relevance of the document." *Faulkner,* 463 F.3d at 134.

Furthermore, it is improper for a court to consider declarations and affidavits on a motion to dismiss. *See Ramasamy v. Essar Global Ltd.,* No. 11–CV–3912, 2012 WL 1681763, at \*2 (S.D.N.Y. May 8, 2012) ("sworn affidavit by plaintiff" is "material that could not ordinarily be considered on a Rule 12(b)(6) motion to dismiss"); *Wachtel v. Nat'l R.R. Passenger Corp.,* No. 11–CV–613, 2012 WL 292352, at \*2 (S.D.N.Y. Jan. 30, 2012) (declining to consider plaintiff's affidavit attached to opposition to motion to dismiss because "the Court cannot consider affidavits in ruling on a motion to dismiss"); *Valez v. City of N.Y.,* No. 08–CV–3875, 2008 WL 5329974, at \*3 n. 5 (S.D.N.Y. Dec. 16, 2008) (noting that it would be improper to consider plaintiff's affidavit on motion to dismiss); *cf. Fonte v. Bd. of Managers of Cont'l Towers Condo.,* 848 F.2d 24, 25 (2d Cir.1988) ("If the district court considered [plaintiff's] affidavit in disposing of the Rule 12(b)(6) motion, it erred in failing to convert the motion to one for summary judgment ....").

  a. *Attachments to Defendants' Motion*
Defendants have submitted the following documents with their Motion to Dismiss:

  • Plaintiffs' Complaint and AC, (Marzolla Aff. Exs. A–B);

  • The text of the Tree Law, (*id.* Ex. C);

  • The Civil Compromise Agreement, signed in February 2010, between Brian Novie and the Village settling the charges brought against Mr. Novie in connection with the 2009 Cutting, (*id.* Ex. D);

  • Plaintiffs' 2010 Tree Removal Permit Application signed on July 15, 2010 and the Village's August 2, 2010 approval of that application, (*id.* Ex. E);

  • Signed copies of an Agreement to Pay Professional Consulting Fees—one signed by Marina Novie on July 15, 2010, and one signed by Brian Novie on August 17, 2010, (*id.* Exs. F–G);

  • A letter dated August 17, 2010 from Martin Spence of Spence Engineering (the Village Engineer) to the Village Clerk notifying the Clerk's Office that Spence Engineering performed an inspection of Plaintiffs' property on August 10, 2010 and found that Plaintiffs had cut down three trees—three more than their permit allowed, (*id.* Ex. H);

  • Minutes of a Village Planning Board meeting on September 14, 2010, which Plaintiffs attended, and at which the Planning Board discussed Plaintiffs' application for an exception to the Tree Law with regard to the 2010 Cutting. Attached to the Minutes are several documents that were presented to the Planning Board at that meeting: the minutes from the August 31, 2010 Community Design Review Committee ("CDRC") meeting; documents concerning an unrelated subdivision (the "Fried" subdivision); a memo from Martin Spence regarding Plaintiffs' Property which includes a tree remediation plan for the Property; and a letter to the Planning Board from Al Rubin—the Chairman of the Planning Board who recused himself from the matter because he is Plaintiffs' neighbor-suggesting that the Planning Board "provide[ ] some environmental message" to Plaintiffs that excess cuttings "will not be tolerated," (*id.* Ex. I);

**\*10** • Minutes from the Planning Board meeting of November 9, 2010 (including CDRC Minutes from October 26, 2010 and an attachment concerning an unrelated issue), (*id.* Ex. J);
  • The text of the Village's regulations concerning consulting fees (Chapter 65 of the Village Code), (Marzolla Reply Aff. Ex. A).[15]

[15]  "Marzolla Reply Aff." refers to the Attorney Affidavit [of Mary E. Brady Marzolla]. (Doc. 21.)

All of these documents except the August 17, 2010 letter from the Village Engineer will be considered for the purposes of these Motions. More specifically, I may take judicial notice of the Tree Law and Consultant Fee Regulations, as they are public documents. *See Missere v. Gross,* 826 F.Supp.2d 542, 553 (S.D.N.Y.2011). The Tree Removal Permit Application is incorporated by explicit reference into the SAC, (*see, e.g.,* SAC ¶ 32–33), and Plaintiff has certainly relied on it in framing the SAC, as it goes to the heart of this lawsuit. The Civil Compromise Agreement appears to be referenced in paragraph 31 of the SAC, and because Plaintiffs take issue with the fees and penalties charged by Defendants in connection with the Tree Law, it is integral to the SAC and Plaintiffs may

be said to have relied on it in framing the SAC. The Agreements to pay consulting fees are likewise integral to the SAC given that some of Plaintiffs' claims are premised on the Village's imposition of consulting fees. (*See, e.g., id.* ¶¶ 157–61.) Finally, the minutes of the September 14, 2010 and November 9, 2010 Planning Board meetings will also be considered because they are public documents[16] of which I may take judicial notice for the fact that they exist, but not for the truth of the matters asserted therein.[17] *See Schubert v. City of Rye,* 775 F.Supp.2d 689, 698 (S.D.N.Y.2011) On 12(b)(6) motion to dismiss, "[t]he court may consider matters of which judicial notice may be taken, even if the corresponding documents are not attached to or incorporated by reference in the complaint.") (alteration and internal quotation marks omitted); *id.* ("[A] court should generally take judicial notice 'to determine what statements the documents contain[,] not for the truth of the matters asserted.' ") (alterations omitted) (quoting *Kramer,* 937 F.2d at 774).

[16]   All minutes from meetings of the Village's Planning Board are available to the public at h ttp://www.villageofmontebello      .com/Planning% 20Board% 20Minutes.html (last visited Aug. 14, 2012).

[17]   For example, to the extent the November 9th minutes are offered to prove that Plaintiffs did not attend the meeting, they are being offered for the truth of their contents, a purpose for which I may not consider them. *See Kramer v. Time Warner Inc.,* 937 F.2d 767, 774 (2d Cir.1991). Further, I need not decide whether consideration of the documents attached to the Planning Board minutes is proper because those documents have no effect on my decision on the pending Motions.

In contrast, the letter from Martin Spence to the Village Clerk's Office will not be considered because it is not clear that Plaintiff had knowledge of this document or relied on it in framing the SAC. (*But see* SAC ¶ 36 (' "consulting engineer" of the Village ... intruded onto Plaintiffs' property").) Accordingly, Exhibits A, B, C, D, E, F, G, I, and J to the Marzolla Affidavit and Exhibit A to the Marzolla Reply Affidavit will be considered.[18] Exhibit H to the Marzolla Affidavit will not be considered.

[18]   Plaintiffs have not challenged the authenticity or accuracy of any of these documents. *See Faulkner,* 463 F.3d at 134.

b. *Attachments to Defendants' Supplemental Briefing*
In response to the Court's request for supplemental briefing regarding the concurrent state court proceeding, (Doc. 44), Defendants attached to their letter brief: (1) transcripts of the proceedings in the Ramapo Justice Court on November 22, 2011 and January 31, 2012; (2) Plaintiffs' motion to dismiss filed with the Ramapo Justice Court and the attachments thereto; and (3) both parties' briefs on appeal of the Justice Court's decision to the New York Supreme Court Appellate Term, Second Department. (*See* Ds' Supp. Exs. A–F.) I may take judicial notice of all of these materials—for the fact that they exist and the facts of what is in them, but not for their truth—because they are public documents. *See Blue Tree Hotels Inv. (Can.), Ltd. v. Starwood Hotels & Resorts Worldwide, Inc.,* 369 F.3d 212, 217 (2d Cir.2004) (courts can "look to public records, including complaints filed in state court, in deciding a motion to dismiss").

c. *Attachment to Plaintiffs' Opposition to Defendants' Motion to Dismiss*
**\*11** Plaintiffs have submitted only one document in conjunction with their opposition to Defendants' Motiona personal Affidavit by Plaintiffs.[19] (Doc. 25.) I will not consider this document for the purposes of deciding Defendants' Motion because affidavits are not properly considered on a motion to dismiss. *See Ramasamy,* 2012 WL 1681763, at \*2; *Wachtel,* 2012 WL 292352, at \*2.

[19]   Plaintiffs' submission is technically not an affidavit because it is not sworn before a notary. *See* Black's Law Dictionary (9th ed. 2009) (An affidavit is "[a] voluntary declaration of facts written down and sworn to by the declarant before an officer authorized to administer oaths."); *see Azkour v. Little Rest Twelve, Inc.,* No. 10–CV–4132, 2012 WL 402049, at \*3 n. 1 (S.D.N.Y. Feb. 7, 2012). Even if I were to construe the affidavit as a declaration pursuant to 28 U.S.C. § 1746, it would still not be considered at this stage. *See Mugno v. Societe Internationale de Telecomm. Aeronautiques, Ltd.,* No. 05–CV–2037, 2007 WL 316572, at \*7 n. 7 (E.D.N.Y. Jan. 30, 2007) (declining plaintiff's request for court to consider "declarations of various persons" on a Rule 12(b)(6) motion to dismiss).

2. *Motion to Dismiss Standard*
"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' "

*556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)* (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiffs obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly,* 550 U.S. at 555 (alteration, citations, and internal quotation marks omitted). While *Federal Rule of Civil Procedure 8* "marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era, ... it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal,* 556 U.S. at 678–79.

In considering whether a complaint states a claim upon which relief can be granted, the court "begin[s] by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth," and then determines whether the remaining well-pleaded factual allegations, accepted as true, "plausibly give rise to an entitlement to relief." *Id.* at 679. Deciding whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—'that the pleader is entitled to relief.' " *Id.* (alteration omitted) (quoting *Fed.R.Civ.P. 8(a)(2)*).

### 3. *Discussion*

I will deem a SAC conforming to my decision laid down above to have been filed and will address my discussion below to such a document.

### a. *Abstention*

Defendants argue that this Court should abstain from deciding this case under the doctrine laid down in *Younger v. Harris,* 401 U.S. 37 (1971), (Ds' Mem. 5–6),[20] which generally prohibits "federal courts from enjoining ongoing state proceedings." *Hartford Courant Co. v. Pellegrino,* 380 F.3d 83, 100 (2d Cir.2004). "Although the *Younger* abstention doctrine was born in the context of state criminal proceedings, it now applies with equal force to state administrative and civil proceedings."

*Diamond "D" Constr. Corp. v. McGowan,* 282 F.3d 191, 198 (2d Cir.2002) (citing *Ohio Civil Rights Comm'n v. Dayton Christian Schs., Inc.,* 477 U.S. 619, 627, 106 S.Ct. 2718, 91 L.Ed.2d 512 (1986)). "*Younger* abstention is required when three conditions are met: (1) there is an ongoing state proceeding; (2) an important state interest is implicated in that proceeding; and (3) the state proceeding affords the federal plaintiff an adequate opportunity for judicial review of the federal constitutional claims." *Id.; accord Parent v. New York,* No. 11–CV–2474, 2012 WL 2213658, at *2 (2d Cir. June 18, 2012) (summary order). "Despite the strong policy in favor of abstention, a federal court may nevertheless intervene in a state proceeding upon a showing of 'bad faith, harassment or any other unusual circumstance that would call for equitable relief.' " *Diamond,* 282 F.3d at 198 (quoting *Younger,* 401 U.S. at 54).

[20] "Ds' Mem." refers to Defendants' Memorandum of Law in Support of Motion to Dismiss Plaintiffs' Complaint. (Doc. 18.)

**\*12** The first two requirements of *Younger* are clearly met here. There is an ongoing proceeding in state court—the appeal from the Town Justice Court to the Second Judicial Department of the New York Supreme Court Appellate Term. *See Hansel v. Town Court for Town of Springfield, NY.,* 56 F.3d 391, 393 (2d Cir.1995) (requirement of ongoing state proceeding met when plaintiff faced ongoing criminal prosecution in town court); *Sendlewski v. Town of Southampton,* 734 F.Supp. 586, 590–91 (E.D.N.Y.1990) (abstention proper where federal action would interfere with proceedings in town justice court and state supreme court).

Second, the state proceeding implicates an important state interest insofar as it concerns a town land use regulation akin to a zoning requirement. *See Donangelo, Inc. v. Town of Northumberland,* No. 03–CV–934, 2005 WL 681494, at *2 (N.D.N.Y. Mar. 24, 2005) (regulating zoning and land use and protecting health of citizens and environment are "clear[ly]" state interests "important enough to warrant abstention"); *Wandyful Stadium, Inc. v. Town of Hempstead,* 959 F.Supp. 585, 590 (E.D.N.Y.1997) (zoning regulation is important state interest); *Sendlewski,* 734 F.Supp. at 591 (action in town justice court to enforce town's zoning and land use regulations implicates important state interest); *cf. id.* ("Determining the substantiality of the state's interest in its proceedings, a court must not look narrowly to the state's interest in the outcome of the particular case, but rather, to the importance of the generic proceedings to the state.") (alteration, emphasis, and internal quotation marks

omitted). Furthermore, the importance of the state interest here is reinforced by the fact that the Village chose to enforce the Tree Law through a criminal proceeding against Mr. Novie. (SAC ¶ 73 (Village prosecuting criminal code enforcement case against Mr. Novie).) *See Wandyful,* 959 F.Supp. at 590 (relying on Ninth Circuit case that found that where city had option to proceed either by civil or criminal enforcement of municipal ordinance, use of latter "demonstrates the importance of the underlying state interest") (internal quotation marks omitted); *Sendlewski,* 734 F.Supp. at 590 ("importance of the state's interest may be demonstrated if the civil action is closely related to a criminal proceeding").

With regard to the third *Younger* prong, "the relevant question ... is whether the state's procedural remedies *could* provide the relief sought[,] not whether the state *will* provide the constitutional ruling which the plaintiff seeks ." *Glatzer v. Barone,* 394 F. App'x 763, 765 (2d Cir.2010) (summary order) (emphasis in original) (alterations and internal quotation marks omitted). Where the constitutional claims in the state and federal actions are different, however, abstention is inappropriate, as "the state proceeding [would] not afford the federal plaintiff an adequate opportunity for judicial review of his or her federal constitutional claims." *Hartford Courant,* 380 F.3d at 101 (emphasis and internal quotation marks omitted). "[I]mportantly," however, "under *Younger,* any uncertainties as to the scope of state proceedings or the availability of state remedies are generally resolved in favor of abstention." *Spargo v. N.Y. State Comm'n on Judicial Conduct,* 351 F.3d 65, 77–78 (2d Cir.2003).

**\*13** I find that the third *Younger* prong is met and abstention is appropriate in this case because the state proceeding pending before the Appellate Term affords Plaintiffs an opportunity for review of their federal claims. In their motion to dismiss the Justice Court lawsuit, Plaintiffs vigorously argued as a defense that the Tree Law is unconstitutional on due process, First Amendment, takings, and state law grounds, (*see* Ds' Supp. Ex. E, at 14–21), and asserted that it also "raises equal protection concerns," (*id.* at 10–11). The parties discussed these defenses at oral argument before the Justice Court on November 22, 2011. (*See, e.g., id.* Ex. F, at 11 (discussing takings, due process, and equal protection defenses); *id.* at 34 (discussing ripeness of takings, due process, and equal protection defenses); *id.* at 36 (discussing First Amendment defenses).) After the Justice Court found the Tree Law to be unconstitutional-presumably because it was not "necessary to secure the health, safety and welfare of [the Village's] residents," (*id.* Ex. A, at 6; *see id.* at 5)—the Village appealed the decision and the parties briefed the

federal constitutional (due process, equal protection, takings, and First Amendment) and state law issues for the Appellate Term.[21] (*See* Ds' Supp. Exs. B–D.) Thus, Plaintiffs clearly had an opportunity to raise these constitutional issues in the pending state proceeding and availed themselves of that opportunity such that the third *Younger* prong is satisfied.[22] *See Parent,* 2012 WL 2213658, at *2 (third prong met where plaintiff raised his constitutional claims in state court); *McGRX, Inc. v. Vermont,* 452 F. App'x 74, 74–75 (2d Cir.2012) (summary order) (holding that *"Younger* clearly applies" where plaintiff Would have opportunity to raise federal claims in state court action).[23]

[21] All briefing before the Appellate Term was complete as of June 22, 2012, and the parties are waiting for the court to set an oral argument date. (*See* Ds' Supp. 1.)

[22] In Plaintiffs' Supplemental Briefing submitted to this Court on July 30, 2012 ("Ps' Supp."), (Doc. 47), Plaintiffs assert that *Younger* abstention is inappropriate because both the Justice Court and the Appellate Court cannot "provide Plaintiffs with redress to the federal law wrongdoing." (Ps' Supp. 2.) Yet Plaintiffs provide no explanation—and the Court can find no apparent reason (apart from the damages issue discussed below)—as to why they cannot obtain the relief they seek in the state court proceedings, at least as far as equitable relief is concerned. *See Parent,* 2012 WL 2213658, at *2 (plaintiff "has not demonstrated that the state courts are an inadequate forum for raising his constitutional claims. Indeed, it appears that [plaintiff] has repeatedly raised his constitutional claims before the state courts, albeit without receiving any favorable decisions. However, simply because the state courts have not issued decisions in his favor does not render them 'inadequate' for purposes of *Younger* abstention."); *Hansel,* 56 F.3d at 394 ("So long as a plaintiff is not barred on procedural or technical grounds from raising alleged constitutional infirmities, it cannot be said that state court review of constitutional claims is inadequate for *Younger* purposes.").

23  In order for a state court to provide a "meaningful opportunity for review" of Plaintiffs' claims, the claims presented to each court must be the same, *Hartford,* 380 F.3d at 101 (declining to abstain because "the constitutional claims in the state and federal actions [we]re ... quite different"). Here, Plaintiffs assert as federal constitutional defenses in state court the same federal constitutional claims they raise in federal court, and I find that the issues in both actions are essentially identical. First, as to Plaintiffs' takings claims, while Defendants argue on appeal to the Appellate Term that

Plaintiffs abandoned their takings claims during oral argument before the Justice Court, (Ds' Supp. Ex. D, at 8), it is far from clear that Plaintiffs indeed abandoned those claims, (*see id.* Ex. F, at 14 (ambiguous as to whether Plaintiffs' counsel was answering in the affirmative the Justice Court's question about pursuing the takings claim or the question about whether Plaintiffs were challenging the entire statute)), and therefore I find that the Appellate Term could provide meaningful review of those claims.

Second, while in the federal action Plaintiffs challenge the constitutionality of the Consultant Fee Regulations under the due process and equal protection clauses, whereas in the state action they challenge those Regulations under the takings clause (although the Consultant Fee Regulations are in fact mentioned in the due process section of Plaintiffs' Appellate Brief (*see, e.g.,* Ds' Supp. Ex. C, at 17–18)), (*compare* Ds' Supp. Ex. C, at 30, *with* SAC ¶ 108), I find the distinction to be meaningless in the circumstances for a number of reasons. First, the substance of the challenges to the Consultant Fee Regulations in both the state and federal court actions is essentially the same: in both actions Plaintiffs take issue with the magnitude of the fees and the process through which they are imposed. (*See* SAC ¶¶ 41–43; Ds' Supp. Ex. C, at 18, 30.) Second, the due process and equal protection challenges to the Consultant Fee Regulations are articulated in the federal action in only one sentence, with little underlying support. (*See* SAC ¶ 108 (one general sentence describing challenge to Consultant Fee Regulations); *see also id.* ¶¶ 41–43, 56 (minimal factual allegations supporting challenge to Consultant Fee Regulations).) Therefore, what appears to be slapdash labeling of the challenges will not save Plaintiffs' claims from abstention where the substance of the claims is the same. Moreover, Plaintiffs' counsel even admitted in correspondence to this Court that "Mr. Novie's Justice Court challenge to the Tree Law [i]s for the most part the same as in this Court." (Doc. 32.) Accordingly, inarticulate, unspecific, or inconsistent pleading will not save Plaintiffs' claims from abstention.

Finally, even if I were not required to abstain from deciding Plaintiffs' due process and equal protection challenges to the Consultant Fee Regulations, these claims would fail. As an initial matter, to the extent that Plaintiffs' due process and equal protection claims overlap with their takings claim—such that Plaintiffs may be said to be seeking damages for these violations, and therefore they are not subject to abstention—these claims would be subject to dismissal under the ripeness doctrine articulated in *Williamson County Regional Planning Commission v. Hamilton Bank of Johnson City,* 473 U.S. 172, 105 S.Ct. 3108, 87 L.Ed.2d 126 (1985), as discussed below. *See Lost Trail LLC v. Town of Weston,* 289 F. App'x 443, 444 (2d Cir.2008) (summary order).

With regard to the merits of these claims, as to the

equal protection claim, Plaintiffs allege essentially no facts in support of this claim, and certainly none that would render an equal protection challenge to the Consultant Fee Regulations plausible. Any such allegations are purely speculative and conclusory. As to the due process challenge, to the extent that Plaintiffs allege that consulting fees were assessed without adequate process, (*see* SAC ¶¶ 41, 41b), this claim fails because adequate process exists for challenging the fees-namely, the option to bring an Article 78 proceeding, (*see id.;* Marzolla Reply Aff. Ex. A, § 65–6 ("Any applicant who disputes any fee statement presented to him pursuant to this chapter may bring a proceeding in the Supreme Court of the State of New York ... pursuant to Article 78 ... within 30 days after presentation of such disputed fee statement.")). That Plaintiffs chose not to avail themselves of that procedure in the proper forum (state court) when presented with the fee statements bars them from now asserting that they did not receive due process of law. *See N.Y. State Nat'l Org. for Women v. Pataki,* 261 F.3d 156, 169 (2d Cir.2001) ("[A] procedural due process violation cannot have occurred when the governmental actor provides apparently adequate procedural remedies and the plaintiff has not availed himself of those remedies.") (internal quotation marks omitted); *Clark v. DiNapoli,* No. 09–CV–1037, 2011 WL 4901330, at *10 (N.D.N.Y. Oct. 14, 2011) (same); *see also Brown v. City of N.Y.,* No. 10–CV–3104, 2011 WL 6003921, at *14 (S.D.N.Y. Nov. 30, 2011) ("Even if plaintiff enjoyed a protectable constitutional interest in his ... employment, he did not challenge his termination in a New York state-court proceeding under Article 78. Courts in this Circuit recognize such proceedings as sufficient to protect an aggrieved party's right against constitutional deprivations without due process of law.") (internal citation omitted).

One could imagine a scenario where a Village resident challenged a fee statement in an Article 78 proceeding within thirty days of receiving the statement, but because "[t]he commencement of [the Article 78] proceeding [did] not stay the obligation ... to pay [the] fee statement," (Marzolla Reply Aff. Ex. A, § 65–6), he or she became obligated to pay the fees—and possibly faced a lien on his or her property, (*see id.* § 65–7)—prior to any action in the Article 78 proceeding. In such a situation, that resident might have a viable due process claim, given that a deprivation would occur prior to the opportunity to be heard. On the other hand, the resident could seek a stay from the Article 78 court. I express no opinion on that matter, however, because it is undisputed that Plaintiffs did not challenge the fee statements through the procedures provided, and in fact, signed agreements with the Village agreeing to pay such fees. (*See* Marzolla Aff. Exs. F–G.) Accordingly, their procedural due process claim also fails on the merits. To the extent Plaintiffs purport to

raise a substantive due process challenge to the Consultant Fee Regulations, such a claim would also fail, as Plaintiffs have not pleaded any facts that would render plausible an interpretation of the Consultant Fee Regulations as "so outrageously arbitrary as to constitute a gross abuse of governmental authority" and "so egregious, so outrageous, that [they] may be fairly said to shock the contemporary conscience." *Ruston v. Town Bd. for Town of Skaneateles,* No. 06–CV–927, 2009 WL 3199194, at *5–6 (N.D.N.Y. Sept. 30, 2009) (internal quotation marks omitted).

While abstention appears to be proper—and Plaintiffs have not demonstrated that an exception to the *Younger* doctrine applies,[24]—courts in this Circuit have held that abstention is generally not appropriate in cases seeking damages pursuant to 42 U.S.C. § 1983 ("Section 1983"). *See Morpurgo v. Inc. Vill. of Sag Harbor,* 327 F. App'x 284, 286 (2d Cir.2009) (summary order) (district court properly found *Younger* requirements were met and abstained from exercising jurisdiction over claims seeking injunctive relief, but "erred in abstaining from exercising jurisdiction over plaintiff's claims for monetary damages"); *Rivers v. McLeod,* 252 F.3d 99, 101–02 (2d Cir.2001) (*per curiam* ) ("[T]he *Younger* doctrine is inappropriate where the litigant seeks money damages for an alleged violation of § 1983 ...."); *Bobrowsky v. Yonkers Courthouse,* 777 F.Supp.2d 692, 709 (S.D.N.Y.2011) ("The Second Circuit has held that *Younger* is inapplicable to § 1983 claims seeking money damages, but *Younger* abstention continues to apply to claims for injunctive relief brought pursuant to § 1983."); *but see Kirschner v. Klemons,* 225 F.3d 227, 238 (2d Cir.2000) ("The Supreme Court has declined to reach the issue [of] whether *Younger* applies to claims for money damages ....").

[24] As the Second Circuit recently explained, "[t]here are ... two 'tightly defined exceptions to the *Younger* abstention doctrine,' the 'bad faith' exception and the 'extraordinary circumstances' exception.' " *Jackson Hewitt Tax Serv. Inc. v. Kirkland,* 455 F. App'x 16, 18 (2d Cir.2012) (summary order) (internal citation omitted) (quoting *Diamond,* 282 F.3d at 197–98). Plaintiffs argue only that the former applies in this action. (See Ps' Mem. 4.) Plaintiffs bear the burden of establishing this exception, see *Diamond,* 282 F.3d at 198, and to do so, they "must show that the party bringing the state action [has] no reasonable expectation of obtaining a favorable outcome, but rather brought the proceeding with a retaliatory, harassing, or other illegitimate motive." *Jackson Hewitt,* 455 F. App'x at 18 (alteration in original) (internal citation and quotation marks omitted). Here,

Plaintiffs broadly assert that the bad faith exception applies, stating that "the code enforcement prosecution was brought in bad faith motivated by discrimination and a desire to harass." (Ps' Mem. 3–4.) Yet the SAC and Plaintiffs' Memorandum are devoid of facts or even allegations that would plausibly show that the code enforcement proceeding was brought in bad faith. To the contrary, the record indicates that Defendants brought the proceeding based on Plaintiffs' repeated violations of the Tree Law, and did not lack a "reasonable expectation of obtaining a favorable outcome." *Jackson Hewitt,* 455 F. App'x at 18.

**\*14** Here, Plaintiffs bring all of their constitutional claims pursuant to Section 1983 but seek monetary damages only for "loss of use of [Plaintiffs'] real property" and for the "regulatory taking of their real property." (SAC 25–26.) Thus, abstention is appropriate as to all of Plaintiffs' claims that are also raised in the state proceeding, except for their takings claim for damages, which I address below. Accordingly, I abstain from exercising jurisdiction, *see Parent,* 2012 WL 2213658, at *2 (district court lacks jurisdiction over claims dismissed pursuant to *Younger* abstention), over Plaintiffs' due process, equal protection, and First Amendment claims; their takings claims for declaratory and injunctive relief; and their state claims,[25] except for their nuisance and Article 78 claims, and dismiss those constitutional and state law claims without prejudice, *see Vandor, Inc. v. Militello,* 301 F.3d 37, 38–39 (2d Cir.2002) (*per curiam* ) ("absent jurisdiction federal courts do not have the power to dismiss *with prejudice"* ) (emphasis in original) (internal quotation marks omitted); *Howard v. Koch,* 575 F.Supp. 1299, 1304 (S.D.N.Y.1982) (dismissing claims without prejudice on *Younger* abstention grounds); *but see Brims v. Ramapo Police Dep't,* No. 11–CV–712, 2011 WL 7101233, at *6 (S.D.N.Y. Dec.23, 2011) (dismissing with prejudice claim barred by *Younger* abstention); *Warburton v. Goord,* 14 F.Supp.2d 289, 297 (W.D.N.Y.1998) (dismissing with prejudice claims barred by *Younger* abstention and *Rooker–Feldman* doctrines).

[25] Plaintiffs have presented to the Appellate Term their arguments that the Tree Law is *ultra vires* and exceeds the authority granted to the Village in the New York Constitution and the General Municipal Law § 96–b. (*See* Ds' Supp. Ex. C, at 16–17, 20–23.) Accordingly, I abstain from exercising jurisdiction over these claims. In any event, as discussed below, I would decline to exercise supplemental jurisdiction over the state claims in the absence of surviving federal claims.

b. *Takings Claims*

Ripeness is a jurisdictional inquiry antecedent to a Court's ability to hear claims. *See Vandor,* 301 F.3d at 38. "The ripeness doctrine is especially important in land use and zoning disputes which are quintessential local issues that ... are properly left in the first instance to local bodies that are better equipped than federal courts to address and resolve such issues." *Caldarola v. Town of Smithtown,* No. 09–CV–272, 2010 WL 6442698, at *7 (E.D.N.Y. July 14, 2010) (report and recommendation, adopted in full, 2011 WL 1336574 (E.D.N.Y. Apr.4, 2011)) (internal quotation marks omitted). "[F]ederal takings claims are not ripe unless (1) the agency involved has reached a final decision and (2) the plaintiff has sought and has failed to receive adequate compensation through available state procedures." *Adrian v. Town of Yorktown,* 341 F. App'x 699, 700 (2d Cir.2009) (summary order) (citing *Williamson,* 473 U.S. at 190–95).

As to the first prong, before any land use dispute—whether brought as a takings, due process, equal protection, or to some extent a First Amendment claim—is ripe for review, Plaintiffs must satisfy the finality requirement of ripeness. *Lost Trail,* 289 F. App'x at 444; *Murphy v. New Milford Zoning Comm'n,* 402 F.3d 342, 348 (2d Cir.2005); *Caldarola,* 2010 WL 6442698, at *7. Under *Williamson,* "a claim that the application of government regulations effects a taking of a property interest is not ripe until the government entity charged with implementing the regulations has reached a final decision regarding the application of the regulations to the property at issue." *Williamson,* 473 U.S. at 186. Ripeness "reflects the judicial insistence that a federal court know precisely how a property owner may use his land before attempts are made to adjudicate the constitutionality of regulations purporting to limit such use."[26] *Murphy,* 402 F.3d at 349. As such, the finality requirement is not met if plaintiffs have not sought, for example, a variance or a waiver of the regulations. *See Williamson,* 473 U.S. at 193–94; *Murphy,* 402 F.3d at 348; *Rivendell Winery, LLC v. Town of New Paltz,* 725 F.Supp.2d 311, 318 (N.D.N.Y.2010). Plaintiffs need not, however, apply for a variance or exception from the regulations if such action would be futile. *See Murphy,* 402 F.3d at 349. The futility exception applies only when the relevant agency "lacks discretion to grant variances or has dug in its heels and made clear that all such applications will be denied." *Id.* "[M]ere doubt" that variance applications will be denied is insufficient to invoke the futility exception. *Rivendell Winery,* 725 F.Supp.2d at 319.

[26]     The Second Circuit's explanation of the underpinnings of the finality requirement is particularly apt here:
        Four considerations ... undergird [the finality

prong of the ripeness inquiry]. First, ... requiring a claimant to obtain a final decision from a local land use authority aids in the development of a full record. Second, ... only if a property owner has exhausted the variance process will a court know precisely how a regulation will be applied to a particular parcel. Third, a variance might provide the relief the property owner seeks without requiring judicial entanglement in constitutional disputes. Thus, requiring a meaningful variance application as a prerequisite to federal litigation enforces the long-standing principle that disputes should be decided on non-constitutional grounds whenever possible. Finally, ... courts have recognized that federalism principles also buttress the finality requirement. Requiring a property owner to obtain a final, definitive position from zoning authorities evinces the judiciary's appreciation that land use disputes are uniquely matters of local concern more aptly suited for local resolution.
*Murphy,* 402 F.3d at 348 (internal citations omitted).

**\*15** Plaintiffs appear to assert three variations of a takings claim. They allege that Defendants effected (1) "a *de facto* temporary taking of real property by preventing the reasonable removal of trees so that a homeowner can ... create a back yard," (SAC ¶ 89); (2) a permanent taking by "deeming trees located upon Plaintiffs' property as Village property which the Plaintiffs cannot use or remove without Village permission," (*id.* ¶ 91); and (3) a taking of Plaintiffs' Property without due process of law by taking money from Plaintiffs' mortgage lender in connection with the imposed consultant fees, (*id.* ¶ 94). I consider only the first two theories because Plaintiffs seek damages solely for a taking of their real property. (*See id.* at 25–26.) Similarly, to the extent these various theories encompass a facial challenge to the Tree Law (which is not clear from Plaintiffs' papers), (*see id* . ¶¶ 89, 92), because Plaintiffs appear to seek damages only in connection with the manner in which the Tree Law was applied to their Property, I abstain from considering any facial takings claims.

Plaintiffs' as-applied takings claim concerning the 2009 and 2010 Cuttings is not ripe because a final decision was not reached as to how the Tree Law would be applied to their land. More specifically, Plaintiffs did not avail themselves of the Village's process by which they could seek a retroactive exception to the Tree Law—a process I find sufficiently analogous to seeking a variance. *See Easton LLC v. Inc. Vill. of Muttontown,* No. 11–CV–4791, 2012 WL 1458211, at *6 (E.D.N.Y. Apr.27, 2012) (hardship exception, which allowed plaintiff to apply for exemption from subdivision

moratorium, akin to a variance); *cf. Murphy,* 402 F.3d at 353 ("[T]hrough the variance process local ... authorities function as 'flexible institutions; what they take with the one hand they may give back with the other.' ") (quoting *MacDonald, Sommer & Frates v. Yolo Cnty.,* 477 U.S. 340, 350, 106 S.Ct. 2561, 91 L.Ed.2d 285 (1986)).

In 2009, Plaintiffs cut down trees on their Property without a permit but did not challenge the enforcement of the Tree Law against them and instead chose to settle the matter. (*See* Marzolla Aff. Ex. D.) In 2010, they applied for a permit to cut more trees. (*Id.* Ex. E.) That permit was granted as to some of the trees, (*id.*), but Plaintiffs exceeded the limits imposed by the permit. After they were served with a Notice of Violation for excessive tree removal on August 17, 2010, Plaintiffs applied for a retroactive exception from the Tree Law pursuant to sections 176–6(B)(2) and 176–6(D) of the Tree Law.[27] (Ds' Supp. Ex. B, at 9 (Plaintiffs "sought to stay enforcement of the [Tree Law] violation by applying to the Planning Board for an exception ... for having exceeded the permitted approval for tree removal.").)[28] As part of the process for obtaining an exception, Plaintiffs attended a Planning Board meeting on September 14, 2010, at which Plaintiffs and the Planning Board agreed that as part of Plaintiffs' application, Plaintiffs would create a comprehensive tree remediation plan and survey with topographic information. (*Id* at 12–13.) The matter was then adjourned until the November 9, 2010 Planning Board meeting. (*Id.*) It appears—and Plaintiffs do not allege otherwise—that shortly thereafter, Plaintiffs abandoned their application for an exception by not appearing with the requested documents at the November 9th meeting. (*Id* at 13.) Thus, because there is no indication in the record that Plaintiffs fully pursued an exception to the Tree Law for the 2009 and 2010 Cuttings, their takings claim is not ripe. *See Kittay,* 112 F.Supp.2d at 349 (claim not ripe where plaintiff "failed to obtain a final ... decision concerning the applicability of the ... Regulations ... to its property and, in effect, invites th[e] Court to address important and potentially complex constitutional and regulatory issues in a vacuum"); *Hunter v. Town of Chili, N.Y.,* No. 09–CV–6285, 2010 WL 598679, at *2 (W.D.N.Y. Feb.18, 2010) (claim not ripe where plaintiff failed to allege that he undertook appeal of decision denying his request for fill permit pursuant to town regulations).[29]

[27] Section 176–6(B)(2) provides in relevant part: "In the case of removal without a permit, independent proof (such as a photograph, police report or arborist's certification) is required in accordance with § 176–6D, Exceptions, in order to obtain approval from the Planning Board excepting said person from the

regulations contained herein." General Code of the Village of Montebello, New York, Ch. 176, *available at* http:// www.ecode360.com/8769464.

Section 176–6(D) holds:

Exceptions. Upon written application to the Planning Board, and after payment of a permit fee set by the Board of Trustees by resolution, the Planning Board may, by resolution, grant an exception from any of the requirements of this chapter. The decision by the Planning Board shall be made within 30 days of receipt of the request or at the next regularly scheduled Planning Board meeting if not within 30 days. The Planning Board may grant such exceptions from the requirements of this chapter as may be reasonable and within the purposes and intent of this chapter if the enforcement of one or more of the provisions is impractical or will exact undue hardship because of peculiar conditions pertaining to the property in question but, in so granting, may require that a compensatory planting or compensatory payment be made. The Planning Board may also request the Village Engineer, Village Planner or other Village consultant to assist in evaluating such applications. The fees charged to the Village by all such consultants shall be paid by the applicant.

*Id.*

[28] The relevant facts regarding Plaintiffs' pursuit of an exception are taken from Defendants' submissions to the Appellate Term. Plaintiffs have not, however, either in their state or federal court papers, challenged these facts or indicated why their claims are ripe under the *Williamson* doctrine. In any event, even if I disregarded the undisputed statements in Defendants' brief to the Appellate Term, the record would still be devoid of any indication that Plaintiffs pursued the exception process to a final decision. Plaintiffs appear only to take issue with the cost involved in the Village's requirements for applying for an exception to the Tree Law, (*see* Ds' Supp. Ex. C, at 8 ("The 'remediation plan' and 'compensatory planting' provisions listed under § 176–7(C) and (D)—which are being required of Respondent Novie, notwithstanding the absence of any Justice Court conviction—impose substantial additional expense")), but the fact that seeking an exception or a variance to a land use law may be expensive does not relieve Plaintiffs from pursuing that process prior to bringing a federal lawsuit for a takings violation, *see Kittay v. Giuliani,* 112 F.Supp.2d 342, 350 (S.D.N.Y.2000) (rejecting argument that pursuing variance or approval would have been futile and noting that plaintiff may not "maintain an otherwise premature lawsuit on the grounds of financial hardship"), *aff'd* 252 F.3d 645 (2d Cir.2001) (*per curiam* ).

29    Nor have Plaintiffs demonstrated that pursuing that process would be futile. They point to no action by the Village that prevents the exception process from continuing.

**\*16** Further, even if a final decision was reached as to the use of Plaintiffs' Property, their takings claims are unripe under the second *Williamson* prong because Plaintiffs have not alleged that they availed themselves of state procedures that could provide them with adequate compensation. *See Williamson,* 473 U.S. at 194 ("The Fifth Amendment does not proscribe the taking of property; it proscribes the taking without just compensation."). "As long as the State has a 'reasonable, certain and adequate provision for obtaining compensation,' an aggrieved party must obtain recourse through that means before bringing a takings claim in federal court." *R–Goshen LLC v. Vill. of Goshen,* 289 F.Supp.2d 441, 449 (S.D.N.Y.2003) (quoting *Williamson,* 473 U.S. at 194). Indeed, New York has such procedures, *see Vandor,* 301 F.3d at 39 (takings claim unripe because plaintiff failed to bring Article 78 proceeding; "under New York State law, Article 78 is a form of proceeding available to compel public officials to comply with their responsibilities" and is "constitutionally sufficient"); *R–Goshen,* 289 F.Supp.2d at 449 (discussing provisions of New York State Constitution and Eminent Domain Procedure Law that would satisfy second *Williamson* prong),[30] but Plaintiffs failed to pursue them. Likewise, with regard to their challenges to the Consultant Fee Regulations, Section 65–6 of the Village Code[31] provides that Plaintiffs could have challenged the imposition of fees via an Article 78 proceeding, but Plaintiffs failed to avail themselves of that opportunity. Thus, Plaintiffs' takings claim would also fail under the second prong of the *Williamson* doctrine.

30    The New York State Constitution provides that "[p]rivate property shall not be taken for public use without just compensation ." N.Y. Const. art. I, § 7(a).

31    *See* General Code of the Village of Montebello, New York, Ch. 65, *available at* http://www.ecode360.com/8767126.

Accordingly, Plaintiffs' takings claim regarding the 2009 and 2010 Cuttings fails on ripeness grounds and is "dismissed without prejudice to refiling if and when Plaintiffs take the requisite actions necessary to make the claim ripe for review on the merits." *TZ Manor, LLC v.*

*Daines,* 815 F.Supp.2d 726, 735 (S.D.N.Y.2011); *see Country View Estates @ Ridge LLC v. Town of Brookhaven,* 452 F.Supp.2d 142, 144 (E.D.N.Y.2006) (dismissing claims without prejudice on ripeness grounds).[32]

32    While in some instances entering a stay of Plaintiffs' claims for monetary damages would be a proper course of action, *see Kirschner,* 225 F.3d at 238 ("The Supreme Court has declined to reach the issue whether *Younger* applies to claims for money damages, but has noted that even if it does, the federal suit should be stayed, rather than dismissed, if the money damages sought could not be obtained in the pending state proceeding, even if the money damages sought could be obtained in a separate state proceeding."); *Sorokin v. Dow Jones & Co. Inc.,* No. 11–CV–839, 2011 WL 1458592, at \*6 (S.D.N.Y. Apr.11, 2011) ("*Younger* abstention does not allow for the dismissal of a claim for money damages, although a stay for a damages claim may be appropriate, pending resolution of the state court proceeding."); *Rodgers v. Cartagena,* No. 10–CV–9285, 2011 WL 724680, at \*1 (S.D.N.Y. Feb.25, 2011) (staying claim for damages where proceeding with case in federal court would interfere with ongoing state proceeding; *Broadway 41st St. Realty Corp. v. N.Y. State Urban Dev. Corp.,* 733 F.Supp. 735, 744–45 (S.D.N.Y.1990) (abstaining under *Younger* from considering plaintiffs' takings claims and thus declining to "consider plaintiffs' requests for damages on the theory of the *de facto* takings doctrine," and "plac[ing] [*de facto* takings claims for monetary relief] on the suspense calendar pending completion of the state court ... proceedings"), but because Plaintiffs' takings claims are not ripe, I lack subject matter jurisdiction over these claims and therefore also lack grounds on which to enter a stay, *see Country View Estates,* 452 F.Supp.2d at 144 (dismissing unripe claims without prejudice rather than staying the case and explaining, "[i]f the case is not ripe, there is no subject matter jurisdiction, and thus no basis to issue a stay").

### c. State-law claims

Plaintiffs' remaining claims—their common law nuisance claim and Article 78 claim—were not explicitly raised in the state-court proceeding, and therefore I need not abstain from exercising jurisdiction over them. Nonetheless, the "traditional 'values of judicial economy, convenience, fairness, and comity' " weigh in favor of declining to exercise supplemental jurisdiction where all federal-law claims are eliminated before trial. *Kolari v. N.Y.-Presbyterian Hosp.,* 455 F.3d 118, 122 (2d Cir.2006) (quoting *Carnegie–Mellon Univ. v. Cohill,* 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988)). Having

determined that all of the claims over which this Court has original jurisdiction should be dismissed, I decline to exercise supplemental jurisdiction over Plaintiffs' remaining state-law causes of action. *See id.* (citing 28 U.S.C. § 1367(c) (3)).[33] Accordingly, these claims are dismissed without prejudice.

[33]     I cannot in any event exercise jurisdiction over Plaintiffs' Article 78 claim. *See Bender v. City of N.Y., No. 09–CV–3286, 2011 WL 4344203, at \*10 (S.D.N.Y. Sept.14, 2011)* (Article 78 proceedings "must be brought in the supreme court of the relevant county [of New York]. Federal courts lack jurisdiction to hear such claims."); *Blatch ex rel. Clay v. Hernandez, 360 F.Supp.2d 595, 637 (S.D.N.Y.2005)* ("New York State has not empowered the federal courts to consider [Article 78] claims.").

## IV. *Conclusion*

**\*17** For the foregoing reasons, Plaintiffs' Motion for Leave to Amend is GRANTED IN PART and DENIED IN PART, and Defendants' Motion to Dismiss is GRANTED. All of Plaintiffs' claims are dismissed without prejudice. The Clerk of Court is respectfully directed to terminate the pending Motions, (Docs.16, 39, 48–50), and close the case.

**SO ORDERED.**

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 3542222

---

© 2017 Thomson Reuters. No claim to original U.S. Government Works.